UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 23-1508
_____

_____

UNITED STATES,
Appellee,

v.

DANA A. PULLMAN,
Defendant-Appellant.

_____

ON APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

BRIEF OF DEFENDANT-APPELLANT
DANA A. PULLMAN
_____

Judith Mizner
Assistant Federal Public Defender
Federal Defender Office
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No.:  11056

# TABLE OF CONTENTS

<u>Page</u>

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

Jurisdictional Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Issues Presented for Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    A.  The Charges Against Dana Pullman. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.  Pullman's Work for SPAM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    C.  The DOL Grievance and its Settlement. . . . . . . . . . . . . . . . . . . . . . . . . . .6

    D.  Mark43 Inc.'s Relationship With Pullman and Lynch. . . . . . . . . . . . . . . . . . 10

    E.  Taser's Relationship With Pullman and Lynch . . . . . . . . . . . . . . . . . . . . . . 13

    F.  Rafferty's Relationship With Pullman and Lynch . . . . . . . . . . . . . . . . . . . . . 16

    G.  Responses to the Grand Jury Subpoenas.. . . . . . . . . . . . . . . . . . . . . . . . . 16

    H.  The Trial, Verdict, Post-Verdict Rulings and Sentence. . . . . . . . . . . . . . . . . 18

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

I.  The Evidence Was Insufficient to Support the Wire Fraud
    Convictions as Charged in Counts III-V. . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
.

Page

  A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

  B. The Evidence Was Insufficient to Establish Wire Fraud
   as to Mark43 (count III). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

   1. The Evidence Was Insufficient to Establish a Scheme
    to Defraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

   2. Any Omission Was Not Material. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

   3. The Evidence Failed to Establish Pullman's Intent to Defraud. . . . . . . . . .33

  C.  The Evidence Was Insufficient to Establish Wire Fraud
   as to Taser (counts IV and V) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

II.  The Evidence Was Insufficient to Establish Honest Services Fraud
  As Charged in (Count II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 36

  A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

  B. Honest Services Fraud is Limited to Bribery and Kickback
   Schemes to Defraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

   1. Lynch Associates' Work on and Payment for the DOL Project,
    and a Payment to Pullman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

   2.  The Evidence Failed to Establish a Quid Pro Quo Bribe
    Or an Illegal Kickback. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

   3.  The Evidence Failed to Establish a Scheme to Defraud
    the Alleged Victims of Pullman's Honest Services. . . . . . . . . . . . . . . . . . .45

III.  Pullman's Questions to Daly and Lynch's Call to Kesten
  Were Insufficient to Establish Obstruction of the Grand Jury
  Investigation of SPAM and Others as Charged in Count VIII. . . . . . . . . . . . . 46

  A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

Page

    B. The Evidence Was Insufficient to Establish Either the
       Intent or the Endeavor Required to Establish Obstruction. . . . . . . . . . . . . . 46

IV. The Evidence Was Insufficient to Establish the RICO
    Conspiracy Charged in Count I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

    A. Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

    B. The Evidence Was Insufficient to Establish a
       "Pattern" of Racketeering Activity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

V. The Evidence Was Insufficient to Establish That Pullman
   Conspired With Lynch to Defraud the United States
   for the Purpose of Impeding the IRS in the Collection
   of Federal Income Taxes as Charged in Count X. . . . . . . . . . . . . . . . . . . . . .52

    A. Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

    B. The Evidence Was Insufficient to Establish the Agreement
       Alleged in the Indictment or Pullman's Willful Joinder
       in That Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

VI. The District Court's Instructions on Fiduciary Duty in an
   Honest Services Wire Fraud Prosecution and its Failure
   to Instruct the Jury on When a Duty to Disclose Arises
   in a Wire Fraud Prosecution Require a New Trial. . . . . . . . . . . . . . . . . . . . . 53

    A. Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

    B. Pullman Did Not Owe a Fiduciary Duty to the Commonwealth. . . . . . . . . . 54

    C. The District Court's Honest Services Wire Fraud Instructions
       Erroneously Charged That Pullman Owed a Fiduciary Duty
       to the Commonwealth. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56

    D. Whether an Employee Owes a Fiduciary Duty to Their
       Employer is a Jury Question. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .60

Page

E.  The Court Below Erred in Rejecting the Defense Request
for Duty to Disclose Instructions in Connection with
the Mark43 and Taser Wire Fraud Charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65

ADDENDUM

Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Oral Ruling on Renewed Motion for Judgment of Acquittal or,
Alternatively, a New Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

# TABLE OF AUTHORITIES

<u>Case</u>                                                                                          <u>Page</u>

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Agero, Inc. v. Rubin,*
    88 Mass.App.Ct. 1104, 37 N.E.3d 688
     (Mass.App. 2015) (unpub) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Bonilla v. Volvo Car Corp.,*
    150 F.3d 62 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Braintree Laboratories, Inc. v. Bedrock Logistics, LLC,*
    2018 WL 4100040 (D. Mass. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . .55

*Chelsea Indus., Inc. v. Gaffney,*
    389 Mass. 1, 449 N.E.2d 320 (1983). . . . . . . . . . . . . . . . . . . . . . . . . .54

*Ciminelli v. United States,*
    143 S.Ct. 1121 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

*Griffin v. United States,*
    502 U.S. 46 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .60

*H.J. Inc. v. Northwestern Bell Telephone Co.,*
    492 U.S. 229 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Kelly v. United States,*
    140 S.Ct. 1565 (2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . 25, 33, 45

*Koch Acton, Inc. v. Benjamin Koller et al.,*
    2024 WL 1093001 (D. Mass. Mar. 13, 2024) . . . . . . . . . . . . . . . . . . . 54, 55

<u>Case</u>                                                                                          Page

*McNally v. United States,*
     483 U.S. 350 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37, 42

*Neder v. United States,*
     527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Orkin Extermination Co., Inc. v Rathje,*
     72 F.3d 206 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 54

*Percoco v. United States,*
     143 S.Ct. 1130 (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

*Sanchez v. Triple-S Management, Corp.,*
     492 F.3d 1 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..28

*Skilling v. United States,*
     561 U.S. 358 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . .37, 42, 44, 45, 54, 59

*Talentburst, Inc. v. Collabera, Inc.,*
     567 F.Supp.2d 261 (D.Mass. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29, 55

*TSC Industries, Inc. v. Northway, Inc.,*
     426 U.S. 438 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ... . . . . .30

*United States v. Abdelaziz,*
     68 F.4th 1 (1st Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37, 60

*United States v. Aguilar,*
     515 U.S. 593 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

*United States v. Argentine,*
     814 F.2d 783 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

*United States v. Baird,*
     712 F.3d 623 (1st Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 63

<u>Case</u>                                                                                          <u>Page</u>

*United States v. Cadden*,
    965 F.3d 1 (1st Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-30

*United States v. Cassiere,*
    4 F.3d 1006 (1st Cir 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

*United States v. Connolly,*
    504 F.3d 206 (1st Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

*United States v. Falcón-Nieves,*
    79 F.4th 116 (1st Cir. 2023). . . . . . . . . . . . . . . . . . . . . . . 24, 36, 46, 50, 52

*United States v. Fernandez,*
    722 F.3d 1 (1st Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41, 53, 59

*United States v. Frankhauser,*
    80 F.3d 641 (1st Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

*United States v. Guerrero-Narvaez,*
    29 F.4th 1 (1st Cir. 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Guzman-Ortiz,*
    975 F.3d 43 (1st Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

*United States v. McDonough,*
    727 F.3d 143 (1st Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

*United States v. Menendez-Montalvo,*
    88 F.4th 326 (1st Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

*United States v. Milovanovic,*
    678 F.3d 713 (9th Cir. 2012) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . .54, 61

*United States v. Mittelstaedt,*
    31 F.3d 1208 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30.

*United States v. Mubayyid,*
    658 F.3d 35 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Case                                                       Page

*United States v. Pina-Nieves,*
    59 F.4th 9 (1st Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

*United States v. Ramos-Baez,*
    86 F.4th 28 (1st Cir. 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Rivera-Santiago,*
    107 F.3d 960 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*United States v. Rodríguez-Martinez,*
    778 F.3d 367 (1st Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Sadler,*
    750 F.3d 585 (6th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31, 32

*United States v. Shellef,*
    507 F.3d 82 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26, 30, 32

*United States v. Sidoo,*
    468 F. Supp. 3d 428, (D. Mass. 2020), aff'd sub nom.
    *United States v. McGlashan*, 78 F.4th 1 (1st Cir. 2023). . . . . . . . . . . . . . . . . .54, 61

*United States v. Sun-Diamond Growers of California,*
    526 U.S. 398 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

*United States v. Takhalov,*
    827 F.3d 1307 (11th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 32, 45

*United States v. Tedesco,*
    635 F.2d 902 (1st Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States ex rel. Vavra v. Kellog Brown & Root, Inc.,*
    848 F.3d 366 (5th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

<u>Page</u>

<u>Statutes</u>

18 U.S.C.

§ 371...............................................................52

§ 1343.............................................................26

§ 1346.........................................................37, 44

§ 1503(a).........................................................46

§ 1961(1)..........................................................51

§ 1961(5).........................................................51

§ 1962(d).........................................................50

§ 3231.............................................................1

28 U.S.C.

§ 1291..............................................................1

## JURISDICTIONAL STATEMENT

Title 18 U.S.C. § 3231, granting exclusive jurisdiction over all offenses against the laws of the United States, conferred jurisdiction over this case on the district court. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291, which confers jurisdiction to review all final decisions of the district courts.

Judgment entered on June 13, 2023 and a timely notice of appeal was filed on June 14, 2023. Add.1; App.v.I:250.[1]

## ISSUES PRESENTED FOR REVIEW

1. Whether the court below erred in denying Pullman's motions for judgment of acquittal on wire fraud charges where the evidence was insufficient to establish that payments to Pullman were the product of a scheme or intent to defraud two companies who contracted with a firm Pullman recommended for lobbying services where there were no affirmative misrepresentations, no material omissions and no violation of a duty to disclose?

2. Whether the court below erred in denying Pullman's motions for judgment of acquittal on an honest services wire fraud charge where the evidence was insufficient to establish that a payment to Pullman from the firm hired to provide

---

[1] "App.v.#:#" refers to the volume and page numbers of the Joint Appendix. "Add." will refer to the addendum to this brief. "D.E..#:#" will refer to the number and page number of the district court docket entries.

services in connection with a settlement of a grievance against the Commonwealth was a quid pro quo bribe or illegal kickback?

3.  Whether the court below erred in denying Pullman's motions for judgment of acquittal on the charge of obstructing the administration of justice where the evidence was insufficient to establish the intent or endeavor to obstruct the grand jury?

4.  Whether the court below erred in denying Pullman's motions for judgment of acquittal on a RICO conspiracy charge where the evidence was insufficient to establish the agreement to commit the predicate acts charged because his conduct was not criminal?

5.  Whether the court below erred in denying Pullman's motions for judgment of acquittal on a tax conspiracy charge where the evidence was insufficient to establish the agreement charged or his knowing and voluntary participation in that agreement?

6.   Whether the court below erred in denying Pullman's motion for new trial where: 1) erroneous jury instructions permitted the jury to return verdict on an honest services wire fraud charge on a legally flawed theory that Pullman owed a fiduciary duty to the Commonwealth of Massachusetts; and 2) the court failed to provide an instruction requested by the defense that the failure to disclose information constituted a false or fraudulent misrepresentation in a wire fraud prosecution only where there was a duty to disclose that information?

## STATEMENT OF THE CASE

### A.  The Charges Against Dana Pullman

In 2019 Dana Pullman (Pullman), a Massachusetts State Police (MSP) trooper, and for six years president of the State Police Association of Massachusetts (SPAM), the State Police troopers' union, was charged, together with Anne Lynch (Lynch), with racketeering conspiracy and racketeering, wire fraud conspiracy and multiple counts of wire fraud, obstruction of justice, and tax offenses spanning the years 2012 to 2018. The substantive offenses allegedly occurred between 2014-2018. The charges stemmed primarily from his relationship with Lynch, a lobbyist and friend. The government alleged, *inter alia*, that Pullman received payments from her after engaging her firm to provide services for SPAM in connection with a grievance against the Commonwealth or recommending to two companies that they engage her firm to provide services as they sought government contracts. App.v.I:40-84.  SPAM was alleged to be the enterprise whose affairs were conducted through a pattern of racketeering activity.[2] App.v.I:57.

---

[2] Before the case was submitted to the jury, the government dismissed the substantive racketeering and wire fraud conspiracy charges (counts two and three of the superseding indictment). App.v.I:26; D.E.214. The Court re-numbered the counts sent to the jury for deliberation. App.v.I:109. This brief refers to the counts provided to the jury on the verdict form and in the redacted superseding indictment.

The racketeering conspiracy and four wire fraud charges focused on: 1) a union grievance against the Commonwealth of Massachusetts concerning failure to properly pay troopers called in to work on their days off (the days- off-lost (DOL)) negotiations (App.v.I:46-47,61-62,71); 2) a company's (Mark 43) efforts to sell/market software to the Commonwealth and local police organizations (App.v.I:49,63-64,72); 3) a company's (Taser) efforts to sell its weapons, body cameras, and other products to the MSP and other law enforcement organizations (App.v.I:51,65-66,73). Lynch Associates, the lobbying firm founded by Lynch and SPAM's lobbyist, also provided services to Mark43 and Taser. App.v.I:42-43,50-52. As to the union grievance, the government alleged Pullman had deprived SPAM and the Commonwealth of honest services and that a $20,000.00 check from Lynch to Pullman's wife was a bribe or kickback. App.v.I:47,61. As to the corporate projects, the government alleged that two $5,000.00 checks to Pullman, one from Lynch Associates and one from Lynch, were the product of a scheme to defraud.[3] App.v.I:75.

The obstruction of justice charge alleged that Pullman attempted to manipulate SPAM expense records subpoenaed by a grand jury. The tax counts alleged a conspiracy to defraud the United States and failure to report the money received from Lynch and Lynch Associates as income. App.v.I:77-84.

---

[3] Two wire fraud charges alleged Pullman obtained union reimbursement for personal expenses. App.v.I:74. Those charges were not predicate acts for the RICO conspiracy. App.v.V:342; .App.v.VI:36.

4

**B. Pullman's Work for SPAM**

SPAM is the bargaining unit or union for the troopers and sergeants of the MSP.App.II:55. The Executive Board (E-Board), consisting of troop representatives and the president, vice-president, treasurer, and secretary of the association[4] (App.v.II:57), manage the union activity, including contract bargaining, workplace safety issues, and addressing grievances. App.v.II:61. The bylaws provided that the president and E-board shared responsibility for general supervision and provided the president with discretion to conduct business activities on behalf of SPAM, including functions and parties for members and for goodwill for the union. App.v.II:81-83

After serving as treasurer, Dana Pullman was the president of SPAM from 2012 to 2018.App.v.II:122, 220. He was the face of the union for the public, members and management. Ap.v.II:81-83. Pullman increased attendance at SPAM's annual meetings and expanded its reach and national contacts, including bringing the National Trooper Coalition convention to Boston. App.v.II:91-94. He worked tirelessly for the union. App.v.II:167. During his tenure troopers received better contractual raises than before or after his tenure. App.II:209. Pullman also worked to benefit the State Police Benevolent Fund. App.II:94-96. The fund supports ill and injured members and families of fallen law enforcement officers.App.v.III:15-16.

---

[4] The president and treasurer were full-time positions. App.v.II:76.

Resolution of the days-off-lost (DOL) grievance against the Commonwealth was a major focus of Pullman's first years as president. App.v.II:157, 250; App.v.III:771-72. The settlement with the Commonwealth ultimately resulted in payment of $21,000,000.00 in direct payment to troopers and other benefits. App.v.III:14; App.v.IV:107,446.

## C. The DOL Grievance and its Settlement

The DOL grievance, which began in 2005 and was settled in 2014 (App.v.IV:105-106, 129-130; App.v.VII:8), concerned the practice of giving troopers a day off when they were called in on a day off, rather than paying them overtime for those days. App.v.II:197, 249. Records were kept on paper calendars. App.v.II:250. It was a priority for Pullman when he became president. He assembled a team, he obtained the paper calendars from MSP and individual troopers; he was involved in the negotiations. App.v.II:250, 266-267; App.v.III:74-78; App.v.IV:106. Resolution of the grievance involved reviewing trash bags full of eight years of paper calendars kept by each trooper to determine amounts owed (App.v.II:155-158; 250; App.v.III:74-78) and developing a formula for addressing missing records. App.v.IV:386, 452-454.

Lynch Associates, headed by Anne Lynch, was SPAM's lobbyist, engaging with legislators and the governor's office on SPAM's behalf. App.v.II:132, 173. Lynch was "[v]ery well informed, aggressive, smart, quick on her feet." App.v.V:250. The firm was hired prior to Pullman becoming president (App.v.II:164-165) and later also

provided public relations work App.v.III:41. It was hired to work on the DOL

grievance in addition to its regular work. App.v.II:140-141.

Pullman contacted Lynch about assisting in evaluating DOL issues.

App.v.IV:286. After an initial evaluation of a limited number of troopers' paper

calendars and a presentation to the E-Board Lynch Associates was hired to review all

of the DOL records. App.v.IV:286-287, 383-384. The initial fixed fee was

$200,000.00. App.v.IV:287; App.v.VII:27.[5]

At the time Lynch Associates  initially agreed to do the work the potential

settlement was estimated to be around $5,000,000.00. App.v.IV:383. After the initial

calendar review Peter D'Agostino (D'Agostino), Lynch's son who joined Lynch

Associates in 2011,  and was a lead on the project, estimated the total would be in the

neighborhood of $15,000,000.00. App.v.IV:281, 290, 384.

The project was labor intensive, encompassing organization and review of over

2,000 records provided in trash bags. App.v.IV:291, 389. SPAM provided temporary

workers and workspace. App.v.IV:387-388.   D'Agostino also developed a formula to

address missing records. App.v.IV:386-387, 452-454. That review produced a total

estimated settlement figure in the range of $20,000,000.00 in direct compensation to

troopers. App.v.IV:387.

---

[5]Andrew Daly (Daly), SPAM's treasurer, thought the fee was too high. App.v.II:252.
He provided Pullman with $25,000.00 checks for Lynch Associates' work on the
DOL project in June, July, and September 2013 and February 2014. There were no
invoices. App.v.III:260-261.

At some point Lynch requested additional money as the scope and detail for the project exceeded initial expectations. App.v.IV:293-294, 389-391, 393. An invoice prepared in December 2013 summarized the tasks and an estimation of the time spent as real-time hours had not been documented for what was a fixed fee contract. App.v.IV:294-295; App.v.VII:29. Pullman pushed back on the requested total of close to $500,000.00 at a meeting with D'Agostino and Lynch, rejecting D'Agostino's hourly rate because he was not an attorney. App.v.IV:295, 394-395. D'Agostino had no further conversations with Pullman about compensation but was told of an agreement for an additional $150,000.00 around December 2023. App.v.IV:398. He did not believe there was any written contract or other documentation for the final agreement. App.v.IV:296-297, 399. He understood "pretty early on" that Lynch Associates would not get full payment until after the Commonwealth reimbursed SPAM for their expenses. App.v.IV:299.

Lynch Associates continued working on the DOL settlement after December 2013 but received no payment beyond the renegotiated $350,000.00. App.v.IV:448-49. D'Agostino participated in meetings with SPAM to explain the settlement with the Commonwealth to the membership. App.v.IV:297, 401; App.v.II:269-270.

John Langan, the director of the Office of Human Relations within the Administration and Finance secretariat and the Commonwealth's negotiator beginning in 2013, testified the Commonwealth settled because they felt they had liability. App.v.IV:103, 105-107. He testified D'Agostino was at negotiation meetings

8

and was "extremely helpful" in reaching settlement. App.v.IV:146. He did a very good job representing the union's arguments and developed the mathematical formula, accepted by the Commonwealth, used to estimate the settlement amount. App.v.IV:146-147. Lynch was "intimately involved" in coming up with the figures. App.v.IV:146.

Negotiations included not only the payments to troopers, which totaled approximately $21,000,000.00 paid directly to troopers (App.v.IV:107) and another $9,000,000.00 in days credited to troopers, but also payment of half of SPAM's expenses. App.v.III:14; App.v.IV:446, 147. The grievance was finally settled in August 2014. App.v.VII:8-15.

Maydad Cohen, deputy chief of staff for governor Patrick, first met with Pullman concerning the DOL grievance in 2012 and met more often as the case moved closer to settlement. Lynch was often with Pullman. App.v.IV:153-157. Cohen confirmed that determining the money owed each trooper was an extensive, very paper intensive process and that reimbursement for that work was a sticking point. App.v.IV:158, 165. Ultimately the Commonwealth agreed to pay half of the $700,000.00 SPAM requested. App.v.IV:158-159. Edward Hunter, SPAM's secretary, understood the $350,000.00 in SPAM reimbursement was for the DOL work Lynch did. App.v.II:146.

D'Agostino did not recall Pullman indicating he was going to get $20,000.00 from Lynch. App.v.IV:298. While he did not recall the exact conversation, he

construed a conversation with Lynch after the DOL settlement as indicating that Pullman wanted a check for himself. App.v.IV: 301, 426. D'Agostino was not aware of any legitimate reason for the check. App.v.IV:302. SPAM deposited the reimbursement check from the Commonwealth on October 27, 2014. 6:170. Daly testified that Pullman came to him on November 5, 2014 and told him to write a check to Lynch Associates for $250,000.00 for final payment on the DOL project. When Daly responded it seemed like too much money, Pullman banged on the desk and angrily demanded the check. Daly gave it to him. App.v.II:274-276. [6] A November 10, 2014 check for $50,000.00, classified as a consulting payment to Mel Pullman in Lynch Associates' general ledger, was a handwritten check payable to Anne Lynch. App.v.IV:314, 317; App.v.VII:34. Lynch wrote a check for $20,000.00 payable to Melissa Pullman, Pullman's wife, the following day.[7] App.v.VII:35.

## D. Mark43 Inc.'s Relationship With Pullman and Lynch

Mark43 builds software for law enforcement. An outgrowth of a college class project examining MSP data collection in Springfield, the company began in 2013 with a prototype of a Records Management system (RMS) and a plan to build a 911 Computer-Aided Dispatch system (CAD). App.v.III:215-217. In 2014 Scott Crouch,

---

[6] While Daly testified that Hunter was outside his office when Pullman demanded the check for Lynch Associates, Hunter was not in the office that day. App.v.III:171-174.

[7] Neither D'Agostino nor Daly had seen her working on the DOL project. App.v.IV:293; App.v.II:257.

one of Mark43's founders and owners, and his partners were looking for inroads into law enforcement stakeholders in Massachusetts to advance their product App.v.III:241-242, 244-245, 252-253. Jeff Gordon, a trooper who had worked with the class, suggested the State Police union, as its members would be using the system and buy-in from the union would be important. App.v.III:252-254. Crouch followed up; unions could be advocates for, or blockers of, new software. App.v.III:218.

Crouch and his co-founder met with Pullman and Gordon in the summer of 2014 to discuss and demonstrate their product. App.v.III:218-219. The meeting went well. App.v.III:258-259. Crouch described Pullman as excited about the product. App.v.III:220. Pullman recommended Lynch Associates and Anne Lynch as a consulting firm that was well-connected and could be helpful throughout the State Police procurement process. *Id.* After the meeting Crouch emailed Pullman asking for advice on next steps; he had no experience with procurement or bids. App.v.III:260-261. Pullman responded to Crouch that Lynch should be contacting him. App.vVII:38. Pullman had no further contact with Crouch. App.v.III:262. Crouch viewed the relationship between Pullman and Lynch as a referral; "they knew each other in their work." App.v.III:233. While he had not been told Lynch Associates represented SPAM as a lobbyist, that was not important to him. App.v.III:220, 227, 279-280.

Following emails with Lynch and the provision of the Commonwealth's Request for Response (RFR) for state police software, Crouch met with Lynch and

D'Agostino in the SPAM offices in August 2014 and discussed Lynch Associates
assisting in putting together a response to the Commonwealth for Mark43 within a
limited timeframe. App.vVII:39, 41; App.v.III:224-228; App.v.IV:319-320. After
further discussion Mark43 entered into an agreement for Lynch Associates to work
with the company in responding to the Commonwealth's RFR for a fee of $20,000.
App.v.III:228-229, 231-234; App.v.VII:43. Pullman did not participate in Mark43's
decision to hire Lynch Associates or the setting of their fee. App.v.III:263.

The contract term was August 12-August 31, 2014. 7:33; 10:160. D'Agostino
testified that the $20,000.00 fee was a fair price for the concentrated services required.
App.v.IV:444.[8] Crouch did not question or negotiate over the fee. App.v.III:272. He
did not ask how Lynch Associates' fee would be spent. App.v.III:275-276. He testified
that while the State Police ultimately made no decision on the responses, at the time
he felt Lynch Associates' assistance was meaningful. App.v.III:236, 279.

Pullman received a $5,000.00 check from Lynch associates on August 20, 2014.
App.v.IV:325. While D'Agostino was aware that that Pullman received the check he
did not recall a conversation with Lynch about it; it could have been a referral fee.
App.v.IV:324, 444-445.

Crouch testified that neither Lynch nor Pullman told him that Pullman received
$5,000 from Lynch Associates and Mark43 would not have hired Lynch Associates

---

[8] Lynch priced the contract. App.v.IV:323. At that time D'Agostino did not know that
Pullman would receive payment. App.v.IV:467.

had he known that because "[i]t seems like inappropriate behavior." App.v.III:237, 282.

**E. Taser's Relationship With Pullman and Lynch**

Mark Swenson was a New England sales representative for Taser, a company selling conductive energy weapons, a less lethal type of weapon commonly known as tasers. App.v.III:426-427, 454. He received a call from either Pullman or Daly in the spring of 2015 asking to meet about obtaining tasers for MSP troopers. App.v.III:429, 461-462. This was an important call as MSP was a large agency and the union was powerful. App.v.III:429-430. Prior to that time the state police had purchased only a few tasers for the STOP Team (a SWAT-type team). App.v.III:457. Swenson was also looking at making the case for body cameras as this was an area the company was trying to grow. App.v.III:462-464, 480.

On April 9, 2015 he met at the SPAM office with Pullman, Daly and Steve Wohlgemuth, the trooper who handled the taser training for the State Police. App.v.III:432-433, 435, 464. Swenson pitched tasers, body cameras, and the Officers Safety Program combining tasers, body cameras and video storage. App.v.III:479-480. They discussed a purchase of a package of approximately $7,000,000.00. App.v.III:436; App.v.IV:14. Pullman asked if Taser used a consultant and mentioned Lynch Associates as a great consultant SPAM used. App.v.III:437-438, 488-489. [9]

---

[9] Swenson told Pullman Taser used Rasky as a consultant. Rasky was a Massachusetts lobbyist with relationships with the Boston police and state house representatives

Swenson felt that if the union recommended Lynch Associates it might be good to use them. App.v.III:438, 486-487, 489. He reported to his bosses that the meeting went well and that it might be good to hire Lynch Associates because of their union relationship. App.v.III:4390440; App.v.IV:42.

Swenson followed up the meeting with emails to Pullman and Daly containing requested information and quotes for the tasers and the officer safety plan. App.v.III:440-441, 498-500. He recalled no response. App.v.III:440-441.

At some point Pullman called about his participation in a new body-worn camera committee. App.v.III:442-443. They set up a meeting for mid-May; Pullman cancelled on the scheduled date. Swenson got no response from Pullman after that. App.v.III:443-444. Eventually he discussed hiring Lynch Associates as a way of getting through to Pullman.[10] App.v.III:445-446. In late May Taser had conversations with Lynch Associates about hiring the firm. App.v.III:513-514. There were discussions in August. App.v.III:516-517. On August 31, 2015 D'Agostino scheduled a meeting with Isaiah Fields, the legal service and governmental affairs director at Taser. App.v.VII:59. A contract was signed on October 1, 2015. While Taser first

---

hired by Taser to work on the Boston police body camera pilot program App.v.III:427-428, 483-484.

[10] In emails to both Pullman and Daly in April Swenson had offered to meet with Lynch; he recalled no response to those emails. App.v.III:495-496, 505-506. Nor did Pullman say he wanted Lynch at the meeting scheduled for mid-May. App.v.III:507-508.

spoke with Lynch concerning the large-scale sale of tasers to the MSP, the October 1, 2015 contract was broader in scope, providing for a monthly retainer for lobbying and relationship-building relating to all matters concerning the Commonwealth's use of Taser's products. App.v.IV:408-411; App.v.VII:66-67.  Swenson was not involved in the negotiations. App.v.III:522; App.v.IV:38-39.

D'Agostino was Swenson's main contact at Lynch Associates. App.v.III:446; App.v.IV:330. D'Agostino testified they began working for Taser before the retainer agreement was signed. App.v.IV:407. Swenson, D'Agostino and others worked on presentations and unsuccessful efforts to obtain statehouse funding for the tasers. App.v.III:447-448, 526-528,531; App.v.IV:33-34; App.v.IV:457.

Swenson was also trying to sell tasers to the Massachusetts Department of Corrections (DOC) in 2015-2016, sending emails and trying to set up meetings. App.v.III:448-449. D'Agostino suggested that Pullman could contact Thomas Turco, the DOC commissioner, for a meeting. App.v.III:449; App.v.IV:330-332. Although Swenson had previously met Turco, he agreed; an extra touch point was good. D'Agostino arranged the meeting, attended by Swenson and his boss, Turco, and D'Agostino on February 11, 2016. Swenson followed up; DOC purchased tasers in April 2016; D'Agostino worked on that project. App.v.III:449-451; App.v.IV:8, 418-419; App.v.VII:63. Lynch Associates received no additional money from that project. App.v.IV:419.

Pullman received a $5,000.00 check from Lynch on February 22, 2016. App.v.VII:69. Swenson was not told Pullman was going to receive money from Lynch Associates in connection with Taser's retaining the firm and would not have recommended Taser hire Lynch had he known. App.v.III:451-452.  "I would have had red flags flying all over the place just saying this doesn't seem right. Integrity— just doesn't seem right to me." App.v.III:452.

**F.  Rafferty's Relationship With Pullman and Lynch**

The government also presented evidence concerning Richard Rafferty's efforts to open a marijuana establishment, his retaining Lynch Associates to assist in that endeavor, Pullman's potential employment by Rafferty as head of security after his retirement, and two checks to Pullman's wife from Lynch. App.v.IV:185-196, 209-223; App.v.VIII:137. These interactions were not charged as substantive offenses and the government did not argue they were fraudulent. App.v.VI:22. They were not the subject of any predicate acts on the verdict form provided to the jury. App.v.I:226-227.

**G. Responses to the Grand Jury Subpoenas[11]**

In July, August, and September 2018 SPAM received federal grand jury subpoenas requesting various financial records. While the August subpoena did not

---

[11]  The government based the obstruction charge on Pullman's conversation with Daly the day before Pullman resigned and Kesten's testimony addressing his conversations with Pullman and Lynch concerning receipts. App.v.V:344.

call for expense reimbursement records, Daly believed that such a request would be forthcoming and began to look for those records. He found two years (2016 and 2018) in his desk where he thought they would be; 2014, 2015, and 2017 were missing. App.v.II:336-337. He thought they might have been misplaced or lost during the office move. App.v.II:338. When he told Pullman that he couldn't find those records and was going to have to tell the government that he lost or misplaced them in the move Pullman asked "[c]an't we just tell them we have an internal policy to destroy them after a year?" App.v.II:338-339. Daly responded he didn't think that was an option. App.v.II:339. The September subpoena requested, *inter alia*, expense reimbursement records. Daly knew that expense records from 2014, 2015 and 2017 were missing.  Pullman had not submitted receipts since 2016. After receipt of the subpoena he submitted some receipts for 2018. App.v.II:339-344. The day before Pullman resigned he asked Daly "[a]re you sure we can't just tell them that we have an internal policy to keep them for a year and then destroy them?" Daly responded they could not; it would probably be obstruction. App.v.II:345.

On an unknown date after receipt of the September subpoena, Pullman called Attorney Leonard Kesten, the SPAM attorney responding to the subpoena, asking him to speak with Lynch. App.v.V:56. Kesten then received a phone call from Lynch asking if he "would delay the production of the documents contained in the subpoena because she was looking, or she, they, were still looking for receipts." App.v.V:56-57. While he took Lynch's request to mean "that [Kesten] should hold off so that receipts

or something, documentation of expenses could be put into the documents before

[Kesten] sent them to the U.S. Attorney," Lynch never actually asked him to do so.

App.v.V:57, 65, 81. FBI Agent Lemanski testified that "[r]olling productions are very

common in these cases." App.v.V:227. And Kesten testified that had Pullman been

able to find receipts not previously submitted to Daly he would have provided them

to the government, advising that they had not been in the records but had now been

located. App.v.V:78'

## H.  The Trial, Verdict, Post-Verdict Rulings and Sentence

A twenty-day trial before District Judge Woodlock and a jury began on

September 28, 2022. App.v.I:23. Jury instructions will be discussed in Argument VI.

The jury returned a verdict of guilty on November 3, 2022. Pullman was convicted on

all counts. App.v.I:225 et seq. He filed a renewed motion for judgment of acquittal or,

alternatively, for a new trial on November 16, 2022. App.v.I:245.

On May 10, 2023, prior to sentencing, the court denied Pullman's post-verdict

motion for judgment of acquittal or alternatively for a new trial. Add.9. The court

noted the interrelatedness of the charges and the possibility of doctrinal developments

in the fraud arena but concluded that no relief was warranted.

Pullman was sentenced to a term of thirty months imprisonment and three

years of supervised release and ordered to pay restitution. Judgment entered on June

13, 2023. Add.3. A notice of appeal was timely filed on June 14, 2023. App.v.I:250.

## SUMMARY OF ARGUMENT

From 2012 to 2018 Dana Pullman was the president of the State Police Association of Massachusetts, (SPAM), the union representing troopers. Anne Lynch was a lobbyist whose firm, Lynch Associates, had been hired by SPAM prior to Pullman's tenure as president.

Pullman recommended Lynch Associates as a well-connected firm that could be helpful in the state procurement process to two firms, Mark43 and Taser, who came to SPAM for support in selling their products to law enforcement in Massachusetts. Both firms entered into contracts with Lynch Associates. Pullman received two $5,000.00 checks from Lynch after those contracts had been signed. Neither Pullman nor Lynch told those firms that Pullman would be receiving money. Pullman and Lynch were charged with wire fraud in connection with those payments.

In addition, Pullman hired Lynch Associates for a fixed fee of $200,000.00 to assist the union in resolving a long-standing grievance against the Commonwealth concerning pay for troopers called in to work on their days off. During the settlement process Pullman and Lynch renegotiated the contract to $350,000.00 when it became apparent that the scope of work was much larger than originally contemplated. The Commonwealth ultimately settled that grievance for $21,000,000.00 in direct payments to troopers and other benefits, including reimbursement to SPAM of $350,000.00 for half of its costs incurred in pursuing the grievance. After SPAM received the reimbursement check and paid Lynch Associates, Pullman's wife received

a check for $20,000.00 from Lynch, a check the government alleged was a bribe or kickback in exchange for Pullman's contracting with Lynch Associates for $350,000. Pullman and Lynch were charged with honest services wire fraud in connection with that payment.

Pullman and Lynch were also charged with obstructing justice in connection with a grand jury subpoena issued to SPAM for records including expense records. The government alleged that they attempted to manipulate records to be produced in response to the subpoena.

Based on the wire fraud and obstruction charges Pullman and Lynch were charged with racketeering conspiracy.

Pullman moved for judgments of acquittal on the wire fraud counts involving Mark43 and Taser. Those motions should have been granted. Pullman recommended Lynch Associates to both firms. He did not participate in their negotiations with Lynch. Neither firm questioned the fee they agreed to or asked what Lynch Associates would be doing with its fee. Nor did they testify that they did not receive the contracted-for services.

The government maintained that Pullman's and Lynch's failure to disclose that Pullman would be receiving money from Lynch gave rise to a scheme to defraud by material false and fraudulent misrepresentations because a witness from Mark43 testified that the company would not have entered into a contract with Lynch Associates, and a witness from Taser testified he would not have recommended the

company enter into a contract with Lynch Associates, had they known that Pullman would receive money from Lynch.

The evidence at trial failed to establish a scheme to defraud. First, it failed to establish that at the time Pullman communicated with the firms before they contracted with Lynch he knew that he would be receiving money. Second, an omission constitutes a misrepresentation only if there was a duty to disclose. And here there was none. Pullman had no fiduciary relationship with either company. Moreover, the omission alleged here was not material as it did not go to the nature of the bargains or bear on the value of the transactions between the companies and Lynch Associates. There was, therefore, no scheme to defraud. Nor was there evidence of intent to defraud.

Pullman moved for a judgment of acquittal on the honest services wire fraud charge. It should have been granted. Honest services wire fraud is limited to bribery and kickback schemes to defraud. It does not include undisclosed self-dealing –acting to further an individual's own undisclosed financial interests while purportedly acting in the interest of those to whom he owes a fiduciary duty.

The government argued that the payment to Pullman's wife after Lynch Associates received its final payment for work on the DOL settlement was a kickback. However, there was no evidence that at or prior to the renegotiation of Lynch Associates' fee there had even been any discussion that Pullman would personally receive money in exchange for the contract with the firm. Nor did the evidence

21

support a finding that the payment was made or received to induce action not in the interests of SPAM or the Commonwealth rather than as a payment to cultivate a business relationship, express thanks, or even curry favor- the type of payment that is not sufficient to establish an illegal kickback. Absent evidence sufficient to support a finding of a kickback, the failure to disclose the payment to SPAM or the Commonwealth does not establish a scheme to defraud.

Both Pullman and Lynch were charged with obstruction of the grand jury investigation of SPAM when, after SPAM received a subpoena for its expense records, Pullman asked SPAM's treasurer if they could just tell the government SPAM had an internal policy of destroying such records after a year and Lynch called SPAM's attorney to ask if he could delay production because she or they were still looking for receipts. Both inquiries were answered in the negative; there was no pressure or follow-up to either. Even assuming, arguendo, sufficient evidence of intent to obstruct, the questions were insufficient to establish an endeavor. Pullman's motion for judgment of acquittal on this charge should have been granted.

Based on the wire fraud and obstruction charges Pullman and Lynch were charged with racketeering conspiracy. Because the evidence failed to establish that Pullman's conduct constituted wire fraud or obstruction, there are no predicate acts he agreed would be committed and his motion for judgment of acquittal on that charge should have been granted.

Both Pullman and Lynch were charged with a conspiracy to defraud the United States for the purpose of impeding the IRS in its collection of taxes based on the payments connected to the wire fraud counts. Conspiracy requires, *inter alia*, an agreement. There was no evidence of an agreement between them as to how either one would file their taxes. Absent evidence of agreement Pullman's motion for judgment of acquittal should have been granted.

A new trial is required because the district court erroneously instructed the jury in its charge on honest services fraud that Pullman owed a fiduciary duty to the Commonwealth. This allowed the jury to return a verdict on that count and on the RICO conspiracy count on a legally invalid theory, requiring reversal and a new trial. Moreover, in instructing the jury that Pullman was a public employee and that a public employee owes a fiduciary duty to his public employer the court erroneously took away the fact-based determination of the existence of a fiduciary duty from the jury. This, too, requires a new trial.

The alleged misrepresentations in the wire fraud charges related to Mark43 and Taser were omissions – the failure to disclose that Pullman was receiving money from Lynch. The court refused to give a requested defense instruction that a failure to disclose is false or fraudulent only if there is a duty to disclose. This requested instruction was supported by evidence in the record, was legally correct, was not covered by the charge given, and its omission impaired Pullman's ability to present his

defense. Accordingly a new trial is required on those counts and the related RICO conspiracy count.

## ARGUMENT

## I. The Evidence Was Insufficient to Support the Wire Fraud Convictions as Charged in Counts III-V

### A. Standard of Review

Pullman moved for judgment of acquittal on all counts at the close of the government's case, at the close of evidence and in a post-verdict motion for judgment of acquittal or alternatively a new trial. App.v.I:244, 245; App.v.V:501. This Court reviews a preserved challenge to the sufficiency of the evidence de novo. *United States v. Falcón-Nieves*, 79 F.4th 116, 123-24 (1st Cir. 2023). "In reviewing a sufficiency challenge, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* This Court "draw[s] all reasonable evidentiary and credibility inferences in favor of the verdict." *United States v. Rodríguez-Martinez*, 778 F.3d 367, 371 (1st Cir. 2015). It "must 'reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" *Id..* It may not "'stack inference upon inference in order to uphold the jury's verdict.'" *United States v. Guzman-Ortiz*, 975 F.3d 43, 55 (1st Cir. 2020). Sufficiency cannot depend "either on speculative inferential leaps or the stacking of inference upon inference." *United States v. Pina-Nieves*, 59 F.4th 9, 15 (1st Cir. 2023).

24

"'[I]f the evidence, when viewed in the light most favorable to the government, "gives equal or nearly equal circumstantial support" to theories of guilt and innocence, the convictions must be reversed.'" *United States v. Guerrero-Narvaez*, 29 F.4th 1, 9 (1st Cir. 2022).

## B. The Evidence Was Insufficient to Establish Wire Fraud as to Mark43 (count III)

The wire fraud statute, 18 U.S.C. § 1343, does not criminalize all "deception, corruption, abuse of power." *Kelly v. United States*, 140 S.Ct. 1565, 1568 (2020). It "prohibits only deceptive 'schemes to deprive [the victim of] money or property.'" *Id.* at 1571. And "that property must play more than some bit part in a scheme: It must be an 'object of the fraud.'" *Id.* at 1573.

A scheme to deceive is not equivalent to a scheme to defraud. *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016) (noting, *inter alia*, Congress's decision to use the phrase "scheme to defraud" rather than "scheme to deceive" in the wire fraud statute). A scheme to defraud requires an intent to use deception to cause injury or loss. *Id.* at 1313. There, nightclubs paid women to pose as tourists and lure visiting businessmen into the clubs. The women concealed their relationship to the club from the men they were inducing to patronize the clubs. The court held that this failure to disclose alone would not constitute a scheme to defraud and that the district court erred in refusing to so instruct the jury. The court explained that to constitute a scheme to defraud "refers only to those schemes in which a defendant lies about the

nature of the bargain itself." *Id.* at 1314. *See also United States v. Shellef*, 507 F.3d 82, 107-109 (2d Cir. 2007) (defendant's misrepresentation to seller concerning what he intended to do with product he purchased at full price did not constitute scheme to defraud within the meaning of the wire fraud statute; there was no misrepresentation of the nature of the bargain).

In *Ciminelli v. United States*, 143 S.Ct. 1121, 1128 (2023) the Court held that "[t]he right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest" required to establish wire fraud under 18 U.S.C. §1343. Ciminelli, the owner of a construction company paid a lobbyist annually to assist in obtaining state-funded jobs. The lobbyist and a member of the board of a nonprofit management corporation in charge of developing project proposals for state-funded development projects in upstate New York devised a scheme whereby the board member, without the knowledge of the board, tailored the bid process to effectively guarantee that Ciminelli would receive the contract. *Id.* at 1125. The Court stated that the theory that the deprivation of information that affected the "'assessment of the benefits or burdens of a transaction or relates to the quality of goods or services received or the economic risks of the transaction'" (at 1126) constituted wire fraud  "expands federal jurisdiction without statutory authorization" and by "treat[ing] mere information as the protected interest, almost any deceptive act could be a criminal act." at 1128.

Accordingly, the wire fraud charge as to Mark 43 required the government to prove, beyond a reasonable doubt, a scheme to defraud by material false fraudulent pretenses, representations or promises with the object of obtaining money or property from Mark43; Pullman's knowing and willful participation in the scheme with the intent to defraud; and the use of the wires. As set forth below, it did not.

The charge rested on evidence that Lynch, without her or Pullman telling Mark43 that she would do so, gave Pullman $5,000 after Lynch Associates provided contracted-for services to Mark43, and testimony from Crouch that Mark43 would not have entered into a contract with Lynch Associates had it known Pullman was to receive money from Lynch. App.v.IV:325; App.v.III:237, 282. There was no testimony that Pullman had requested payment from Lynch in connection with the contract; no testimony that Pullman and Lynch had discussed payment prior to Lynch Associates contracting with Mark43; no testimony that Mark43 overpaid for, or did not receive, the contracted-for services from Lynch Associates; and no testimony that Pullman pressured Mark43 to retain Lynch Associates. There was testimony that referral fees were not uncommon in the lobbying industry. App.v.V:449.

## 1. The Evidence Was Insufficient to Establish a Scheme to Defraud

There were no false or fraudulent pretenses, representations or promises here. Mark43 wanted union support as it was looking for inroads into law enforcement to advance its products. Crouch described Pullman as enthusiastic at their meeting. He suggested Lynch Associates and Anne Lynch as well-connected consultants who

could be helpful to Mark43 through the Massachusetts police procurement process. App.v.III:220. There was no evidence that Pullman's descriptions of Lynch Associates were false. When Crouch emailed Pullman the following day asking for advice on next steps Pullman responded that Lynch would be calling.App.v.VII:38. Pullman had no further contact with Mark43. He did not participate in their discussions with Lynch Associates. App.v.III:262.

While an omission of material information can be a misrepresentation, the omission alleged here -- the failure to disclose to Mark43 that Pullman would receive $5,000.00 from Lynch, argued to be a kickback connected to Mark43's contract with Lynch -- was not. First, there was no evidence that at the time of his last communication with Mark43 Pullman knew he would be getting money from Lynch. There was no evidence of a pre-arrangement that Pullman would receive money if Lynch Associates entered into a contract. Without knowledge of future payment his failure to mention such payment could not have been an omission.

Second, an omission violates the wire fraud statute only where there is a duty to disclose. Even if the omission here was material – and, as argued below, it was not - failing to disclose a material fact is only fraudulent if the individual in question had a duty to make such a disclosure and failed to make the disclosure with the specific intent to defraud. *See Sanchez v. Triple-S Management, Corp.*, 492 F.3d 1,10 (1st Cir. 2007) ("A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes."); *United States v. Cassiere,* 4 F.3d 1006,

1022 (1st Cir 1993); *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 75 (1st Cir. 1998)

("A…wire fraud conviction usually cannot result from a failure to disclose unless the

defendant was *aware* of its duty to disclose.")

A duty to disclose arises from a fiduciary relationship or relationship of trust

and confidence. *See Orkin Extermination Co., Inc. v Rathje*, 72 F.3d 206, 207 (1st Cir.

1995) ("Under Massachusetts law, '[e]mployees occupying positions of trust and

confidence owe a duty of loyalty to their employer…'"); *Talentburst, Inc. v. Collabera,*

*Inc.*, 567 F.Supp.2d 261, 266 (D.Mass. 2008) ("Massachusetts law makes clear that

only certain employees owe their employers a fiduciary duty of loyalty."). These

employees are those occupying positions of trust and confidence, including officers,

directors, executives and partners, but not rank and file employees, absent special

circumstances. *Id.* at 265-266. *See also Agero, Inc. v. Rubin*, 88 Mass.App.Ct. 1104, *5-*7,

37 N.E.3d 688 (Mass.App. 2015) (unpub). Here, Pullman had no relationship with

Mark43 giving rise to a duty to disclose. He held no position in the company, much

less one of trust and confidence.

### 2. Any Omission Was Not Material

In *Neder v. United States*, 527 U.S. 1, 25 (1999), the Court held that "materiality

of falsehood is an element of the federal…wire fraud statute[]" that must be

submitted to the jury. It stated that "[i]n general, a false statement is material if it has

'a natural tendency to influence, or [is] capable of influencing the decision of the

decisionmaking body to which it was addressed.'" *Id.* at 16. *See also United States v.*

*Cadden*, 965 F.3d 1, 12 (1st Cir. 2020). In discussing materiality in the context of

securities fraud the Court had previously stated that the determination of materiality

"requires delicate assessments of the inferences a 'reasonable shareholder' would draw

from a given set of facts…" *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450

(1976). *See also Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153-154

(1972) (defining material fact as one a reasonable investor might have considered

important in making a decision).

As the court explained in *United States v. Shellef*, 507 F.3d at 108, there is a

distinction between "schemes that do no more than cause their victims to enter into

transactions they would otherwise avoid – which do not violate the mail or wire fraud

statutes—and schemes that depend for their completion on a misrepresentation of an

essential element of the bargain—which do violate the mail and wire fraud statutes.".

To constitute fraud, the alleged scheme must be one in which the misrepresentation

went to the very nature of the bargain. *Id.*. This is the essence of materiality *See also*

*United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994) ("To be material, the

information withheld either must be of some independent value of must bear on the

ultimate value of the transaction.").

Notwithstanding Crouch's assertion that Mark43 would not have entered into a

contract with Lynch Associates had it known about a future payment to Pullman from

Lynch, the government failed to prove materiality beyond a reasonable doubt. *See*

7:36; 8:78; 9:42. The omission of that information did not bear on the value of the

30

transaction. Mark43 received exactly what it bargained for: the true effort of the

services of Lynch Associates. Mark43 retained Lynch Associates to assist in preparing

a response to the Commonwealth's RFR in a compressed period for a fee of

$20,000.00. Lynch Associates did just that. App.v.III:236, 280. Crouch testified that

he did not question or seek to negotiate the fee and did not ask how the fee would be

spent. He expressed no dissatisfaction with Lynch Associates' work and felt they

provided meaningful assistance. App.v.III:272, 275-176, 239, 279. When asked why he

would not have entered into the contract had he known Pullman would receive

money he did not say that Mark43 had overpaid for Lynch Associates' services or that

their services had been misrepresented; he said "it seems like inappropriate

behavior."App.v.III:237. His response had nothing to do with the value of the

transaction or a belief that the company had overpaid for Lynch Associates' services.

   The situation here is analogous to that in *United States v. Sadler*, 750 F.3d 585

(6th Cir. 2014) where defendant, owner and operator of a pain-management clinic,

was charged with, *inter alia*, conspiring to illegally distribute controlled substances and

wire fraud. The wire fraud charge was based on defendant's lying to pharmaceutical

distributors in ordering pills for the clinic by using a fake name on the drug orders and

falsely telling distributors that the drugs were being used to serve indigent patients.

The government first argued that defendant had deprived the drug distributors of

their pills. However, the evidence showed that defendant timely paid full price for all

the drugs purchased. Thus, the court found, there was no deprivation of property;

"paying the going rate for a product does not square with the conventional understanding of 'deprive.'" 750 F.3d at 590. The court continued: "[Defendant] may have had many unflattering motives in mind in buying the pills, but unfairly depriving the distributors of their property was not one of them." *Id.* The court then rejected the government' argument that defendant's lies convinced the distributors to sell drugs they would not have sold had they known the truth – a deprivation of the company's right to accurate information before selling the pills: "[T]he statute is 'limited in scope to the protection of '*property rights*,' and the ethereal right to accurate information doesn't fit that description." *Id.* at 590-591.

Here, as in *Sadler*, there was no evidence that Mark43 did not receive what it had purchased – Lynch Associates' services.  And here, as in *Sadler*, any deprivation of accurate information as to what Lynch Associates would do with its fee was not the deprivation of a property interest. *See also See Shellef*, 507 F.3d at 108; *Takhalov*, 827 F.3d at 1314 ("[E]ven if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims received exactly what they paid for.").

In sum, absent an affirmative misrepresentation or an omission of a material fact where there is a duty to disclose there is no scheme to defraud. Such was the case here.

### 3. The Evidence Failed to Establish Pullman's Intent to Defraud

The government also failed to prove Pullman's intent to defraud. Since there was no evidence that Lynch Associates was not a well-connected and well-performing firm, if Pullman did not know Lynch would be paying him at the time his communications with Mark 43 ended, there is no support for a finding of willful intent to defraud. Even assuming that Pullman did know he would be receiving money, that knowledge does not support a finding of willful intent to defraud. There was testimony that referral fees are not uncommon in the lobbying industry. App.v.V:49.   The salesman for Taser testified that if he were entering into a contract with a buyer he would not disclose his commission because it was not relevant to a buyer's decision. (App.v.IV:1415).Here, it is not reasonable to assume that Pullman would believe that what Lynch Associates did with their fee would affect Mark43's decision or that Pullman intended to defraud Mark43.

The wire fraud statute is not a general license for "the Federal Government . . . to enforce (its view of) integrity." *Kelly*, 140 S.Ct. at 1574. It requires proof beyond a reasonable doubt that the defendants charged engaged in a scheme not just to deceive, but to defraud, that the alleged misrepresentations or omissions were material (and, as to omissions, not disclosed where there was a duty to disclose), and that a defendant participated in the scheme with intent to defraud. The government has failed to prove those elements as to Pullman's interactions with respect to Mark43's contract with Lynch Associates. Judgment of acquittal should be ordered on Count III.

### C. The Evidence Was Insufficient to Establish Wire Fraud as to Taser (counts IV and V)

As with Mark43, the charge of wire fraud rested on evidence that Lynch, without her or Pullman telling the companies that she would do so, gave Pullman $5,000 after Lynch Associates provided contracted-for services to Taser,[12] and testimony from a Taser salesman that he would not have recommended the company contract with Lynch Associates had he known Pullman was to receive money from Lynch. App.v.VII:69; App.v.III:451. Again, there was no testimony that Pullman had requested payment in connection with the contract; no testimony that Pullman and Lynch had discussed payments prior to Lynch Associates contracting with Taser; no testimony that Taser overpaid for, or did not receive, the contracted-for services. no testimony that Pullman pressured Taser to retain Lynch Associates or participated in their contract negotiations.

While Taser first spoke with Lynch Associates concerning an ultimately unsuccessful large-scale sale of tasers to the MSP, it entered into a broader scope contract for representation relating to all matters concerning the Commonwealth's use of Taser's products (App.v.VII:66-67) and ultimately secured a deal with the Massachusetts Department of Corrections to buy weapons. App.v.IV:8, 33-35;

---

[12] Taser signed a contract with Lynch Associates on October 1, 2015; the $5,000.00 check the government alleged was a kickback to Pullman was dated February 22, 2016. App.v.IV:408; App.v.VII:69.

App.v.VII:63. Lynch Associates also pursued multiple avenues for full deployment of tasers to the State Police. App.v.IV: 8-9, 33- 34. This work fell squarely within the terms of the evolving agreement Taser and Lynch Associates reached in October 2015. App.v.IV:406-412.

Swenson testified he would not have recommended Taser retain Lynch Associates had payment to Pullman been known because "I would have had red flags flying all over the place just saying this doesn't seem right. Integrity –just doesn't seem right to me" (App.v.III:451-452), not because Taser felt it had overpaid for Lynch Associates' services. He did not testify that Lynch Associates failed to do the work bargained for in the respective contracts or that Lynch Associates was asked about, or made any representations concerning, the disposition of their fees.

For the reasons set out in connection with the wire fraud charge as to Mark43, *supra*, the evidence as to Taser failed to establish a scheme to defraud, a material omission, or Pullman's intent to defraud.

The lack of materiality of any failure by Pullman to inform Swenson that he would receive a payment from Lynch should Lynch Associates be retained is further illustrated by Swenson's testimony that in seeking to make a sale he would not disclose his commission to a customer because it was not relevant to a potential buyer's decision to make a purchase. App.v.IV:14-15. Similarly, what Lynch Associates chose to do with their fees would not be relevant to Taser.

Furthermore, even if a single sentence from a decisionmaker at Taser that they

would not have entered into these contracts had they known about a subsequent

payment from Lynch to Pullman could be sufficient to prove materiality beyond a

reasonable doubt, the evidence remains insufficient. Swenson was the only witness

from Taser to testify. However, he was not the decisionmaker at Taser. He testified

that "it wasn't [his] call" to hire Lynch Associates and that he was not involved in the

contract negotiations. App.v.IV:38-39. Accordingly, his testimony could not establish

what was material to Taser when it entered into the contract with Lynch Associates.

Just as with Mark43, the government has failed to prove the elements of wire

fraud as to Pullman's interactions with respect to Taser's contract with Lynch

Associates. Judgment of acquittal should be ordered on Counts IV-V.

## II. The Evidence Was Insufficient to Establish Honest Services Fraud as Charged in Count II

### A. Standard of Review

Pullman moved for judgment of acquittal on all counts at the close of the

government's case, at the close of evidence and in a post-verdict motion for judgment

of acquittal or alternatively a new trial. App.v.I:244, 245; App.v.V:501. This Court

reviews a preserved challenge to the sufficiency of the evidence de novo. *United States

v. Falcón-Nieves*, 79 F.4th 116, 123-24 (1st Cir. 2023). *See* Argument I.A. for further

discussion of standard of review.

**B. Honest Services Fraud is Limited to Bribery and Kickback
Schemes to Defraud**

In *Skilling v. United States*, 561 U.S. 358 (2010) the Court held that 18 U.S.C.

§ 1346, honest services fraud, "criminalizes *only* the bribery-and-kickback core of the

pre-*McNally*[13] case law." *Id.* at 409. It expressly rejected as a category of proscribed

conduct "'undisclosed self-dealing by a public official or private employee…' defined

by the government as 'the taking of official action by the employee that furthers his

own undisclosed financial interests while purporting to act in the interest of those to

whom he owes a fiduciary duty.'". *Id.* It noted that the inclusion of undisclosed self-

dealing in honest services fraud would raise due process concerns. *Id.* at 411 n.44.  *See*

*also Percoco v. United States*, 143 S.Ct. 1130, 1137 (2022) (reiterating that undisclosed

self-dealing is outside the scope of §1346); *United States v. Abdelaziz*, 68 F.4th 1 (1st

Cir. 2023) (holding government's honest services theory invalid as a matter of law

under *Skilling* where defendants were charged with honest services fraud arising from

their agreements with a third party, whom they paid with the understanding that their

payments were going to university accounts in exchange for  university employees

securing their children's admission as athletic recruits).

A violation of the honest services fraud statute, as charged, required proof

beyond a reasonable doubt that Pullman participated in a scheme to defraud SPAM,

its membership, and the Commonwealth of the intangible right to Pullman's honest

---

[13] *McNally v. United States*, 483 U.S. 350 (1987).

services through bribery or kickbacks. Here, the evidence failed to establish essential elements of this offense.

### 1. Lynch Associates' Work on and Payment for the DOL Project, and a Payment to Pullman

SPAM originally negotiated and agreed to pay Lynch Associates $200,000 for their work on the DOL project. App.v.IV:287; App.v.VII:27-28. By December 2013, it became clear the work required for the project was significantly greater than anticipated at the time of the original agreement. App.v.IV 293-294. MSP had provided its troopers' paper calendars in a disorganized and incomplete manner; additional calendars obtained from troopers had to be reviewed; the records contained a number of errors; missing records required development and application of a formula for determining the value of the grievance.App.v.IV:385-390, 452-454; App.v.III:72-78. Based on Lynch Associates' work the estimated value of the grievance increased from about $5,000,000.00 to $15,000,000.00 to $20,000,000.00. App.v.IV:383-384, 387.

Lynch Associates therefore sought to renegotiate its compensation, requesting a total of close to $500,000.00. App.v.VII:29. Pullman, as SPAM's president, agreed to renegotiate the original terms and reimburse Lynch Associates $350,000 for its work on the DOL project. App.v.IV:295-296, 398.[14] Following the completion of the DOL

---

[14] D'Agostino testified that the absence of a new written contract after the renegotiation was not unusual; it didn't "stand out" to him at all. App.v.IV:399.

settlement, SPAM received a $350,000 check from the Commonwealth in October 2014 as the negotiated reimbursement for one-half of SPAM's expenses in connection with the grievance. SPAM then paid Lynch Associates $250,000, the amount owing on the renegotiated terms of reimbursement of $350,000. App.v.III:170-171; App.v.VII:25.

No witness disputed that Lynch Associates did the labor-intensive work of organizing, compiling, analyzing, and tabulating years of trooper attendance calendars or that the work they did was thorough, accurate, and complete. App.v..III:75-76, 94; App.v.IV:146-147, 383-386, 388-390,446-448, 454-455. D'Agostino, on behalf of Lynch Associates, put in over a thousand hours of work on the project. *See* App.v.VII:29;11:49. Lynch had done similar work for a different bargaining unit's settlement with the Commonwealth.App.v.IV:103-104. Cohen, the governor's deputy chief of staff, testified that it was obvious from reviewing the materials in connection with the settlement negotiation around SPAM's costs that significant sums were due for this work. App.v.IV:158, 160-161. While Hunter, SPAM's secretary, testified that he would have preferred to retain a large accounting firm for the project (App.v.II:141), and Daly, SPAM's treasurer, testified that he questioned the cost(App.v.II:252), there was no evidence that a large accounting firm would have performed better or cost less.

Langan, the Commonwealth's negotiator, testified that Pullman showed him a document on SPAM letterhead outlining the expenses SPAM incurred in connection

with the DOL grievance totaling $705,000.00. App.v.IV:112.[15] It broke down expenses by category, including photocopying, office space, temporary employees, professional fees, and lobbying consultants and personnel. App.v.IV:136-137. Personnel related expenses listed in an unsigned outline of expenses totaled $637,793.94. App.v.VII:2. Office and supplies totaled $67,992.80. App.v.VII:3. While the union sought reimbursement of $705,000,00 the Commonwealth negotiated a 50-50 split. The $350,000.00 in reimbursement from the Commonwealth to SPAM in connection with the DOL settlement was to cover half of SPAM's expenses. App.v.IV:142. Thus the $350,000.00 payment to Lynch Associates would constitute half of SPAM's expenses.

Aside from Daly's unsupported belief that the agreement with Lynch Associates was too high at $200,000.00 (App.v.II:252), there was no testimony concerning the dollar value of the firm's work. The work was, however, integral to the settlement. Langan testified that D'Agostino developed the mathematical formula, accepted by the Commonwealth, used to estimate the settlement amount and was very good at representing the union's position in negotiations, and that Lynch was "intimately involved" in coming up with the figures. App.v.IV:146-147. In sum, there was a fair basis for SPAM using Lynch Associates to perform the work, and no basis from which to conclude the sum paid to Lynch Associates was unreasonable.

---

[15] Langan could not later find the document to provide to investigators. App.v.IV:112-113.

D'Agostino testified that on some unknown date after the DOL settlement he spoke to Lynch on the phone. App.v.IV:300-301. While he did not recall exactly what Lynch said to him or know what Pullman specifically said to Lynch, the connotation of that call was that Pullman had had "hit [Lynch] up for a check" for himself. App.v.IV:301, 426, 428. He remembered no other details about that call, and there was no other testimony about that conversation.

SPAM wrote a check to Lynch Associates for $250,000.00 on November 5, 2014 for final payment on the DOL project. App.v.II:274. Lynch wrote a check for $20,000.00 payable to Melissa Pullman, Pullman's wife on November 12, 2014. App.v.VII:35.

### 2. The Evidence Failed to Establish a Quid Pro Quo Bribe or an Illegal Kickback

A bribe requires a "specific intent to give or receive something of value *in exchange* for an official act" – a *quid pro quo*. *See United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404 (1999) (emphasis in original). The timing of the agreement is key: "one cannot agree to perform an act in exchange for payment when that act has already been performed." *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013). While the court's instructions addressed both bribes and kickbacks (App.v.VIA:345-346) the government argued only that Pullman's and Lynch's conduct in connection with the DOL settlement involved a kickback (App.v.VI:14-

15).[16]

In *Skilling* the Court described *McNally* as "present[ing] a paradigmatic kickback fact pattern" and a "classic kickback scheme." 561 U.S. at 407, 410. *McNally* described the following fact pattern:

> In 1975, the Wombell Insurance Company of Lexington, Kentucky (Wombwell), which since 1971 had acted as the Commonwealth's agent for securing a workmen's compensation policy, agreed with Hunt [chair of the state Democratic Party with de facto control over selection of insurance agencies from which the Commonwealth would purchase policies] that in exchange for a continued agency relationship it would share any resulting commissions in excess of $50,000 a year with other insurance agencies specified by him….
>
> From 1975 to 1979, Wombell funneled $851,000 in commissions to 21 separate insurance agencies designated by Hunt. Among the recipients of these payments was Seton Investments, Inc. (Seton), a company controlled by Hunt and petitioner Gray [ a public official in Kentucky from 1976-1979] and nominally owned and operated by petitioner McNally [a private individual].
>
> ….Prior to [Gray's] 1976 appointment, he and Hunt established Seton for the sole purpose of sharing in the commissions distributed by Wombell.

*McNally*, 483 U.S. at 352-353.

This "classic kickback scheme" also included a *quid pro quo* – money in exchange for a continued relationship with the Commonwealth.

If bribes and kickback require a *quid pro quo*, the evidence here failed to establish either. There was no evidence that at the time of the renegotiation of Lynch Associates' fee or at any prior time Pullman and Lynch reached, or even

---

[16] The government similarly described other payments to Pullman as kickbacks. App.v.VI:6-7, 32, 34.

discussed, an agreement that in exchange for the payment to Lynch Associates for their work on the DOL settlement Pullman would receive money personally. Rather, the only evidence of the circumstances of the check to Pullman's wife was D'Agostino's testimony concerning his phone call with Lynch on some unknown date after the DOL settlement, which he characterized as connoting that Pullman was hitting Lynch up for a check in some undisclosed amount, and the provision of the check after Lynch Associates received their final payment.. The "connotation" of the call may support an inference that Pullman was turning to his friend, Lynch, for money and the timing of the check suggests its provision at a time the money was available to Lynch. Neither the call nor the provision of a check are sufficient to support the conclusion of a bribe or kickback.

Even if an illegal kickback does not require a strict *quid pro quo*, the evidence remained insufficient to support conviction. It did not support a finding that the payment was made or received to induce action not in the interests of SPAM or the Commonwealth. A payment made to cultivate a business relationship, express gratitude, or curry favor is not sufficient to establish an illegal kickback, whether or not the circumstances around a payment are unsavory or even unethical. A legal gratuity is "something 'given to curry favor because of an official's position.'" *United States v. McDonough*, 727 F.3d 143, 157 (1st Cir. 2013). *See also*, *United States ex rel. Vavra v. Kellog Brown & Root, Inc.*, 848 F.3d 366, 378-379 (5th Cir. 2017) (illegal kickback "requires a pursuit of more than building better customer relations in the

43

abstract;" it "must be for 'action,' as opposed merely to developing more congenial feelings."). As the court below instructed: "it is not sufficient…that the thing of value is given as a gesture, to curry favor, to cultivate a friendship, or to express gratitude. A goodwill gesture given simply with the generalized hope or expectation of ultimate benefit on the part of the donor does not constitute a bribe or kickback." App.v.I:202.

Here, the evidence suggests, at most, the undisclosed self-dealing by a public official or private employee that *Skilling* held cannot provide the predicate for honest services fraud. 561 U.S. at 409, 411. Indeed, Langan testified that the reason he would not have recommended the DOL settlement had he known Pullman was receiving money for himself was that that would be self-dealing and "we can't engage in any self-dealing." App.v.IV:123. Whether or not self-dealing is proscribed by some other provision of law, it is not proscribed by 18 U.S.C. §1346.

In sum, taken in the light most favorable to the verdict, the evidence does not support beyond a reasonable doubt the government's theory that the payment from Lynch to Pullman's wife after the DOL settlement was an unlawful bribe or kickback. Without such evidence, a judgment of acquittal must be ordered on the honest services fraud conviction (Count II).

### 3. The Evidence Failed to Establish a Scheme to Defraud the Alleged Victims of Pullman's Honest Services

To sustain a conviction for honest services wire fraud, the government must prove, beyond a reasonable doubt, a scheme or artifice to defraud the alleged victim. *Skilling*, 561 U.S. at 368, 409-11; *Kelly v. United States*, 140 S.Ct. at 1573-74. A scheme to deceive by failing to disclose information is not equivalent to a scheme to defraud. *See e.g. United States v. Takhalov*, 827 F.3d at 1315-16 (reversing wire fraud convictions for failing to give defendant's proposed jury instruction that said, "[f]ailure to disclose the financial arrangement . . . , [is] not in and of itself, sufficient to convict …").

The evidence showed that several months after the DOL settlement with the Commonwealth was finalized, Pullman failed to disclose to SPAM, its membership, and to the Commonwealth that his wife received a check from Lynch. Such an omission, absent evidence to establish that the payment to Lynch Associates was increased in order to provide the payment to Pullman's wife, or that the payment to Pullman's wife was a bribe or illegal kickback, did not establish a scheme to defraud SPAM, its members, or the Commonwealth[17] in breach of Pullman's fiduciary duties to SPAM and the Commonwealth of Massachusetts.

As discussed above, the evidence failed to establish a bribe or illegal kickback. Nor did it establish that the payment to Lynch Associates was increased in order to

---

[17]  In Argument VI Pullman maintains that he had no fiduciary duty to the Commonwealth and that the court below erred in so instructing the jury.

provide for payment to Pullman's wife. Rather, the evidence showed that the fee to

Lynch Associates was set well before any request for money from Pullman and was

warranted by the work performed. Judgment of acquittal on count II is required for this

reason as well.

## III. Pullman's Questions to Daly and Lynch's Call to Kesten Were Insufficient to Establish Obstruction of the Grand Jury Investigation of SPAM and Others as Charged in Count VIII

### A. Standard of Review

Pullman moved for judgment of acquittal on all counts at the close of the

government's case, at the close of evidence and in a post-verdict motion for judgment

of acquittal or alternatively a new trial. App.v.I:244, 245; App.v.V:501. This Court

reviews a preserved challenge to the sufficiency of the evidence de novo. *United States*

*v. Falcón-Nieves*, 79 F.4th 116, 123-24 (1st Cir. 2023). *See* Argument I.A. for further

discussion of standard of review.

### B. The Evidence Was Insufficient to Establish Either the Intent or the Endeavor Required to Establish Obstruction

The catchall provision of 18 U.S.C. § 1503(a) required the government to prove

that "in or about and between September 2018 and October 2018" Pullman and

Lynch "corruptly…endeavor[ed] to influence, obstruct and impede the due

administration of justice in the grand jury investigation of SPAM and others

by…attempting to manipulate records required to be produced pursuant to a grand

jury subpoenas." (sic). App.v.I:75. The government maintained that Pullman's asking

46

Daly if, in response to a grand jury subpoena for expense records, Daly could tell the

government that SPAM had an internal policy to destroy those records after a year,

together with a conversation Anne Lynch had with SPAM's attorney responding to

the subpoena, met its burden.

SPAM received three subpoenas from the U.S. Attorney's office seeking

records: one in July 2018; another in August 2018; and another in September 2018.

App.v.VII:70-90. In August 2018,[18] after Daly told Pullman he could not find expense

records for a few of the years he anticipated would be requested in a subpoena,

Pullman asked Daly if he (Daly) could tell the government that SPAM had an internal

policy to destroy expense records after a year. He repeated the question in September

2018 after receipt of the subpoena. App.v.II:338-339, 345.

Attorney Kesten represented the union in responding to these subpoenas.

App.v.V:60. On an unknown date after receiving the September subpoena, Pullman

called, asking him to speak with Lynch. App.v.V:56. He then received a phone call

from Lynch asking if he "would delay the production of the documents contained

in the subpoena because she was looking, or she, they, were still looking for

receipts." *Id.* He took Lynch's request to mean "that [Kesten] should hold off so

that receipts or something, documentation of expenses could be put into the

documents before [Kesten] sent them to the U.S. Attorney." App.v.V:57. However,

---

[18] This was outside the time frame set out in the indictment. App.v.I:75.

that was simply his speculation; Lynch never actually asked him to delay production so that she could help Pullman find receipts and "put them in the file" as though they had been there all along. App.v.V:65, 81. In fact, Kesten never even asked Lynch what she meant by her request. App.v.V:84. Others at SPAM were gathering documents to provide to the United States Attorney's office. App.v.V:66; App.v.II: 212-213. As Lemanski testified, rolling productions were common. App.v.V:227. And as Kesten testified, had receipts been located he would have provided them to the government. App.v.V:78. Thus, Lynch's conversation with Kesten was insufficient to establish an intent to obstruct.

Even if there was sufficient evidence of intent to obstruct, there was not sufficient evidence of an endeavor. In *United States v. Aguilar*, 515 U.S. 593 (1995) defendant was charged with endeavoring to obstruct the due administration of justice by making false statements to FBI agents interviewing him in connection with a grand jury investigation. The Court held that false statements to an investigating agent who might or might not testify before a grand jury did not violate the catchall provision. *Id.* at 600. The Court defined an endeavor as "act[ing] with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but [being] foiled in some way." Intent alone is not enough. *Id.* at 601-602. *See also United States v. Menendez-Montalvo*, 88 F.4th 326, 332 (1st Cir. 2023), recognizing the "distinction between a person's intent to do harm and the steps taken to carry out that intent," citing *Aguilar* for the proposition that "it is a core tenet of our justice system that a defendant must have

committed the prohibited act itself to merit criminal sanction," and rejecting the

government's argument in that case as "com[ing] dangerously close to imposing

liability based on a person's mindset alone."

In *United States v. Tedesco*, 635 F.2d 902 (1st Cir. 1980) defendant on two

different occasions told a witness who had testified at a grand jury that had indicted a

friend of defendant, that the friend "could do a lot" for the witness. He suggested that

the witness speak with the friend, a suggestion the witness declined. Defendant met

with the witness and spelled out what the friend could do for the witness, including

financial assistance and a subcontract. Defendant suggested the witness meet with the

friend's attorney to review his testimony. In another conversation defendant again

said the friend could do a lot of things for the witness, including discussion of the

subcontract, and said that if the witness "had some solid information against [friend]

he should 'hold back on it.'" *Id.* at 903-904.  The court found this evidence sufficient,

stating that "endeavor connotes a somewhat lower threshold of purposeful activity

that attempt." *Id.* at 907 (interior quotes omitted).

In contrast with *Tedesco*, here there were no repeated approaches and offers of

assistance. While Pullman asked Daly whether the government could be told (falsely)

that SPAM had an internal policy of destroying records after one year, there was no

pressure or follow-up when Daly responded negatively. When Lynch asked Kesten if

he "would delay the production of the documents contained in the subpoena because

she was looking, or she, they, were still looking for receipts" and he said no, there was

49

no follow-up or pressure App.v.V:12:56-57, 84. These were not actions undertaken in a manner likely to obstruct justice. Absent such actions the evidence was insufficient and a judgment of acquittal on Count VIII should be ordered.

## IV. The Evidence Was Insufficient to Establish the RICO Conspiracy Charged In Count I.

### A. Standard of Review

Pullman moved for judgment of acquittal on all counts at the close of the government's case, at the close of evidence and in a post-verdict motion for judgment of acquittal or alternatively a new trial. App.v.I:244,245; App.v.V:501. This Court reviews a preserved challenge to the sufficiency of the evidence de novo. *United States v. Falcón-Nieves*, 79 F.4th 116, 123-24 (1st Cir. 2023). *See* Argument I.A. for further discussion of standard of review.

### B. The Evidence Was Insufficient to Establish an Agreement to Conduct and Participate in the Conduct of the Affairs of SPAM Through a Pattern of Racketeering Activity

Count I, as submitted to the jury, charged that, in violation of 18 U.S.C. § 1962(d), Pullman and Lynch conspired to conduct the affairs of SPAM through a pattern of racketeering activity consisting of the wire fraud offenses alleged in counts II-V and the obstruction of justice offenses alleged in counts VIII and IX..[19] App.v.I:98-99, 225-227. The evidence was insufficient to establish that conspiracy.

---

[19] While the indictment alleged that Pullman, Lynch and others conspired, the government stated that the only conspirators were Pullman and Lynch. App.v.V:340-341. The government also stated that the racketeering predicates were limited to the

The RICO conspiracy charge submitted to the jury required proof beyond a reasonable doubt of an agreement to conduct and participate in the conduct of the affairs of SPAM through a "pattern of racketeering activity" consisting of acts of wire fraud and obstruction of justice. App.v.I:98. Wire fraud and obstruction of justice are acts of "racketeering activity." 18 U.S.C. § 1961(1). A "pattern of racketeering activity" "requires at least two acts of racketeering activity,...the last of which occurred within ten years…after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). The government must also prove that the racketeering acts are "related" and "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 238 (1989). *See also United States v. Ramos-Baez*, 86 F.4th 28, 45 (1st Cir. 2023). To establish a racketeering conspiracy the government must prove that "'the defendant agreed that at least two acts of racketeering would be committed in furtherance of the conspiracy.'" *Id.* at 49.

As set out in Arguments I-III above, the evidence failed to establish that Pullman's conduct constituted wire fraud or obstruction of the administration of justice. Thus there are no predicate acts which he agreed would be committed and a judgment of acquittal should be ordered on Count I.

---

DOL, Mark43, and Taser wire fraud charges and the obstruction charged in count VIII. App.v.V:346.

**V.  The Evidence Was Insufficient to Establish That Pullman Conspired With Lynch to Defraud the United States for the Purpose of Impeding the IRS in the Collection of Federal Income Taxes as Charged in Count X.**

### A.  Standard of Review

Pullman moved for judgment of acquittal on all counts at the close of the government's case, at the close of evidence and in a post-verdict motion for judgment of acquittal or alternatively a new trial. App.v.I:244, 245; App.v.V:501. This Court reviews a preserved challenge to the sufficiency of the evidence de novo. *United States v. Falcón-Nieves*, 79 F.4th 116, 123-24 (1st Cir. 2023). *See* Argument I.A. for further discussion of standard of review.

### B.  The Evidence Was Insufficient to Establish the Agreement Alleged in the Indictment or Pullman's Willful Joinder in That Agreement

To prove the charged conspiracy to commit tax fraud under 18 U.S.C. § 371 (App.v.I:106), the government must prove the existence of the agreement whose purpose was to impede the IRS in its collection of income taxes, the defendant's knowing and voluntary participation in that agreement, and the commission of an overt act in furtherance of the agreement. *United States v. Mubayyid*, 658 F.3d 35, 56–57 (1st Cir. 2011); *United States v. Frankhauser*, 80 F.3d 641, 653 (1st Cir. 1996). To prove willful joinder the government must prove that the defendant had an intent to agree and an intent to commit the substantive offense. *United States v. Falcon-Nieves*, 79 F.4th 116, 132 (1st Cir. 2023).

The evidence was insufficient to establish the charged agreement or Pullman's knowing and voluntary participation in that agreement. There was no evidence – direct or circumstantial – of any agreement between Pullman and Lynch about how Pullman would file his taxes or how Lynch or Lynch Associates would file their taxes. There was no evidence that Pullman was aware of how Lynch filed or intended to file her taxes or that Lynch was aware of how Pullman filed or intended to file his taxes.

In the absence of evidence of any agreement to impede the IRS in its collection of taxes or participation in such an agreement, judgment of acquittal should be ordered on Count X.

## VI. The District Court's Instructions on Fiduciary Duty in an Honest Services Fraud Wire Prosecution and its Failure to Instruct the Jury on When a Duty to Disclose Arises in a Wire Fraud Prosecution Require a New Trial

### A. Standard of Review

This Court reviews preserved claims of legal error in jury instructions de novo. *United States v. Fernandez*, 722 F.3d at 16. It reviews claimed errors in the form or wording of instructions for abuse of discretion. *Id.* It reviews the failure to give a theory of defense instruction under a multi-part standard. Whether the evidence was sufficient to support the instruction is reviewed de novo. *United States v. Baird*, 712 F.3d 623, 627 (1st Cir. 2013). Reversal is required if the instruction was substantively correct as a matter of law, not substantially covered by the instructions given, and "integral to an important point in the boncase so that the omission of the instruction

seriously impaired the defendant's ability to present his defense." Each of these three steps involves a question of law reviewed de novo. *Id.* at 628

This Court reviews the denial of a motion for new trial for abuse of discretion. *United States v. Connolly*, 504 F.3d 206, 211 (1st Cir. 2007). "[A] district court abuses its discretion whenever it predicates its ruling on an erroneous view of the law, [citation omitted], and abstract questions of law engender de novo review [citation omitted]." *Id.* at 211-212.

### B. Pullman Did Not Owe a Fiduciary Duty to the Commonwealth

Honest services wire fraud requires participation in bribery or kickback schemes in violation of a fiduciary duty. *Skilling v. United States*, 561 U.S. 358, 407 (2010); *United States v. Milovanovic*, 678 F.3d 713, 721 (9th Cir. 2012) (en banc); *United States v. Sidoo*, 468 F. Supp. 3d 428, 443 (D. Mass. 2020), aff'd sub nom. *United States v. McGlashan*, 78 F.4th 1 (1st Cir. 2023).

Here, Pullman did not owe a fiduciary duty to the Commonwealth. As discussed in Argument I.C, *supra*, under Massachusetts law the fact of employment alone does not create a fiduciary relationship. Only employees "occupying positions of trust and confidence owe a duty of loyalty to their employer and must protect the interests of the employer." *Orkin Exterminating Co. v. Rathje*, 72 F.3d at 207, citing *Chelsea Indus., Inc. v. Gaffney*, 389 Mass. 1, 11, 449 N.E.2d 320 (1983); *accord Koch Acton, Inc. v. Benjamin Koller et al.*, 2024 WL 1093001, at *10 (D. Mass. Mar. 13, 2024); Rank-

and-file employees have a fiduciary duty only where there are indicia of trust such as access to confidential information. *See e.g. TalentBurst,*, 567 F.Supp.2d at 266 n.5

At the time of the alleged DOL honest services fraud, the evidence failed to establish that Pullman possessed the qualities that would make him a fiduciary of the Commonwealth. While he remained a MSP trooper, he was released to SPAM full-time. App.II:223, 361. There was no evidence that he performed any duties as a trooper, or that, as a trooper, he was authorized to make management-level decisions on behalf of the MSP or Commonwealth. Rather, while Pullman remained a trooper in title, his roles as SPAM treasurer and, later, as president, constituted his fulltime charge. And there was no evidence that as a SPAM official he performed any tasks relating to MSP decision-making or completed any tasks on behalf of the MSP or the Commonwealth. *Contrast Koch Acton*, (court found employees functioned as "officers, directors, or key executives" carrying fiduciary duty where they were entrusted with ongoing business operations and decision-making of [their employer], managed all aspects of dealer-to-dealer digital marketing services, entered into contracts on employer's behalf, and would only report to the [employer's] owner upon inquiry." 2024 WL 1093001 at *10 (D. Mass. 2024)); *Braintree Laboratories, Inc. v. Bedrock Logistics, LLC*, 2018 WL 4100040, at *7 (D. Mass. 2018) (shipping manager owed fiduciary duty to  employer because he "had the authority to make decisions about which logistics providers [employer] would use and the responsibility to ensure [ employer] received competitive pricing.").

Moreover, Pullman's role in SPAM further demonstrated the absence of any fiduciary duty to the Commonwealth. As president of SPAM, Pullman negotiated against the Commonwealth's interests for the benefit of SPAM's members in many areas: to secure better contracts for the troopers at the expense of the Commonwealth's interest; to fight disciplinary and other adverse treatment of individual troopers in opposition to the Commonwealth's interest; and, crucially, to bargain for the highest possible settlement for SPAM and the troopers in the DOL dispute against the Commonwealth. Pullman's duty of loyalty lay not with the Commonwealth, but with the troopers and with the union. In sum, Pullman was an unusual public employee, one who directly negotiated against the Commonwealth, often to the detriment its interests. He could not have owed a fiduciary duty to the Commonwealth in connection with the DOL grievance under these atypical circumstances.

### C.  The District Court's Honest Services Wire Fraud Instructions Erroneously Charged That Pullman Owed a Fiduciary Duty to the Commonwealth

The court first instructed the jury the day after closing arguments, Friday October 28, 2022, informing them that he would be delivering instructions concerning the elements of the offenses orally with the understanding that the jury would be getting them in writing later. App.v.VI:152. In discussing honest services fraud he instructed that SPAM and the Commonwealth of Massachusetts had an intangible right to honest services and that Pullman owed fiduciary duties to SPAM

and to the Commonwealth. App.v.VI:162. He repeated Pulman's fiduciary duty to the Commonwealth (App.v.VI:163, 164) and in explaining fiduciary duty instructed that "[a] union official typically owed a fiduciary duty to the union -but it's for you to decide in this case – and its members, and an employee owes a fiduciary duty to his or her employer. Here the Commonwealth of Massachusetts." App.v.VI:166. The fiduciary duty was "to act only for the benefit of…the union members or the Commonwealth of Massachusetts." *Id.*

During a break the court asked counsel if there were things to be remedied before the jury received the written instructions; counsel expressed concern with the instruction that Pullman had a fiduciary duty to the Commonwealth as the defense position was that he did not. App.v.VI:188. The court responded that it "did mean to convey that, as a matter of law, Mr. Pullman is a fiduciary wearing two hats….as a union official [and] as an employee of the Commonwealth in a particular setting." *Id.*. The court then finished its oral instructions and sent the jury out telling them they would be getting the written instructions probably on Monday. They could start talking about the case but were not formally deliberating. App.v.VI:93.

The jury was sent home Monday as the parties discussed the written instructions with the court. A renewed request that the court not instruct the jury that the Commonwealth was deprived of intangible services was denied (App.v.VI:40-41), as was the defense request for a detailed instruction on fiduciary duty, including directly instructing that the jury must determine whether a fiduciary duty existed.

App.v.VI:263-264; App.v.I:154-155. The court also declined to give the defense request on undisclosed self-dealing. App.v.VI:264-265; App.v.I:153

On Tuesday November 1, 2022 the court reinstructed the jury orally and provided written instructions. Consistent with its previous oral instructions the court repeatedly instructed that Pullman owed the Commonwealth a fiduciary duty: App.v.VI:344, 344- 345, 346-347; App.v.I:200, 201-202. And in its definition of a fiduciary duty the court instructed that "[a] union official typically owes a fiduciary duty to the union and its members, and a public employee owes a fiduciary duty to his public employer." App.v.I:201; App.v.VI:347. While the union official "typically" owed a fiduciary duty, the fiduciary duty owed by a public employee was expressed unequivocally. The court's subsequent instructions regarding the RICO conspiracy (Count I), incorporating honest services wire fraud as a racketeering act, thereby incorporated its instruction that Pullman owed a fiduciary duty to the Commonwealth. App.v.I:218-219, 221-222; App.v.VI:371, 373, 375, 377.

After the court's final instructions defense counsel reiterated the objection to the instructions that Pullman owed a fiduciary duty to the Commonwealth (App.v.VI:389). Counsel also objected to the court's instruction that Pullman owed a duty of honest services to the Commonwealth, repeating the request from previously submitted instructions that the court instruct the jury that to convict Pullman for honest services wire fraud,

> The object of the scheme must have been to deprive SPAM and the membership of their intangible right to honest services. That SPAM and the membership had to have been deprived of their rights and honest services is not sufficient. The result must have been the object of the scheme.

Counsel explicitly stated that he omitted mention of the Commonwealth in the requested instruction, arguing there was no honest services fraud as to the Comonwealth.App.v.VI:386. He also requested that the court give the proposed defense instruction on breach of duty (instruction 42). App.v.VI:384-385; App.v.I:173.

The jury found Pullman guilty of RICO conspiracy and honest services wire fraud. It did not indicate on its verdict form whether it believed Pullman violated a fiduciary duty to SPAM or to the Commonwealth or to both when committing those offenses. App.v.I:226, 231.

The court's instructions were flawed. Not all public employees owe a fiduciary duty to their employer and, under the circumstances of this case, Pullman did not owe a fiduciary duty or a duty of honest services to the Commonwealth in connection with the DOL grievance. The court's instructions allowed the jury to return a verdict on a legally erroneous theory.

"[C]onstitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory." *Skilling v. United States*, 561 U.S. at 414. S*ee also United States v. Fernandez*, 722 F.3d at 26-27 (vacating convictions where instructions permitted conviction on legally invalid

theory); *United States v. Abdelaziz*, 68 F.4th at 65  (recognizing that a verdict must be set aside "where 'a particular theory of conviction submitted to [the jury] is contrary to law, and not where one of several alternative bases for conviction is legally sound but supported by insufficient evidence.'"). A verdict that may exclusively rest on an invalid ground, such as legal error, [20]  cannot stand unless it is clear that the jury did not rely on that ground.  "The existence of some reasonable possibility that error of constitutional dimension influenced the jury in reaching a verdict…demands that a conviction be vacated." *United States v. Argentine*, 814 F.2d 783, 789 (1st Cir. 1987).

Such is the case here with respect to the court's instructions on fiduciary duty. If, as Pullman maintains, he did not have a fiduciary duty to the Commonwealth of Massachusetts, the district court's instructions permitted the jury to return a verdict of guilty on the RICO conspiracy and honest services wire fraud counts on a legally erroneous basis and a new trial on those counts is required.

### D.  Whether an Employee Owes a Fiduciary Duty to Their Employer is a Jury Question

After instructing the jury that Pullman was "a public employee" (App.v.VI:346; App.v.I:201) , the court unequivocally instructed the jury that "a public employee owes a fiduciary duty to his public employer."App.v:VI:347; App.v.I:201. This was not only incorrect as a matter of law, but erroneously removed the determination of

---

[20] Legal error means a "mistake about the law, as opposed to a mistake concerning the weight or the factual import of the evidence." *Griffin v. United States*, 502 U.S. 46, 59 (1991).

the existence of a fiduciary duty from the jury. "Whether or not a specific

employment arrangement qualifies as creating a fiduciary relationship is a factual

question reserved for the jury." *Sidoo*, 468 F. Supp. 3d at 443. *See also United States v.*

*Milovanovic*, 678 F.3d at 723 ("[t]he existence of a fiduciary duty in a criminal

prosecution is a fact-based determination that must ultimately be determined by a jury

properly instructed on this issue"). To instead instruct the jury that Pullman owed the

Commonwealth a fiduciary duty "impermissibly trespassed upon the jury's factfinding

prerogative." *United States v. Argentine*, 814 F.2d at 786 (jury question asked for

information which went to essential element of offense; court's substantive response,

which presented information as facts to be taken as true, took question from jury and

constituted eversible error); *United States v. Rivera-Santiago*, 107 F.3d 960, 965 (1st Cir.

1997) (trial judge "usurped the jury's factfinding role as to the subject matter of

[jury's] question" and required reversal). A new trial is required for this reason as well.

### E. The Court Below Erred in Rejecting the Defense Request for Duty to Disclose Instructions in Connection with the Mark43 and Taser Wire Fraud Charges

The government argued in closing that defendants' "overt representations were

made false and misleading because of what they failed to say." App.v.VI:33. The

defense argued in closing in discussing Mark43 "you heard of no legal duty of

disclosure owed and no affirmative misrepresentations or lies." App.v.VI:61. As set

out in Argument I.B.1, failing to disclose a material fact is only fraudulent if the

individual in question had a duty to make such a disclosure and failed to make the

disclosure with the specific intent to defraud. The defense requested such an instruction. App.v.I:159, 172.

In its initial oral instructions the court instructed that a scheme to defraud involved, *inter alia*, "the omission of a material fact or matter." App.v.VI:163. It did not instruct the jury that an omission was false or fraudulent only when there was a duty to disclose as had been requested by the defense (App.v.I:159, 172) and, when the omission of that instruction was raised after the initial oral instructions, advised counsel it was not going to do so. App.v.VI:190.

In the subsequent discussion of the written instructions to be provided to the jury the defense again requested an instruction that concealment of a material fact is false or fraudulent only if there is a duty to disclose and reiterated its request for its duty to disclose instruction. App.v.VI:249-250, 258, 260. App.v.I:159, 172. The court rejected the reiterated requests. App.v.VI:251, 258, 260.

After final instructions were given counsel reiterated the objection to the failure to instruct on the duty to disclose, requesting the defendant's instructions from the second page of 31 and instructions 41 of its proposed instructions. App.v.VI:383-384; App.v.I:159, 172.

Pullman maintains that the failure to instruct the jury that omissions can be found to be false or fraudulent misrepresentations only where there is a duty to disclose deprived him of a valid theory of defense instruction. "A criminal defendant is entitled to an instruction on his theory of defense so long as the theory is legally

sound and supported by evidence in the record." *United States v. Baird*, 712 F.3d at 627. As this Court also said in *Baird*, the failure to give a requested instruction is reversible error "if the instruction was (1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present his defense." *Id.* at 628

All of the criteria for reversal are met here. As set out in in Argument I.B.1, the theory was legally sound. The requested instruction was supported by the evidence. There were no affirmative misrepresentations to Mark43 or Taser. Indeed, the government argued in closing that it was the defendants' omissions that made their overt representations false and misleading. There was also no evidence that Pullman had any fiduciary relationship to either Mark43 or Taser that would give rise to a duty to disclose. The requested instruction was substantively correct. No instruction in the charge provided the defense theory to the jury. The absence of a duty to disclose was central to the sufficiency of the evidence to establish the wire fraud charged as to Mark43 and Taser. Accordingly, a new trial on those counts is required. And since those alleged offenses were alleged as predicate acts in the RICO conspiracy count, a new trial is required on that count as well.

## CONCLUSION

For the reasons set forth above this Court should order the entry of judgments of acquittal on counts I-V, VIII, and X. At minimum it should order a new trial on counts I-V.

Dated: April 15, 2024

Respectfully submitted,
by his attorney,

**/s/ Judith H. Mizner**
Judith H. Mizner, AFPD
Federal Defender Office
District of Massachusetts
51 Sleeper Street 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No. 11056

## CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)

I, Judith Mizner, hereby certify that the foregoing brief of appellant Dana Pullman complies with the type-volume limitation set in this Court's order of April 8, 2024.

1. The brief contains 15,416 words excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).

2. The brief has been prepared in a proportionally spaced typeface using word in 14 point Garamond.

/s/Judith H. Mizner

Judith H. Mizner

## CERTIFICATE OF SERVICE

I, Judith H. Mizner, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, including all counsel of record for the respondent, Donald C. Lockhart,  Kristina E. Barclay, and Neil J. Gallagher, Jr., as identified on the Notice of Electronic Filing on. April 15, 2024

*/s/Judith H. Mizner*

Judith H. Mizner

ADDENDUM
TABLE OF CONTENTS

Page

Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Oral ruling on renewed motion for judgment of acquittal or,
    alternatively, motion for a new trial    May 10, 2023. . . . . . . . . . . . . . . . . . . . . . . 9

AO 245B (Rev. 02/18)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

## District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| DANA A. PULLMAN | Case Number: **1  19 CR 10345  - 01  - DPW** |
| | USM Number:  01723-138 |
| | Timothy G. Watkins and Brendan O. Kelley |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
 which was accepted by the court.

☑ was found guilty on count(s)   1s, 4s, 5s, 6s, 7s, 8s, 9s, 10s, 12s, 13s and 14s of the Superseding Indictment
 after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §1962(d) | Racketeering Conspiracy | 09/28/18 | 1s |
| 18 U.S.C. §§1343, 1346 | Honest Services Wire Fraud | 11/12/14 | 4s |
| 18 U.S.C. §2 | Aiding and Abetting | 11/12/14 | 4s |
| 18 U.S.C. §1343 | Wire Fraud | 09/14/14 | 5s |
| 18 U.S.C. §2 | Aiding and Abetting | 09/14/14 | 5s |

 The defendant is sentenced as provided in pages 2 through    8    of this judgment. The sentence is imposed pursuant to
the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   1-10, 12-14, 2s, 3s    ☐ is   ☑ are dismissed on the motion of the United States.

 It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence,
or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution,
the defendant must notify the court and United States attorney of material changes in economic circumstances.

| |
|---|
| 5/10/2023 |
| Date of Imposition of Judgment |
| /s/ Douglas P. Woodlock |
| Signature of Judge |
| The Honorable Douglas P. Woodlock |
| Judge, U.S. District Court |
| Name and Title of Judge |
| 6/13/2023 |
| Date |

# ADD. 1

AO 245B (Rev. 02/18)    Judgment in a Criminal Case
Sheet 1A

Judgment—Page _____ 2 _____ of _____ 8 _____

DEFENDANT: DANA A. PULLMAN
CASE NUMBER: **1  19  CR  10345  - 01  - DPW**

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §1343 | Wire Fraud | 02/11/16 | 6s |
| 18 U.S.C. §2 | Aiding and Abetting | 02/11/16 | 6s |
| 18 U.S.C. §1343 | Wire Fraud | 02/22/16 | 7s |
| 18 U.S.C. §2 | Aiding and Abetting | 02/22/16 | 7s |
| 18 U.S.C. §1343 | Wire Fraud | 10/18/16 | 8s |
| 18 U.S.C. §2 | Aiding and Abetting | 10/18/16 | 8s |
| 18 U.S.C §1343 | Wire Fraud | 03/01/17 | 9s |
| 18 U.S.C. §2 | Aiding and Abetting | 03/01/17 | 9s |
| 18 U.S.C. §1503(a) | Obstruction of Justice | 10/31/18 | 10s |
| 18 U.S.C. §2 | Aiding and Abetting | 10/31/18 | 10s |
| 18 U.S.C. §371 | Conspiracy to Defraud the United States | 09/30/18 | 12s |
| 26 U.S.C. §7206(2) | Aiding and Assisting the Filing of a False Tax Return | 03/09/15 | 13s |
| 26 U.S.C. §7206(2) | Aiding and Assisting the Filing of a False Tax Return | 03/27/16 | 14s |

## ADD. 2

AO 245B (Rev.02/18)   Judgment in Criminal Case
Sheet 2 — Imprisonment

| | Judgment — Page | 3 | of | 8 |

DEFENDANT: DANA A. PULLMAN
CASE NUMBER: 1 19 CR 10345 - 01 - DPW

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: 30 month(s)

This term consists of thirty (30) months on each of Counts 1s ,4s, 5s, 6s, 7s, 8s, 9s,10s, 12s, 13s and 14s, to be served concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:

Defendant be designated to an institution commensurate with security where the Bureau of Prisons can afford appropriate medical care for the defendant's documented medical needs.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☑ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

# ADD. 3

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
           Sheet 3 — Supervised Release

Judgment—Page   __4__   of   __8__

DEFENDANT:  DANA A. PULLMAN
CASE NUMBER:  **1  19  CR  10345  - 01  - DPW**

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :        **three**  year(s)

This term consists of three (3) years on each of Counts 1s, 4s, 5s, 6s, 7s, 8s, 9s,10s, 12s, 13s and 14s, to be served concurrently.

## MANDATORY CONDITIONS

1.    You must not commit another federal, state or local crime.
2.    You must not unlawfully possess a controlled substance.
3.    You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

        ☑ The above drug testing condition is suspended, based on the court's determination that you
           pose a low risk of future substance abuse. *(check if applicable)*

4.    ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

5.    ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

6.    ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

ADD. 4

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

|  | Judgment—Page | 5 | of | 8 |

DEFENDANT:   DANA A. PULLMAN
CASE NUMBER:   1 19 CR 10345  - 01  - DPW

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision.  These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.   You must answer truthfully the questions asked by your probation officer.
5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.   You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.   You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.   You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.   If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
13.   You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature   _____   Date   _____

# ADD. 5

AO 245B(Rev. 02/18)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

DEFENDANT: DANA A. PULLMAN
CASE NUMBER: 1 19 CR 10345 - 01 - DPW

Judgment—Page ___6___ of ___8___

## SPECIAL CONDITIONS OF SUPERVISION

1. You are prohibited from engaging in an occupation, business, or profession that would require or enable you to be concerned with activities involving the exercise of financial trust in you by others.

2. You must meet with the Internal Revenue Service within the first 90 days of the period of supervision in order to determine your prior tax liability and you are to file tax returns and pay any past or future taxes due.

3. You must pay the balance of the restitution imposed according to a court-ordered repayment schedule.

4. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

5. You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page __7__ of __8__

DEFENDANT:  DANA A. PULLMAN
CASE NUMBER:   **1  19 CR 10345  - 01  - DPW**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 1,100.00 | $ 0.00 | $ 0.00 | $ 58,957.12 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| State Police Association of Massachusetts (SPAM) | $28,911.12 | $28,911.12 | |
| Taser International | $5,000.00 | $5,000.00 | |
| Mark43 | $5,000.00 | $5,000.00 | |
| Mark43 (attorney fees) | $5,000.00 | $5,000.00 | |
| Internal Revenue Service | $12,943.00 | $12,943.00 | |
| MA Department of Revenue | $2,103.00 | $2,103.00 | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $ 58,957.12 | $ 58,957.12 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☑ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine  ☐ restitution.

    ☐ the interest requirement for the   ☐ fine  ☐ restitution is modified as follows:

\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

# ADD. 7

AO 245B (Rev. 02/18)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page   8   of   8

DEFENDANT:   DANA A. PULLMAN
CASE NUMBER:   **1 19 CR 10345 - 01 - DPW**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☑   Lump sum payment of $   60,057.12   due immediately, balance due

     ☐   not later than _____ , or
     ☐   in accordance with   ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C   ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D   ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E   ☑   Payment during the term of supervised release will commence within   30 days   *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☑   Joint and Several

     Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

     Co-Defendant Anne M. Lynch, Case #19-10345, in the joint and several amount of $35,000 as follows:
     $20,000 to SPAM; $5000 to Taser International; $5,000 to Mark43(for loss); and, $5,000 to Mark43(for attorneys fees).

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

# ADD. 8

```
 1                      UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF MASSACHUSETTS

 3

 4                                        )
         UNITED STATES OF AMERICA,        )
 5                                        )
                  Plaintiff,              )
 6                                        )   Criminal Action
         v.                               )   No. 1:19-CR-10345-DPW
 7                                        )   Pages 1 to 66
         DANA PULLMAN and                 )
 8       ANNE LYNCH,                      )
                                          )
 9                Defendants.             )
                                          )
10

11

12          BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
                 UNITED STATES DISTRICT JUDGE
13

14                       SENTENCING HEARING

15

16                         May 10, 2023
                            9:30 a.m.
17

18          John J. Moakley United States Courthouse
                      Courtroom No. 1
19                    One Courthouse Way
                 Boston, Massachusetts 02210
20

21

22

23                  Jessica M. Leonard, CSR
                    Official Court Reporter
24          John J. Moakley United States Courthouse
                      One Courthouse Way
25               Boston, Massachusetts 02210
                 JessicaMichaelLeonard@gmail.com
```

ADD. 9

```
1                    P R O C E E D I N G S
2          (Case called to order)
3          THE COURT:  Well, I want to outline what I hope to
4    accomplish today in a structured way.  I have a series of
5    motions for judgment of acquittal or, alternatively, a new
6    trial.  I'll say, in a broad brush, that I'm going to be
7    denying those motions.  I'll turn to the larger issues that are
8    presented by them.  I am, however, going to grant the motions
9    for the parties to cross-join and the Defendants cross-join in
10   the motions that they've filed.  Because they do map on each
11   other, I think, fairly significantly.
12         Then we have the question of challenges to the
13   Presentence Report.  The most recent Presentence Report's been
14   updated to -- proposes a somewhat different way of looking at
15   the offenses charged here, and I want to spend some time with
16   that.  And then we have the question of sentencing under these
17   circumstances.
18         But I would add one further point.  And it gets me
19   back to the beginning.  This is a prosecution in the context of
20   heavily contested doctrinal developments in the Supreme Court
21   and the First Circuit generally.  And it seems to me it's
22   utterly appropriate for the Government to pursue the charges
23   that they have pursued here.  That's a separation of powers
24   issue.  It's not for me to comment on, I suppose, in one sense.
25   But in another sense it is, because it frames the issues here
```

**ADD. 10**

1    fairly effectively.

2         In this context, we spent a great deal of time

3    hammering out what the instructions would be to the jury, the

4    way in which the case would be presented at the jury with a

5    verdict slip.  I've been back looking at the instructions and

6    the record of the case, which is pretty much completed in terms

7    of transcript, and I'm satisfied that the way in which I'm

8    looking at this case as presented by the Government is in the

9    narrowest possible sense.  That is to say, the Government did

10   charge this as a -- I'll use as an example, breach of the

11   fiduciary duty having to do with the Commonwealth.  It's what's

12   in there.  I'll hold them to it.  If they're wrong about that,

13   ultimately, then there's going to be a new trial.

14        These charges are so interrelated that it seems to me

15   that I would have to look long and hard at trying to pick and

16   choose among those that would not be subject to a new trial if

17   major events overtake the doctrinal developments as they exist

18   now.  I'm satisfied that I captured the doctrinal developments

19   as they exist now, but the parties have indicated in their

20   submissions that there are cases now before the Supreme Court,

21   cases that are being held before the First Circuit, held in the

22   sense that awaiting resolution of companion cases arising out

23   of a series of related matters.  These are -- what do we do?

24   How do we characterize properly fiduciary duty in the context

25   of unusual kinds of fraud -- or at least not traditionally

**ADD. 11**

1   anticipated kinds of fraud -- that arises and is subject to

2   doctrinal contest over political corruption or corruption

3   generally or commercial bribery.

4          And we see it in this district and in the Court of

5   Appeals now with the Varsity Blues cases, which are the matters

6   subject to state consideration to some degree.  All of that is

7   to say that there will be more to be heard about these kinds of

8   cases than I have to say at this time.  And as things are said

9   or appear, I'll have to respond to them.  And so I'm offering a

10  provisional resolution, I think, if I'm to be candid about it.

11         I turn, then, to the Probation Office recalculation of

12  the guidelines here that quite recently led to requests by the

13  parties to put the sentencing off so that they'd be able to

14  respond fully.  I think it will become clear that I take a

15  somewhat different view than the newly developed Probation

16  view.  But the newly developed Probation view, it seems to me,

17  is evidence -- not that we need a lot -- that the Probation

18  Office, as with the United States Attorney's Office, is trying

19  to keep up with what the doctrinal developments are, fit them

20  into the larger scheme of the criminal justice system.  And

21  I'll make my rulings with respect to that.

22         Then we come to the question of sentencing.  And the

23  question of sentencing is confounded, I suppose, by my view

24  that, given the uncertainties that are created here, there

25  is -- if it's sought -- no doubt in my mind that I will stay,

**ADD. 12**

1    pending appeal, and permit the Court of Appeals to decide

2    whether or not a sentence should be begun.  This case seems to

3    me to be the archetype of the kind of case that would justify

4    stay pending appeal.  Now, that, of course, depends upon the

5    entry of a judgment, and the judgment has to express a

6    direction.  And the guidelines here -- putting to one side the

7    degree to which I'd be prepared to enforce them specifically,

8    either as highs or lows or, you know, anywhere from 76 to

9    substantially lower guidelines -- well, I think the parties may

10   want to think about what they want on that.  I'll, obviously,

11   entertain that view.

12            So the short of it is, this is the first step in the

13   resolution of this kind of case involving these two Defendants.

14   And my view, as I've indicated, is that there is no grounds now

15   that I am aware of to justify the motions for judgment of

16   acquittal, so as a consequence I'm denying Number 254 and

17   Number 255 on the docket.  And they bear with them the

18   correlative that the parties who argued with greater or lesser

19   degrees of -- the Defendants have, with greater or lesser

20   degrees of specificity for a new trial, and I will say at this

21   point I would not grant a new trial on the case.  The

22   determination of the jury seems to me to be thorough as a

23   result of what I understand to be properly being instructed and

24   making some -- and one very specific -- form of discriminating

25   judgment between the parties.

**ADD. 13**

```
 1            Now, I did say that I would allow the motions for the
 2    parties to -- defendant's parties to join with each other and I
 3    do.  So I'm allowing Number 266, and I guess 266 is really the
 4    shared one here between the parties.  I don't think there's a
 5    need for extensive argument, and that's why I -- on this issue.
 6    That's why I wanted to move on, because I think it gets focused
 7    with specificity as to these Defendants when we get to the
 8    question of what the guidelines properly should be.  But I
 9    think the parties should understand my overarching view here
10    that is shaping my approach to the motions for judgment of
11    acquittal.
12            This is an unusual set of circumstances, I think, and
13    if it's not unusual in practice, it's unusual in the case law,
14    in which the Commonwealth of Massachusetts seems to have what
15    I'll call an industrial policy with respect to the
16    Massachusetts State Police that has the Defendant Pullman -- or
17    had the Defendant Pullman, but he and his compatriots, who were
18    executives with the SPAM, functioning both as representatives
19    of the union but also as having de facto and even de jure
20    responsibilities for the Commonwealth itself.  That justifies
21    treating them as agents of the Commonwealth, which I do.
22            But it raises the question of what's the predominant
23    role here, when it's possible to say that someone like
24    Mr. Pullman and those who are engaged in the conduct of an
25    enterprise with him undertake action.  I think it's fair to
```

**ADD. 14**

1    say, at the risk of being a little bit provocative, that

2    they're hermaphrodites:  They have both characteristics here.

3    And how they are characterized, identified, is critically

4    important.  That's what's going to happen when we get to the

5    question of the guidelines.

6          So let me then turn to the question of the guidelines.

7    As I indicated, the Probation Office developed, after careful

8    consideration of the circumstances, a somewhat different

9    approach to the guidelines in this area.  And I'm referring to

10    the PSR that's revised as of April 25.  I think the quickest

11    way to get into this is to turn to -- I'll use Mr. Pullman's

12    PSR as a way of framing it.  Page 33, which talks about the

13    transactions that are considered to be forms of loss that would

14    be identifiable and the contention made by Mr. Pullman

15    regarding them.

16          I believe these amounts that Mr. Pullman identifies

17    are the proper ones here.  It's possible in certain kinds of

18    cases to take an expanded view of what might loosely be called

19    forms of related conduct.  But when the Government pursues a

20    case like this with this kind of potential for ambiguity, even

21    potential for lack of fair notice, it's important to ensure

22    that we focus on precisely what it is that's at issue.  So, for

23    the DOL amount, we're really talking about a $20,000 bribe or

24    kickback; that's what it is.  The questions about the work, the

25    amount of work that was put in by Lynch Associates is open, it

**ADD. 15**