Nos. 23-1508, 23-1510

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 23-1508            UNITED STATES OF AMERICA,
                               APPELLEE

v.

DANA A. PULLMAN,
DEFENDANT-APPELLANT

No. 23-1510            UNITED STATES OF AMERICA,
                               APPELLEE

v.

ANNE M. LYNCH,
DEFENDANT-APPELLANT

ON APPEAL FROM A JUDGMENT IN A CRIMINAL CASE,
ENTERED IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRIEF FOR THE UNITED STATES

JOSHUA S. LEVY
ACTING UNITED STATES ATTORNEY

ALEXIA R. DE VINCENTIS
ASSISTANT U.S. ATTORNEY
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY, SUITE 9200
BOSTON, MASSACHUSETTS 02210
(617) 748-3211

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF JURISDICTION ...........................................................1

STATEMENT OF ISSUES .................................................................1

STATEMENT OF THE CASE ...............................................................2

      A.    Statement of Facts ...........................................................2

           1.    SPAM and Lynch Associates.....................................2

           2.    Days Off Lost ...............................................4

           3.    Mark43 ....................................................11

           4.    Taser International .........................................14

           5.    Richard Rafferty...........................................17

           6.    Pullman's Expenses .......................................19

           7.    Obstruction of Justice .....................................20

      B.    Procedural History...........................................23

SUMMARY OF ARGUMENT .............................................................25

ARGUMENT ..........................................................................28

I.     THE GOVERNMENT CONCEDES JUDGMENTS OF ACQUITTAL SHOULD ENTER ON THE COUNTS III-V WIRE FRAUD CONVICTIONS AND THE COUNT D TAX FRAUD CONVICTION .....28

II.    THE EVIDENCE WAS SUFFICIENT TO ESTABLISH HONEST-SERVICES FRAUD................................................................29

A.     Procedural History.................................................................29

B.     Standard of Review ...........................................................29

C.     Ample Evidence Supported the Jury's Quid Pro Quo Finding...........30

D.     The Jury Supportably Found a Scheme to Defraud ...........................36

III.   THE   EVIDENCE  WAS  SUFFICIENT  TO  ESTABLISH OBSTRUCTION OF JUSTICE ...................................................................37

A.     Procedural History.................................................................38

B.     Standard of Review ...........................................................38

C.     A Rational Jury Could Find an Intent to Obstruct ..............................38

D.     Defendants' Actions Constituted an "Endeavor"................................42

IV.   THE  EVIDENCE  WAS  SUFFICIENT  TO  PROVE  A  RICO CONSPIRACY,  AND  THERE  WAS  NO  CONSTRUCTIVE AMENDMENT ........................................................................................45

A.     Procedural History.................................................................45

B.     Standard of Review ...........................................................46

C.     A Rational Jury Could Find a Pattern of Racketeering Activity ........46

D.     There Was No Constructive Amendment ...........................................49

V.    THE EVIDENCE WAS SUFFICIENT TO PROVE A CONSPIRACY TO DEFRAUD THE UNITED STATES......................................................50

A.     Procedural History.................................................................50

B.     Standard of Review ...........................................................50

C.    A Rational Jury Could Find an Agreement and Defendants' Willful Participation In It ...................................................................51

VI.    DEFENDANTS' CLAIMS OF INSTRUCTIONAL ERROR DO NOT WARRANT A NEW TRIAL .........................................................................54

A.    Procedural Background ....................................................................54

B.    Standard of Review ..........................................................................58

C.    Defendants' Unpreserved "Legal Invalidity" Claim Fails .................59

D.    Any Error in Failing to Submit the Fiduciary Duty Question to the Jury Was Harmless Beyond a Reasonable Doubt .........................61

VII.    DEFENDANTS ARE NOT OTHERWISE ENTITLED TO A NEW TRIAL ........................................................................................................63

A.    Procedural Background ....................................................................64

B.    Standard of Review ..........................................................................64

C.    Lynch's Argument for a New Trial on the Remaining Tax Count and the Obstruction Counts Is Doubly Waived and Meritless ...........64

CONCLUSION .......................................................................................................67

CERTIFICATE OF COMPLIANCE ......................................................................68

# TABLE OF AUTHORITIES

## CASES

*Evans v. United States*,
 504 U.S. 255 (1992) ................................................................34

*Griffin v. United States*,
 502 U.S. 46 (1991) ............................................................ 60-61

*Heinrich v. Waiting Angels Adoption Servs., Inc.*,
 668 F.3d 393 (6th Cir. 2012) ...................................................47

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
 492 U.S. 229 (1989) ......................................................... 46-47

*Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp.*,
 44 F.3d 40 (1st Cir. 1995) .......................................................62

*McNally v. United States*,
 483 U.S. 350 (1987) .................................................................30

*Neder v. United States*,
 527 U.S. 1 (1999) ...................................................... 58, 62-63

*Rhode Island Dep't of Env't Mgmt. v. United States*,
 304 F.3d 31 (1st Cir. 2002) .....................................................38

*Skilling v. United States*,
 561 U.S. 358 (2010) ........................................................ 30, 36

*Snyder v. United States*,
 No. 23-108, 2024 WL 3165518 (U.S. June 26, 2024) ........................................30

*United States v. Abdelaziz*,
 68 F.4th 1 (1st Cir. 2023) ....................................... 61, 66-67

*United States v. Acevedo*,
 882 F.3d 251 (1st Cir. 2018) ..................................... 41, 44

*United States v. Ackell*,
 907 F.3d 67 (1st Cir. 2018) ....................................................58

iv

*United States v. Ackerly*,
  981 F.3d 70 (1st Cir. 2020) ...................................................64

*United States v. Aguilar*,
  515 U.S. 593 (1995) ..................................................... 39, 42-43

*United States v. Blumenthal*,
  332 U.S. 539 (1947) ...............................................................54

*United States v. Brady*,
  168 F.3d 574 (1st Cir. 1999) .................................................42

*United States v. Buffis*,
  867 F.3d 230 (1st Cir. 2017) .................................................34

*United States v. Busacca*,
  936 F.2d 232 (6th Cir. 1991) ............................................ 47-48

*United States v. Callipari*,
  368 F.3d 22 (1st Cir. 2004) ...................................................43

*United States v. Connolly*,
  341 F.3d 16 (1st Cir. 2003) ...................................................47

*United States v. Correia*,
  55 F.4th 12 (1st Cir. 2022) ............................................... 58-59

*United States v. Duarte*,
  246 F.3d 56 (1st Cir. 2001) ...................................................59

*United States v. Fernandez*,
  722 F.3d 1 (1st Cir. 2013) .....................................................33

*United States v. Frankhauser*,
  80 F.3d 641 (1st Cir. 1996) ...................................................51

*United States v. Goldberg*,
  105 F.3d 770 (1st Cir. 1997) .................................................53

*United States v. Gracie*,
  731 F.3d 1 (1st Cir. 2013) .....................................................34

*United States v. Kaplan*,
886 F.2d 536 (2d Cir. 1989) ................................................................47

*United States v. Katana*,
93 F.4th 521 (1st Cir. 2024) ................................................ 46, 49-50

*United States v. Lazzerini*,
611 F.2d 940 (1st Cir. 1979) ...............................................................42

*United States v. Mayendia-Blanco*,
905 F.3d 26 (1st Cir. 2018) ................................................................63

*United States v. Meléndez-González*,
892 F.3d 9 (1st Cir. 2018) ..................................................................29

*United States v. Merlino*,
592 F.3d 22 (1st Cir. 2010) ........................................................... 29-30

*United States v. Milovanovic*,
678 F.3d 713 (9th Cir. 2012) ..............................................................62

*United States v. Mubayyid*,
658 F.3d 35 (1st Cir. 2011) ................................................................51

*United States v. Olbres*,
61 F.3d 967 (1st Cir. 1995) .......................................................... 30, 35

*United States v. Pabon*,
819 F.3d 26 (1st Cir. 2016) ................................................................65

*United States v. Pena*,
24 F.4th 46 (1st Cir. 2022) .................................................................37

*United States v. Rathbun*,
98 F.4th 40 (1st Cir. 2024) .................................................................65

*United States v. Roberson*,
998 F.3d 1237 (11th Cir. 2021) ..........................................................31

*United States v. Roe*,
529 F.2d 629 (4th Cir. 1975) ..............................................................44

vi

*United States v. Romero*,
  906 F.3d 196 (1st Cir. 2018) ..................................................60

*United States v. Runnels*,
  833 F.2d 1183 (6th Cir. 1987), *vacated on other grounds*,
  877 F.2d 481 (6th Cir. 1989) ..................................................37

*United States v. Russell*,
  255 U.S. 138 (1921) ................................................... 42-44

*United States v. Simon*,
  12 F.4th 1 (1st Cir. 2021) ............................................. 34, 49

*United States v. Soto-Beniquez*,
  356 F.3d 1 (1st Cir. 2003) ..................................................40

*United States v. Stewart-Carrasquillo*,
  997 F.3d 408 (1st Cir. 2021) ..................................................35

*United States v. Stubbert*,
  655 F.2d 453 (1st Cir. 1981) ..................................................54

*United States v. Tedesco*,
  635 F.2d 902 (1st Cir. 1980) ........................................ 40, 43-44

*United States v. Woodward*,
  149 F.3d 46 (1st. Cir. 1998) ......................................... 31, 36

*United States v. Wright*,
  937 F.3d 8 (1st Cir. 2019) ........................................... 58, 62

*United States v. Zannino*,
  895 F.2d 1 (1st Cir. 1990) ........................................... 38, 65

*Yates v. United States*,
  354 U.S. 298 (1957) ................................................. 59, 61

## STATUTES

18 U.S.C. § 371 ..................................................24

18 U.S.C. § 1961(1) ..................................................47

18 U.S.C. § 1961(5) ................................................................................46

18 U.S.C. § 1962(d) ...............................................................................23

18 U.S.C. § 3231 ......................................................................................1

18 U.S.C. § 1343 .....................................................................................23

18 U.S.C. § 1346 .....................................................................................23

18 U.S.C. § 1503 .....................................................................................42

18 U.S.C. § 1503(a) ....................................................................... 23-24, 38

18 U.S.C. § 1503(2) ................................................................................23

26 U.S.C. § 7206(2) ................................................................................24

28 U.S.C. § 1291 ......................................................................................1

## STATEMENT OF JURISDICTION

The district court (Woodlock, J.) had subject matter jurisdiction because the indictment charged the defendants, Dana A. Pullman and Anne M. Lynch, with offenses against the United States. 18 U.S.C. § 3231. Judgments were entered on June 13, 2023 [D.305, 307], and the defendants each filed a timely notice of appeal [App.I:250-51].[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. The government concedes judgments of acquittal should enter on Counts III-V and Count D.

2. The evidence was sufficient to establish honest-services fraud.

3. The evidence was sufficient to establish obstruction of justice.

4. The evidence was sufficient to prove a RICO conspiracy, and there was no constructive amendment.

5. The evidence was sufficient to prove a conspiracy to defraud the United States.

6. Defendants' claims of instructional error do not warrant a new trial.

7. Defendants are not otherwise entitled to a new trial.

---

[1] Citations are as follows: "[D.___]" refers to a docket entry; "[P.Br.___]" and "[P.Add.___]" refer to Pullman's opening brief and addendum; "[L.Br.___]" and "[L.Add.___]" refer to Lynch's opening brief and addendum; "[App.___]" refers to the joint appendix; "[S.App.___]" refers to the government's supplemental appendix; and "[Sealed.S.App.___]" refers to the government's sealed supplemental appendix.

1

## STATEMENT OF THE CASE

**A.      Statement of Facts**

**1.      SPAM and Lynch Associates**

The State Police Association of Massachusetts ("SPAM") is a private association that acts as the exclusive bargaining agent for Massachusetts State Police ("MSP") troopers and sergeants.  [App.II:55; S.App.3].  It is funded almost entirely by dues paid by its members.  [App.II:247-48].  Its Executive Board (the "E-Board") consists of four constitutional officers and eleven troop representatives.  [App.II:56-58; S.App.5].

Pullman was a trooper employed by the MSP from as early as 2000.  [App.II:220].  He was also the treasurer of SPAM from 2008 until December 2012, when he was elected president.  [App.II:122, 220].  He served as SPAM President until he resigned on September 28, 2018, after a federal grand jury began investigating SPAM's finances.  [App.V:168].

The SPAM treasurer and president positions were full-time, which meant that Pullman drew two salaries between 2008 and 2018: one from the MSP, and another from SPAM.  [App.II:63, 315; App.III:174; App.V:155].  Pullman was "released" by the MSP full-time to SPAM, but he remained an MSP trooper.  [App.II:361].  He was eligible to work MSP details, he drove an MSP cruiser, and he carried MSP "gear" until August 2017, when his MSP status changed to "no duty" because of his

2

health.  [App.II:74, 281, 361; App.III:142-43].  He was also required to complete yearly ethics trainings for employees of the Commonwealth of Massachusetts and was prohibited from accepting gifts or gratuities of more than $50 in connection with his employment.  [App.II:72-73, 199-200; App.III:65-66].

Anne M. Lynch was the owner of Lynch Associates, Inc. ("Lynch Associates"), which was retained by SPAM to provide lobbying and public relations services.  [App.II:246; App.IV:480].   SPAM paid Lynch Associates $6,250 per month for lobbying between approximately 2008 and 2012 but raised that figure to $7,000 in November 2012 and added $2,500 per month for public relations work beginning in 2016, for a total monthly retainer of $9,500.  [App.II:230, 246; S.App.24].  Two of Lynch's sons, Peter and Greg D'Agostino, purchased Lynch Associates from their mother in October 2016, and Lynch became a consultant to the firm.  [App.IV:240, 284, 304].

As the President of SPAM, Pullman was the "face of the union."  [App.II:81-82; App.III:175].  He was a "strong president," and it was "his way or the highway."  [App.II:133-34, 185].  He and Lynch became very good friends over the years, however, and their relationship was one of "equals."  [App.II:77; App.IV:242-43; App.V:49-50].  They routinely had business meals together, and Lynch helped Pullman set the agenda for SPAM, spoke at SPAM E-Board meetings and annual meetings, and met with SPAM attorneys.  [App.II:67, 76-77, 318; App.V:49;

App.VII:91-93].  Pullman regularly relied on Lynch to do "things that might be outside the scope of a normal contract" for a lobbyist.  [App.IV:475].

### 2.    Days Off Lost

One of the issues that Pullman and Lynch handled during Pullman's SPAM tenure was settlement of the "days off lost" ("DOL") grievance, which began in 2005 and was settled in 2014.  [App.II:155; App.IV:297].  DOL concerned the practice of giving troopers called in on a day off compensatory time rather than overtime pay.  [App.II:197, 249].  Resolution of the longstanding grievance required reviewing eight years of paper calendars kept by each trooper to determine amounts owed and developing a formula for addressing missing and erroneous records.  [App.II:157-58, 250; App.III:75, 82-83; App.IV:386, 452-54; S.App.26].  It was a priority for Pullman when he became president.  [App.II:250].  He assembled a team to formulate a plan for reviewing paper calendars from MSP and individual troopers[2] and engaged in negotiations with the Commonwealth of Massachusetts.  [App.II:250, 266-67; App.III:75-77; App.IV:291; S.App.238].

Instead of hiring an accounting or auditing firm to compile and analyze the calendar data, Pullman hired Lynch Associates in April 2013 to do the work "from

---

[2] MSP delivered two trash bags containing an initial tranche of calendars in April 2013 and a box with additional calendars in October 2013.  [App.II:157-58; App.III:74-75, 77-78; S.App.242].

4

beginning to end" for a fixed fee of $200,000—on top of Lynch Associates' monthly retainer. [App.II:141, 163, 250-52; App.IV:287; App.VII:27-28]. SPAM Treasurer Andrew Daly told Pullman upon learning of the $200,000 fee that he thought "it was a hell of a lot of money." [App.II:217-18, 221-22, 252]. When Pullman learned that Daly had conveyed the same sentiment to SPAM Secretary Edward Hunter, Pullman said to Daly, "This should be between you and me." [App.II:252-53; App.III:185-86].

Pullman later reached a personal agreement with Lynch to seek still more compensation for Lynch Associates. [App.IV:296, 398]. At some point in late 2013, Lynch and Greg D'Agostino requested additional payment, stating that the project scope and detail had exceeded initial expectations and that the firm had performed an estimated $495,000 of work through December 19, 2013. [App.IV:293-95; App.VII:29]. Pullman pushed back on that figure, rejecting D'Agostino's $275 hourly rate because D'Agostino was not an attorney or even a college graduate. [App.IV:295, 394-95]. But Pullman nevertheless relied on the $495,000 figure to increase SPAM's request for reimbursement of its DOL-related costs from the Commonwealth, combining that figure with the $210,000 in estimated out-of-pocket expenses SPAM had also incurred through December 19, 2013 [App.VII:6-7[3]] to

_____

[3] These costs were in addition to the amount to be paid to Lynch Associates and included, among other things, temporary workers and additional office space which SPAM paid for directly, and not through Lynch Associates. [App.II:253-54,

claim total expenses of $705,000 [App.VII:1-3; S.App.131].   [App.V:220-21]. Pullman requested that the Commonwealth cover $350,000 of the claimed expenses [S.App.131]—and meanwhile arranged with Lynch to increase Lynch Associates' fee to that same amount.  [App.IV:398].  The list of expenses SPAM provided to the Commonwealth to justify its request did not specify how much was payable to Lynch Associates.[4]  [App.VII:2-3].

Pullman did not seek approval from Daly or the other E-Board members for— or even inform them at the time of—a 75% fee increase.  [App.III:185].  And despite a provision in the April 2013 agreement providing that "[a]ny changes to this agreement shall be valid only when agreed upon in writing and signed by both parties," [App.VII:28], he and Lynch did not reduce their personal agreement to writing.  [App.IV:296-97].  Though D'Agostino did not perceive this as an issue [App.IV:399], it was hardly standard practice for SPAM.  Each of the $7,000 per-month lobbying, $200,000 DOL, and $2,500 per-month public relations agreements

---

263-65; App.III:97-105; App.VII:5-7].  These costs were at least somewhat inflated. [*E.g.*, App.III:97-105].

[4] John Langan, the Commonwealth's negotiator beginning in 2013, could not later find this document to provide to investigators.  [App.IV:103-06, 112-13]. D'Agostino believed the letter contained in Exhibit 49 was what was submitted [App.IV:450-51].

between SPAM and Lynch Associates was memorialized in a written contract. [App.II:230; App.VII:27-29; *see also* App.III:63-65; S.App.20].

D'Agostino understood "pretty early on" that Lynch Associates could not actually receive the amount that had been discussed until after the Commonwealth reimbursed SPAM. [App.IV:299]. Negotiations over the DOL settlement, including the amount of reimbursement, were ongoing through the spring of 2014. [S.App.247, 250, 256]. Reimbursement was a sticking point. [App.IV:108-09, 116, 158, 168]. Though the Commonwealth tentatively agreed to reimburse SPAM up to $350,000 in expenses, Langan insisted that SPAM supplement its list of expenses with documentation to substantiate the amounts. [App.IV:108-09, 111, 113, 116-17; S.App.131-32]. For months, Pullman refused, and instead went over Langan's head to the governor's deputy chief of staff, Maydad Cohen. [App.IV:110, 122, 145; S.App.132, 150, 154, 161]. Cohen recognized that significant work had gone into compiling and analyzing the data. [App.IV:161]. He recommended that "while getting details would be best," getting the settlement across the finish line mattered more. [App.IV:168-69].

The grievance was finally settled in August of 2014. [App.VII:8-15]. The Commonwealth accepted Lynch Associates' calculation of the settlement amount, resulting in more than $20 million in compensation paid directly to troopers.

[App.IV:107, 146-47]. It also agreed to reimburse SPAM $350,000 in costs without requiring detailed invoices. [App.VII:14].

The SPAM E-Board remained unaware throughout this period that Pullman had an understanding with Lynch to pay Lynch Associates the entire $350,000 reimbursement. Indeed, SPAM financial statements approved by the E-Board and presented to the general membership recorded that money as an asset that would cover SPAM's *own* DOL-related office and staff expenses. [App.III:288-89, 297-98, 300-01, 309-10; S.App.70, 102, 107; *see also* S.App.30, 92]. The first record of any discussion of paying Lynch Associates more than $200,000 was an email dated September 29, 2014, when Hunter told Pullman that he "fe[lt] that *any* funds given to our lobbyist above what the contract called for regarding the DOLs should not happen." [S.App.29 (emphasis added)]. Hunter wrote: "We want the Commonwealth to live up to our contract, but not people who do business with us." [S.App.29].

It was not until Pullman demanded a check from Daly on November 5, 2014, that Daly learned Lynch Associates would be given *$150,000* more. [App.III:184]. The reimbursement check issued by the Commonwealth was deposited into a SPAM account on October 27, 2014. [App.VII:4, 35; S.App.52]. When Pullman soon thereafter requested a check that would bring Lynch Associates' compensation to the full $350,000 reimbursement amount, Daly told him that was a lot of money for

a person already on retainer and it sounded like SPAM was "getting fleeced." [App.II:275]. Pullman banged on Daly's desk and told him to "stop breaking [my] fucking balls and give [me] the check." [App.II:276]. "Taken aback" because he had never seen Pullman act like that before, Daly complied. [App.II:276]. The check was deposited into a Lynch Associates account the next day. [App.V:118; App.VII:25[5]; S.App.207].

Lynch paid Pullman $20,000 of that money. [App.V:120]. While Lynch Associates was awaiting payment from SPAM, Lynch told D'Agostino about a call she had with Pullman. [App.IV:300-01]. Though D'Agostino did not recall Lynch's exact words, the connotation of the call was that Pullman had "hit her up for a check." [App.IV:300-01, 426]. D'Agostino knew of no legitimate reason for Lynch Associates to make a personal payment to Pullman in connection with DOL and told Lynch he thought it was "bullshit." [App.IV:301-02]. Lynch then secretly handwrote a Lynch Associates' check to herself for an "owner's draw" of $50,000, deposited the check into her personal account, and wrote a $20,000 personal check

---

[5] The November 2014 check was for $250,000: $350,000 less $100,000 SPAM had already paid to Lynch Associates between June 2013 and February 2014. [S.App.230].

to Pullman's wife, Melissa.[6]  [App.IV:470; App.VII:35; App.VIII:2; S.App.183, 187, 190, 207, 210].

Lynch ultimately reclassified the $50,000 debit to Lynch Associates—including $30,000 that she spent on personal expenses [App.V:112-13]—as a "consulting fee" to "Mel Pulman," thereby reducing both Lynch's and the firm's tax liability.[7]  [App.IV:308-09, 314-15, 489-96, 501; App.V:183-84; App.VII:34; App.VIII:3-5, 134].  Lynch Associates did not issue an IRS Form W-2 or 1099 for Dana or Melissa Pullman, however, and Pullman did not include the $20,000 on his joint personal tax return for 2014.  [App.V:128, 156].

Neither Pullman nor Lynch disclosed to the Commonwealth during negotiations that Lynch would pay Pullman $20,000 of SPAM's reimbursement money.  Cohen and Langan would not have approved the DOL Settlement if they had known.  [App.IV:123-24, 161-62].  Cohen was "shocked" when he learned of the payment, "[b]ecause having been a union lawyer, I know the responsibilities of that role, and the intent of that settlement was to provide the union with its expenses, not to be provided for individual use."  [App.IV:169].  Langan likewise expressed

_____

[6] A $20,000 check deposited into the Pullmans' joint account on November 6 bounced.  [App.V:92-94; S.App.216-17].  It was followed by a second $20,000 check dated November 11 and deposited on November 12.  [S.App.217, 228-29].

[7] Lynch also reclassified six owner's draws for $1,208 each as "IT Expenses" paid to "Joseph D'Agostino."  [App.VIII:135].  According to his brother Peter, Jospeh never did IT consulting.  [App.IV:284; App.V:127].

shock, explaining, "[W]e can't engage in any self-dealing.  You can't take money and put it into your own pocket."  [App.IV:123-24].

Pullman and Lynch did not disclose the $20,000 personal payment to SPAM, either.  [App.II:146; App.III:185].  E-Board member Kevin Fredette would not have voted to approve additional compensation to Pullman for his work on the DOL settlement.  [App.II:199].  "That would be part of [Pullman's] duties as the president of SPAM," for which he was already paid a salary.  [App.II:199].

### 3.    Mark43

The $20,000 Lynch paid Pullman in connection with the DOL settlement was neither the first nor the last personal payment she made to him.

In July of 2014, 23-year-old Scott Crouch met with Pullman to discuss the possibility of a partnership between the MSP and Crouch's company, Mark43, which was developing law enforcement software products.  [App.III:218-19, 221-23].  Because unions could be advocates for, or blockers of, new software purchases for their members' use, Crouch knew Mark43 needed SPAM's support.  [App.III:218].  And to get SPAM's support, Mark43 needed Pullman's support.  [App.III:281].

During the meeting, Mark43 gave a demo of their record management software prototype.  [App.III:217, 219].  Crouch was forthcoming about the "limited functionality" of the software, for which Mark43 was looking to find a law

enforcement agency that would "buy into the vision and work with us to continue to develop our product." [App.III:217, 219, 241-42]. Crouch described Pullman as excited about the pitch. [App.III:220].

Pullman recommended at the conclusion of the meeting that Mark43 hire Lynch Associates to assist with an upcoming MSP request for proposals ("RFP"), stating that Lynch was well-connected and would be very helpful for the process. [App.II:279; App.III:220-21]. When Crouch emailed Pullman the next day to thank him for his time and asked what the "next best steps" were, Pullman said Lynch would be reaching out. [App.VII:37]. He wrote: "[Y]ou should be contacted by Anne Lynch from Lynch Assoc. She is aware of issue [sic] and a true expert in the state of Mass procurement process, talk soon, it was a pleasure meeting you both and I look forward to doing business with you[.]" [App.VII:37]. Lynch did indeed reach out, and she and D'Agostino soon met with Crouch. [App.III:226-27; App.VII:39; S.App.163]. The meeting took place at SPAM. [App.III:227; S.App.163].

Crouch was hesitant to move forward because he knew that Mark43 could not meet the MSP's expectations for the RFP. [App.III:229]. The RFP called for both a records management system—which Mark43 had only a prototype of—and a computer-aided dispatch ("CAD") system—which Mark43 had not yet begun to develop at all. [App.III:217, 229, 256-57]. Crouch asked whether Mark43 had "any

type of remote chance with this project" and agreed to proceed only after D'Agostino said there was a "solid chance" the MSP would "buy into the vision." [App.III:231-32; App.VII:41]. In an agreement dated August 16, 2014, Mark43 agreed to pay Lynch Associates to review and edit the RFP bid over a two-and-a-half-week period beginning on August 12, 2014 for a fixed fee of $20,000.[8] [App.III:233-34; App.VII:45-46]. Lynch determined the price of the contract, and D'Agostino, who was doing the bulk of the work, thought the price was fair. [App.III:236; App.IV:323, 444, 467; S.App.232-33]. Lynch Associates sent Mark43 an invoice for the full contract amount on August 18, 2014. [App.VII:48].

Two days after Lynch Associates sent Mark43 the invoice, Lynch wrote Pullman a check for $5,000. [App.IV:325-26; S.App.321]. The check was drawn on the Lynch Associates business account, a copy of the check stub was placed together with a copy of the Mark43 invoice in a Lynch Associates folder labeled "Mark43," and the amount was recorded in the firm's books as a "commission" payment to Pullman. [App.IV:326-28; App.VII:51-52, 56, 58]. Lynch Associates did not issue an IRS Form W-2 or 1099 for Pullman, however, and Pullman did not include the $5,000 on his joint personal tax return for 2014. [App.V:128, 150, 156; App.VII:237, 332].

---

[8] The project was ultimately awarded to another company, but the MSP lacked funding to carry it out. [App.III:111-12, 236].

Lynch did not tell Crouch that Lynch was going to pay Pullman $5,000 for sending Crouch to Lynch Associates. [App.III:237]. Crouch said that "[a]t the time it just seemed like referral, that they knew each other in their work." [App.III:233; *see also* App.IV:445]. He assumed the money Mark43 was paying Lynch Associates was going to pay Lynch Associates employees, however, and he would not have hired Lynch Associates if he had known that Lynch would pay Pullman $5,000 in connection with that engagement because "[i]t seems like inappropriate behavior." [App.III:237, 282].

### 4.    Taser International

In the spring of 2015, Pullman or Daly contacted Mark Swenson, a New England sales representative for Taser International, Inc. ("Taser"). [App.III:426, 428-29, 461-62; S.App.164]. Tasers had recently gained momentum as a less lethal alternative to firearms, and Pullman wanted to meet about obtaining them for MSP troopers.[9] [App.III:112-13, 116, 465]. This was an important call because the MSP was a large agency and SPAM was powerful. [App.III:429-30]. Like Crouch, Swenson understood that SPAM buy-in was crucial to securing MSP support. [App.III:429-30, 438; App.IV:41-42].

---

[9] Prior to this time, the MSP had purchased only a handful of tasers for a SWAT-like team. [App.III:457].

Swenson met with Pullman and others at the SPAM offices on April 9, 2015. [App.III:432-33; S.App.166]. Swenson provided a taser demo and discussed a taser purchase package valued at approximately $7,000,0000. [App.III:433, 436]. He also made a case for body cameras, as this was an area the company was trying to grow. [App.III:462-64, 479-80]. During the meeting, Pullman asked Swenson if Taser had a consultant. [App.III:437]. Swenson explained that Taser had a lobbying firm on retainer, but Pullman repeatedly told Swenson that Taser should use Lynch Associates, describing it as a "great outfit" that SPAM also employed.[10] [App.III:428, 437-38, 483-84, 488-89]. Swenson left the meeting with the impression that Taser had to hire Lynch Associates to secure SPAM's support. [App.III:438-40, 486-88, 489]. That feeling was further confirmed when Pullman first stopped responding to outreach and then cancelled a meeting with Swenson and his boss hours before the scheduled time. [App.III:440, 444; App.IV:23].

Swenson eventually recommended that Taser hire Lynch Associates as "a way to get through" to Pullman. [App.III:445-46, 486-87]. In late May and again in late August, Swenson arranged calls between Lynch Associates and Isaiah Fields, the legal services and governmental affairs director at Taser. [App.III:512-14;

---

[10] Swenson testified that the firm Taser had on retainer was a "very good" lobbying firm which had connections to legislators, the Boston Police Department ("BPD"), and the MSP, and was hired by Taser to work on the BPD body camera pilot program, "amongst other things." [App.III:484-86, 489].

App.VII:59-61; S.App.170].    A contract was signed on October 1, 2015. [App.VII:66-67].  The agreement provided for a monthly retainer for lobbying and relationship-building related to not just the MSP's use of tasers but to the Commonwealth's use of any of Taser's products.  [App.VII:66-67].  Consistent with Taser's effort to close a taser deal with the MSP by the end of year, however, [App.III:528], the contract called for a decreased monthly retainer after December 2015 and permitted termination on 30 days' notice.  [App.VII:67].  Swenson was not involved in the negotiations.  [App.III:446].

As the end of the year approached, D'Agostino learned that Taser was looking to pitch its products to the Massachusetts Department of Corrections ("DOC"). [App.IV:330-31].   D'Agostino offered to have Pullman set up a meeting for Swenson with Thomas Turco, then a decisionmaker with DOC.  [App.III:449]. Pullman set up a meeting between Swenson, D'Agostino, and Turco, which took place on February 11, 2016.  [App.IV:331-32; S.App.172].   That same day, D'Agostino thanked Pullman for an "[u]nbelievable meeting." [S.App.178].  Lynch initiated payment to Pullman for his efforts four days later. [App.IV:333; App.VII:69].[11]

---

[11] Taser closed a small deal with DOC in April 2016, but Lynch Associates was unsuccessful in securing funding for a large-scale deployment of tasers with the MSP.  [App.III:447-48; App.IV:33-34; S.App.172-73].

Specifically, Lynch handwrote a $5,000 check to herself from the Lynch Associates bank account on February 15, 2016, deposited the check into her personal account on February 19, and wrote a $5,000 check to Pullman on February 22. [App.VII:69; S.App.184, 197, 200, 206].   D'Agostino was unaware of the payment, which was falsely recorded in the Lynch Associates records as a consulting payment to Boston Consulting Group ("BCG") and claimed as a business expense. [App.IV:333-34; App.V:22, 140-41; App.VII:68].  Lynch Associates did not issue an IRS Form W-2 or 1099 for Pullman, and Pullman did not include the $5,000 on his joint personal tax return for 2016.  [App.V:128, 150-51; App.VII:288].

Lynch never informed Swenson that Pullman was going to receive money from Lynch Associates in connection with the Taser engagement.  [App.III:451]. Swenson would not have recommended that Taser hire Lynch Associates if he had known.  [App.III:451].  He "would have had red flags flying all over the place just saying this doesn't seem right.  Integrity—just doesn't seem right to me.  So we would not have done it."  [App.III:451-52].

### 5.  Richard Rafferty

In 2013, SPAM Attorney Richard Rafferty applied for a medical marijuana license but made a mistake on the application that generated news coverage. [App.IV:182, 184].  Pullman was upset that Rafferty had not told him about his plans, and Pullman had Rafferty use Lynch to handle the matter.  [App.IV:184-85,

206-08]. In 2016, when Rafferty decided to try again to enter the cannabis industry, he informed Pullman and asked for permission to hire Lynch Associates as a lobbyist. [App.IV:185-86; *see also* S.App.174]. Pullman wanted periodic updates from Rafferty, and during those discussions Rafferty spoke to Pullman about becoming a security expert for the business after he retired from the MSP. [App.IV:189-91].

Meanwhile, Lynch Associates was making payments to Pullman in connection with the Rafferty engagement. [App.IV:196, 339, 404]. On November 29, 2016, the same day Pullman attended a kickoff meeting with Rafferty at Lynch Associates, D'Agostino prepared a Lynch Associates check to Melissa Pullman for $2,250. [App.IV:339-40; App.VIII:137; S.App.211]. In December 2016, when Lynch Associates received a $90,000 payment from Rafferty, D'Agostino prepared a Lynch Associates check to Melissa Pullman for $9,000. [App.IV:341-42; App.VIII:137; S.App.212].

According to D'Agostino, the Rafferty engagement originated with Lynch and paying Pullman in connection with the engagement was not his idea. [App.IV:335, 339, 380-81]. He made the checks payable to Melissa Pullman at Pullman's request. [App.IV:340-43; S.App.179]. They were recorded in the firm's books as "consulting fees" to Melissa Pullman, but Lynch Associates did not issue an IRS Form W-2 or 1099 for Melissa or Dana Pullman, and Pullman did not include

18

the $11,500 on his joint personal tax return for 2016.  [App.V:128, 145, 147, 153, 159; App.VII:288; App.VIII:136].

### 6.  Pullman's Expenses

Between June 2016 and June 2018, Pullman was in a romantic relationship with Amy Finsilver.  [App.IV:48].  In October 2016, Pullman traveled with Finsilver to New York, where she accepted an award for the hotel she managed.  [App.IV:52-53].  Pullman took her to a celebratory lunch featuring champagne and caviar.  [App.IV:53-54; S.App.115].  Despite the lunch being personal in nature, Pullman used the SPAM debit card to pay for it.  [App.IV:53-54; App.V:131; App.VII:98].  Pullman told Daly that he was going to New York to meet with National Trooper Convention ("NTC") lawyers, causing Daly to classify the expense in the SPAM records provided to their accountant as a business expense.  [App.II:298, 305].

In February 2017, Pullman and Finsilver took a vacation to Miami, and Pullman used the SPAM debit card to pay for airfare, a rental convertible, and a four-night stay at The Palms Hotel and Spa.  [App.II:307-11; App.IV:54-57; App.V:131-33; S.App.119, 123-26, 129-30].  Daly again classified the charges as business expenses based on Pullman's misrepresentation that the trip was SPAM-related.  [App.II:307-12].

SPAM expenditures were required to be tied to union business, and each E-Board member who was asked testified that they would not have approved the annual

19

SPAM financial statements if they had known that Pullman had used the SPAM debit card for personal trips and meals with his girlfriend. [App.II:69, 73-74, 195; App.III:187-88].

### 7.    Obstruction of Justice

A federal grand jury sitting in the District of Massachusetts issued subpoenas to SPAM on July 11, August 1, and September 18 of 2018. [App.VII:70-90]. The first subpoena requested records relating to campaign contributions; the second requested bookkeeping records and financial statements; and the third requested expense reimbursement records, among other things. [App.VII:73, 80, 87].

Daly called Pullman immediately upon learning of the second subpoena. [App.II:332-35]. Daly suggested to Pullman that they hire a criminal attorney and "get ahead of everything and figure out what's going on," anticipating that a subpoena for SPAM's expense reports and receipts would soon follow.[12] [App.II:336]. He told Pullman—who had not submitted receipts since 2016—that he should "probably get his all together." [App.II:291, 336].

Daly meanwhile began to gather the expense reports and receipts in SPAM's possession. [App.II:336-37]. When he looked in the location where they were usually kept, however, he found records for only 2016 and 2018. [App.II:337-38].

---

[12] Daly testified pursuant to an immunity agreement. [App.II:346-47; S.App.44-46].

He believed at the time that the 2014, 2015, and 2017 records must have gotten misplaced during an office move and proceeded to spend "[d]ays, probably weeks" searching "every nook and cranny" of the SPAM office, but to no avail.  [App.II:337-38; App.III:194].  He told Pullman that he could not find certain years' records and would have to tell the government that he lost or misplaced them.  [App.II:338-39].  Pullman responded: "Can't we just tell them we have an internal policy to destroy them after a year?"  [App.II:339; App.III:195].  Daly replied that he did not think that was an option.  [App.II:339].

Following SPAM's receipt of the third subpoena on September 18, 2018, Pullman called Kesten asking that he speak to Lynch.  [App.V:56].  Kesten then received a call from Lynch, who "asked … if I would delay the production of the documents contained in the subpoena because she was looking, or she, they, were still looking for receipts."  [App.V:56-57, 62].  Kesten understood that Lynch meant she and Pullman were looking for receipts, and the call made him uncomfortable because he took the request to mean "that I should hold off so that receipts or something, documentation of expenses could be put into the documents before I sent them to the U.S. Attorney."  [App.V:57, 82].  It concerned Kesten that the receipts would be added into the documents and then "produced as if they had existed when the subpoena came in."  [App.V:76].

Pullman soon resigned as the president of SPAM [App.V:57-58, 168], but not before again suggesting to Daly that they falsely claim that SPAM had a one-year retention policy.  During a September 27, 2018 conversation with Daly, Pullman asked, "'Are you sure we can't just tell them that we have an internal policy to keep [expense records] for a year and then destroy them?'"  [App.II:345; App.III:195]. Daly again responded that Pullman's suggestion was not an option, telling Pullman, "I don't think we can do that.  I think I'd probably get charged with obstruction." [App.II:345].  Pullman resigned the next day.  [App.II:346].

On October 17, 2018, FBI Special Agent Matthew Elio and IRS Special Agent Sandra Lemanski went to the Lynch Associates office for the purpose of attempting to interview Lynch.  [App.IV:238-39, 258].  Lynch was not there, but the agents met Greg D'Agostino.  [App.IV:250].  They subsequently interviewed Lynch at her home in Hull, and Lynch secretly recorded the interview on her cell phone. [App.IV:238, 362-63].  Multiple times throughout the interview, Lynch was reminded by the agents that it was a crime to lie to them.  [App.IV:244, 246-47; App.VIII:149].  Lynch told the agents repeatedly that she had not made payments to Dana or Melissa Pullman [App.IV:244, 247, 364-65, 368; App.VIII:153-54, 161, 163-64] and that "we don't do kickbacks" [App.IV:265-66; App.VIII:150].  Lynch further denied talking to Pullman about the investigation and said she had

"absolutely nothing to do with" expense reimbursements. [App.IV:248, 371; App.VIII:156-57, 170-71].

## B.    Procedural History

On September 12, 2019, a federal grand jury returned an indictment against Pullman and Lynch. [D.17]. On September 28, 2022, they proceeded to trial on the following charges:

Count I:     racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (both defendants)

Count II:    honest-services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, regarding the $20,000 payment from Lynch to Pullman's spouse in connection with the DOL Settlement (both defendants)

Count III:   wire fraud, in violation of 18 U.S.C. § 1343, regarding the $5,000 check from Lynch to Pullman in connection with the Mark43 engagement (both defendants)

Count IV:    wire fraud, in violation of 18 U.S.C. § 1343, regarding the $5,000 check from Lynch to Pullman in connection with the Taser engagement (both defendants)

Count V:     wire fraud, in violation of 18 U.S.C. § 1343, also regarding the $5,000 check from Lynch to Pullman in connection with the Taser engagement (both defendants)

Count VI:    wire fraud, in violation of 18 U.S.C. § 1343, regarding use of a SPAM debit card to pay for lunch at the New York restaurant (Pullman)

Count VII:   wire fraud, in violation of 18 U.S.C. § 1343, regarding use of a SPAM debit card to pay for the Miami hotel (Pullman)

Count VIII:  obstruction of justice, in violation of 18 U.S.C. §§ 1503(a) and 2, regarding the attempt to manipulate records required to be

23

produced in response to the grand jury subpoena (both defendants)

Count IX:     obstruction of justice, in violation of 18 U.S.C. § 1503(a), regarding false statements during the FBI interview (Lynch)

Count X:     conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (both defendants)

Count A:     aiding and assisting the filing of a false tax return, in violation of 26 U.S.C. § 7206(2), regarding the failure to declare the $20,000 DOL payment and $5,000 Mark43 payments on his 2014 tax return (Pullman)

Count B:     aiding and assisting the filing of a false tax return, in violation of 26 U.S.C. § 7206(2), regarding the failure to declare the $5,000 Taser payment and $11,250 in Rafferty payments on his 2016 tax return (Pullman)

Count C:     aiding and assisting the filing of a false tax return, in violation of 26 U.S.C. § 7206(2), regarding false classification of (a) the $50,000 owner's draw, including $30,000 employed for personal use, as a consulting expense, and (b) six owner's draws of $1,208 each as "IT Expenses," in the 2015 Lynch Associates tax filing (Lynch)

Count D:     aiding and assisting the filing of a false tax return, in violation of 26 U.S.C. § 7206(2), regarding false classification of the $5,000 Taser payment as a consulting expense in the 2016 Lynch Associates tax filing (Lynch)

[App.I:39-109].[13]

---

[13] The government dismissed certain charges before and during trial, resulting in a renumbering of the counts sent to the jury for deliberation. [D.186; D.214]. This brief refers to the counts provided to the jury on the verdict form and in the redacted superseding indictment.

24

At the conclusion of the 20-day trial, the jury convicted on all counts. [App.I:225-43]. For purposes of the RICO conspiracy, the jury found the following predicate acts proven as to Pullman: (1) honest-services wire fraud related to the DOL settlement, (2) wire fraud related to Mark43, (3) wire fraud related to Taser, and (4) obstruction of justice related to the grand jury subpoena. [App.I:226-27]. As to Lynch, the jury found proven each of those predicate acts and the further act of (5) obstruction of justice related to the FBI interview. [App.I:229-30].

The district court denied the defendants' motions for judgment of acquittal or, alternatively a new trial. [D.249 at 75-76; P.Add.10]. Pullman was sentenced to a term of 30 months' imprisonment and three years' supervised release. [P.Add.1-8]. Lynch was sentenced to 24 months' imprisonment and two years' supervised release.[14] [L.Add.1-8].

Additional procedural history is provided as needed below.

## **SUMMARY OF ARGUMENT**

Pullman and Lynch challenge the sufficiency of the evidence to prove honest-services wire fraud related to the DOL settlement (Count II), wire fraud related to Mark43 and Taser (Counts III-V), obstruction of justice related to the SPAM subpoena (Count VIII), RICO conspiracy (Count I), and conspiracy to commit tax

---

[14] Defendants' sentences were stayed pending appeal. [D.304].

fraud (Count X).  Lynch additionally argues that she is entitled to a new trial on the individual tax fraud counts against her (Counts C and D) and obstruction of justice related to both the SPAM subpoena (Count VIII) and her false statements to agents (Count IX).  The government concedes that judgments of acquittal are warranted on Counts III-V and Count D.  Each of the remaining counts, however, should be affirmed.

Ample evidence supported the honest-services fraud verdict.  Within a day of Pullman demanding a check that would increase Lynch Associates' DOL compensation by $150,000 over the objections of at least two members of the SPAM E-Board, Lynch supplied a $20,000 check made out to Pullman's wife and disguised on the Lynch Associates' books as an owner's draw.  The jury rationally found based on the timing and circumstances of this payment and others that it was not merely a gift or gratuity, but a classic kickback.

The proof likewise supported the jury's conclusion that defendants endeavored to obstruct justice by attempting to manipulate SPAM's grand jury subpoena response.  Kesten's understanding that Lynch was requesting not just that the response be delayed but that receipts be added as if they had been in SPAM's files all along was supported by Pullman's repeated request that Daly falsely claim that SPAM had a one-year retention policy and his rapid resignation when Daly

confirmed he could not.  The jury thus supportably found defendants acted with obstructive intent.

The sufficiency of the evidence to prove honest-services fraud and obstruction of justice dispels defendants' derivative challenge to their RICO conspiracy convictions because a rational jury could find that those predicate acts were related to defendants' abuse of Pullman's position and posed a threat of continued criminal activity so long as he remained at SPAM's helm.  Lynch's additional contention that the evidence at trial constructively amended the RICO conspiracy count is baseless.

The evidence was also sufficient to support the tax fraud conspiracy verdict. Lynch made multiple payments to Pullman on the heels of Lynch Associates' receipt of money or other benefits Pullman played a role in obtaining, and in all but the first defendants took efforts to make the payments look like something other than income to Pullman.  The jury rationally concluded both defendants were aware of the requirement that Pullman report this income and conspired to avoid it.

Defendants' alternative bid for a new trial on the remaining counts of conviction fails.

The government's concession moots defendants' argument that the district court's refusal to give a duty-to-disclose instruction necessitates a new trial on the wire fraud counts related to Mark43 and Taser, and their challenge to the honest-services fraud fiduciary duty instruction is unavailing.  Their arguments concerning

the question of Pullman's fiduciary duty to the Commonwealth demonstrate that their claim is one of evidentiary insufficiency, not legal invalidity. Moreover, any error in failing to submit the question to the jury was harmless beyond a reasonable doubt because Pullman's fiduciary duty to SPAM was uncontested and the evidence of it overwhelming.

Finally, Lynch's contention that "unsound fraud theories" require a new trial on the tax and obstruction counts is moot as to Count D and otherwise waived twice over. It also lacks merit. While Count D was predicated on proof of the illegality of Lynch's $5,000 payment to Pullman in connection with the Taser engagement, the remaining tax count and obstruction counts in no way depended on the Taser or the Mark43 payments being the product of fraud, and Lynch provides no record support for her assertion that the jury's assessment of the obstructions counts and remaining tax count would have been influenced by a finding that they were. A new trial is unwarranted.

## **ARGUMENT**

## I.   **THE GOVERNMENT CONCEDES JUDGMENTS OF ACQUITTAL SHOULD ENTER ON THE COUNTS III-V WIRE FRAUD CONVICTIONS AND THE COUNT D TAX FRAUD CONVICTION**

In light of the manner in which the evidence developed at trial and post-trial developments in the law, the government concedes that judgments of acquittal

should enter on the Counts III-V wire fraud convictions against both defendants and the Count D tax charge against Lynch.

Each of the remaining counts should be affirmed for the reasons set forth below.

## II.    THE EVIDENCE WAS SUFFICIENT TO ESTABLISH HONEST-SERVICES FRAUD

Defendants contend the evidence failed to establish that they participated in a scheme to defraud SPAM, its membership, or the Commonwealth of the right to Pullman's honest services through bribes or kickbacks.  [P.Br.37-46; L.Br.14 n.2, 18-28].  Ample evidence supported the jury's finding that they did.

### A.    Procedural History

Defendants moved for judgments of acquittal on all counts at the close of the government's case, at the close of evidence, and in a post-verdict motion for judgment of acquittal or alternatively for a new trial, arguing that the evidence failed to prove each element of the offenses.  [App.I:244-48; App.V:501].

### B.    Standard of Review

This Court reviews preserved sufficiency challenges de novo, "resolv[ing] all credibility disputes in the verdict's favor," *United States v. Merlino*, 592 F.3d 22, 29 (1st Cir. 2010), and "examin[ing] the evidence—direct and circumstantial—as well as all plausible inferences drawn therefrom, in the light most favorable to the verdict," *United States v. Meléndez-González*, 892 F.3d 9, 17 (1st Cir. 2018)

(cleaned up).  The verdict must be upheld "if it is supported by a plausible rendition of the record." *Merlino*, 592 F.3d at 29.

### C.    Ample Evidence Supported the Jury's Quid Pro Quo Finding

Defendants argue the evidence in this case established no more than self-dealing of the sort that *Skilling v. United States*, 561 U.S. 358, 409-11 (2010), held to be outside the honest-services fraud statute's reach.  But *Skilling* described a still-illegal "classic kickback scheme" as one in which an employee provides favorable action to a third party in exchange for a share of the proceeds, *id.* at 410 (construing *McNally v. United States*, 483 U.S. 350, 352-53, 360 (1987)), and when taken "in the light most flattering to the prosecution, together with all reasonable inferences," *United States v. Olbres*, 61 F.3d 967, 970 (1st Cir. 1995), that is exactly what the evidence here showed.[15]

When Pullman demanded from Daly the check that would bring Lynch Associates' total DOL compensation to $350,000, he did so over clear objections from at least two members of the SPAM E-Board and acted in a manner Daly had never seen before: "like a different person," he "banged on the desk and told [Daly]

---

[15] Pullman argues that the evidence was insufficient even if a quid pro quo is not necessary to prove a kickback.  [P.Br.33-34].  Consistent with its position below [*e.g.*, D.165 at 49-50], the government does not dispute that a quid pro quo was required.  *Cf. Snyder v. United States*, No. 23-108, 2024 WL 3165518 (U.S. June 26, 2024).

to stop breaking his fucking balls and give him the check." [App.II:276]. This was not the behavior of a disinterested party, and the $20,000 check from Lynch to Pullman's wife deposited the very next day confirmed that Pullman's interest was personal. The jury could find from this evidence alone that Lynch had agreed that she would pay Pullman in exchange for the increased compensation.

This conclusion was buttressed by Lynch's efforts to ensure that Pullman got paid and to cover it up. Lynch, like Pullman, faced blowback from the deal, with D'Agostino telling her in no uncertain terms that paying Pullman in connection with the increased compensation was "bullshit." [App.IV:301-02]. Undeterred, and unbeknownst at the time to D'Agostino [App.IV:470], Lynch wrote a Lynch Associates check to herself as an owner's draw and paid Pullman from her personal account (only reclassifying the draw as a consulting fee paid to Pullman's wife when, nearly a year later, she realized her personal tax implications). The jury could supportably find that Lynch did so to live up to her end of the bargain. *See United States v. Roberson*, 998 F.3d 1237, 1249 (11th Cir. 2021) ("[T]he extent to which the parties went to conceal their bribes is powerful evidence of their corrupt intent."). Her later denial of having made payments to Pullman or his wife underscored that finding by evincing consciousness of guilt. *See United States v. Woodward*, 149 F.3d 46, 57 (1st. Cir. 1998) ("suggestions of a cover-up" supported inference of illicit intent).

31

Defendants' arguments that the evidence failed to establish the requisite quid pro quo are unavailing.

As an initial matter, defendants' discussion of the reasons Lynch Associates may have been deserving of increased compensation is a red herring. [P.Br.39-40; L.Br.25-26]. The government did not dispute that Lynch Associates put considerable effort into the DOL project. [*E.g.*, App.II:9; App.VI:11]. But, contrary to Lynch's contention [L.Br.25], the firm had agreed to undertake "a complete compilation and analysis" of SPAM members' calendars and to "manage and oversee the presentation of [its] findings" for a fixed fee of $200,000. [App.VII:27-28]. The firm could have been held to the terms of that agreement, and the only relevant question was whether a rational jury could find that "at the time Pullman caused SPAM to issue the check to Lynch Associates" [L.Br.22] raising the firm's compensation from $200,000 to $350,000 over objection, he did so in exchange for Lynch's agreement to kick back a portion of the proceeds to him.

Pullman suggests the government was required to show that Lynch had agreed to pay Pullman as of December 2013, citing what he calls a "renegotiation" of the agreement at that time. [*See* P.Br.38, 42]. "Renegotiation" is a misnomer. Unlike the $7,000 per month lobbying agreement and the original $200,000 DOL agreement that came before it and the $2,500 per month public relations agreement that came after, this agreement was not reduced to writing. Nor, for that matter, was the E-

32

Board informed of it. Pullman kept the SPAM E-Board in the dark about the agreement for months, even signing off on financial statements in January 2014 that would have led the E-Board and membership to believe that the $350,000 reimbursement from the Commonwealth would be used to *offset* SPAM's out-of-pocket DOL-related expenses, not as a basis for incurring new ones. [S.App.107]. The list of expenses Pullman submitted on SPAM's behalf to the Commonwealth meanwhile did not delineate the amount due to Lynch Associates, and he and Lynch fought to ensure SPAM was not required to produce proof of its expenses as a condition of reimbursement. The result was that there was no documentation of *any* agreement—much less an *enforceable* agreement—to pay Lynch Associates any more than $200,000, a point driven home by Hunter's objection to paying "any funds … above what the contract called for." [S.App.29]. Thus, although "one cannot agree to perform an act in exchange for payment when that act has already been performed" [P.Br.41 (quoting *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013)], the relevant act here was Pullman demanding a check from Daly to convert an unenforceable, personal agreement into an executed one.[16]

---

[16] While thus not essential to the government's case, there in fact was evidence suggesting that a quid pro quo agreement was in place at the time Pullman unilaterally acquiesced to the increase. Daly had balked at paying Lynch Associates even $200,000 on top of its then-$7,000 per month retainer, and this evidence and Pullman's secrecy surrounding the deal suggested that he well knew that a 75% increase in SPAM's payment to Lynch Associates would be met with resistance from SPAM. He also would have known that his request for the funds that would supply

Lynch contends that "[i]f there had been a preexisting agreement, Pullman would not have asked Lynch for a check after the settlement was finalized." [L.Br.24]. She adds that doing so amounted to extortion. [L.Br.26-27 & n.4]. This argument rests on the same flawed assumption regarding the timing of the relevant act discussed above. *See United States v. Gracie*, 731 F.3d 1, 3 (1st Cir. 2013) ("When a person with the power to do or not do something demands a payment from the beneficiary of the exercise of that power as a condition for continuing to do so, the payment is [a bribe].").  It also misapprehends the relationship between bribery and extortion.  "[P]roof of bribery can[] be proof of extortion (and vice-versa)." *United States v. Buffis*, 867 F.3d 230, 235 n.5 (1st Cir. 2017); *see also Evans v. United States*, 504 U.S. 255, 268 n.18 (1992) (rejecting idea that "extortion under color of official right and bribery are mutually exclusive").

Pullman does not suggest that the call undermines the inference of a quid pro quo exchange.  Instead, he argues that "[n]either the call nor the provision of a check are sufficient to support the conclusion of a bribe or kickback."  [P.Br.43].  This

---

the increased payment—$350,000 paid as partial reimbursement of over $700,000 in falsely inflated costs he refused to verify—was likely to be met with resistance from the Commonwealth.  A jury could rationally conclude that Pullman agreed to what plainly would be a difficult sell only because Lynch had agreed that she would pay him a portion of the proceeds in return.  *See United States v. Simon*, 12 F.4th 1, 24 (1st Cir. 2021) ("In conducting [sufficiency review], we must honor the jury's evaluative choice among plausible, albeit competing, inferences." (quotation omitted)).

argument proceeds from the faulty premise that the call and the payment were the extent of the evidence. That premise fails to account for Pullman's aberrant behavior when requesting the check and Lynch's efforts to disguise and deny her payment to him. It also ignores Pullman's extended efforts to keep the arrangement secret, his willingness to delay settlement with the Commonwealth to secure the reimbursement necessary to act on it, and his insistence on overriding the concerns of at least two E-Board members to force payment. The jury could rationally conclude from the totality of this evidence that Pullman was not merely "turning to his friend, Lynch, … at a time [when] money was available to [her]" [P.Br.43], or receiving a "gift" given "to cultivate a business … friendship" [L.Br.24 (cleaned up)].[17] *See Olbres*, 61 F.3d at 974 ("[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." (cleaned up)). Indeed, the latter suggestion was roundly refuted by Lynch's repeated payments to Pullman on the heels of Lynch Associates' receipt of money or other benefits Pullman played a role in securing—

---

[17] Lynch's argument that the evidence did not "preclude" the "alternative explanation" that SPAM hired Lynch Associates for the DOL project because Lynch Associates had previously negotiated a settlement with the Commonwealth on behalf of court employees [L.Br.24] misunderstands the nature of both the government's case and its burden of proof. Pullman and Lynch were not charged in connection with the decision to hire Lynch Associates but rather based on Lynch's personal payment to Pullman in exchange for causing SPAM to pay Lynch Associates more than the $200,000 SPAM was contractually obligated to pay. And to prove its case, the government was not required to disprove every theory consistent with innocence. *E.g.*, *United States v. Stewart-Carrasquillo*, 997 F.3d 408, 418 (1st Cir. 2021).

including the Mark43 payment made just a few months prior.  *See infra* at Part V.C.

*Cf. Woodward*, 149 F.3d at 53 (deeming "noteworthy" the "pattern formed by the[]

amounts" of the payments over time; they increased when the official became chair

of the relevant committee and ceased after he resigned from office).

Defendants' reliance on Langan's testimony to imply the evidence suggested

only self-dealing [P.Br.44] does not change the calculus.  In layman's terms, a

kickback is a form of self-dealing.  And regardless, a layperson's labeling is not

determinative of legal liability.

Finally, Lynch's argument that the honest-services fraud statute is

unconstitutionally vague as applied to the case is foreclosed by *Skilling*.  As that

decision observed, "it has always been as plain as a pikestaff that bribes and

kickbacks constitute honest-services fraud, and the statute's mens rea requirement

further blunts any notice concern."  561 U.S. at 412 (cleaned up).

### D.    The Jury Supportably Found a Scheme to Defraud

Defendants additionally argue that the evidence failed to establish a scheme

to defraud.  Lynch does not independently develop this claim.  [L.Br.27].  In the

argument made by Pullman that she joins, Pullman asserts that his failure to disclose

his wife's receipt of the check from Lynch is insufficient to prove a scheme to

defraud *if* that payment was not a bribe or kickback.  [P.Br.45-46; L.Br.14 n.2].  This

claim necessarily fails given the sufficiency of the evidence to conclude the payment

was a kickback.  As Pullman's framing of the issue acknowledges, "the agreement between the breaching fiduciary and the person paying him [a kickback] constitutes a scheme," and "the breach itself provides the necessary deception."[18]  *United States v. Runnels*, 833 F.2d 1183, 1187 (6th Cir. 1987), *vacated on other grounds*, 877 F.2d 481 (6th Cir. 1989).

## III. THE EVIDENCE WAS SUFFICIENT TO ESTABLISH OBSTRUCTION OF JUSTICE

Both Pullman and Lynch were found guilty of obstructing the administration of justice based on their attempt to manipulate SPAM business records subpoenaed by the grand jury (Count VIII).  [App.I:75, 237].  Lynch was additionally found guilty of obstruction based on her false denials to agents that she had ever made payments to either Pullman or his wife or had conversations with Pullman about the ongoing grand jury investigation (Count IX).  [App.I:76, 238].

Pullman, joined by Lynch, challenges the sufficiency of the evidence to support the Count VIII conviction.  [P.Br.46-50; L.Br.14 n.2].  Lynch does not

---

[18] Defendants also argue the evidence failed to establish Pullman owed a duty of honest services to the Commonwealth.  [P.Br.54-56; L.Br.14n.2].  Because the evidence was sufficient to prove he owed a duty of honest services to SPAM and its membership—a point defendants do not dispute—the Court can affirm on that basis alone.  *See United States v. Pena*, 24 F.4th 46, 74 (1st Cir. 2022) ("When a jury returns a general guilty verdict … and there is sufficient evidence as to one of two alternative theories of guilt in that count, … insufficiency of the evidence as to the other theory of guilt will not undermine the conviction."); *see also infra* Part VI.D.

challenge the sufficiency of the evidence to support her conviction on Count IX.[19] Because defendants' challenge to Count VIII fails and Count IX goes unchallenged, both counts should be affirmed.

### A.    Procedural History

The relevant procedural history is set forth *supra* at Part. II.A.

### B.    Standard of Review

The standard of review is set forth *supra* at Part II.B.

### C.    A Rational Jury Could Find an Intent to Obstruct

Count VIII charged that "in or about and between September 2018 and October 2018" Pullman and Lynch "corruptly … endeavor[ed] to influence, obstruct and impede the due administration of justice in the grand jury investigation of SPAM and others by … attempting to manipulate records required to be produced pursuant to a grand jury subpoenas [sic]," in violation of 18 U.S.C. § 1503(a).  [App.I:104].

---

[19] In a footnote, Lynch attempts to incorporate by reference "each of the grounds for acquittal and a new trial previously stated in her prior submissions to the district court." [L.Br.14n.2].  Lynch's Rule 29 and 33 filings in the district court are devoid of any argument concerning the sufficiency of the evidence to prove Count IX.  And regardless, "[f]iling a brief that merely adopts by reference a memorandum previously filed in the district court does not comply with the Federal Rules of Appellate Procedure" and "is a practice that has been consistently and roundly condemned by the Courts of Appeals." *Rhode Island Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 47 n.6 (1st Cir. 2002) (cleaned up); *see also United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.)

Defendants' first challenge to their conviction on this charge is that the evidence was insufficient to establish an intent to obstruct. That claim fails.

The government presented evidence from which it urged the jury to find that, in anticipation of a subpoena requesting SPAM's expense reimbursement records, Pullman asked Daly whether they could "just tell them we have an internal policy to destroy them after a year" [App.II:339; App.III:195]; that upon receipt of the subpoena in September 2018, Lynch requested that Kesten delay SPAM's subpoena response so that the receipts she said she and Pullman were looking for could be included in the production as if they had always been contained in SPAM's files [App.V:57, 65, 76-77]; and that when Kesten refused, Pullman once again asked Daly whether he was "sure we can't just tell them that we have an internal policy to keep [expense records] for a year and then destroy them.'" [App.II:345; App.III:195]. Defendants do not dispute that this version of events, if credited, was sufficient to establish an intent to obstruct justice. *See United States v. Aguilar*, 515 U.S. 593, 601-02 (1995) (intent can be inferred from the "the natural and probable effect" of defendant's actions). Rather, they quarrel with Kesten's stated understanding that Lynch was requesting that the receipts be "'put … in the file' as though they had been there all along," which defendants say was "simply his speculation." [P.Br.47-48 (quoting App.V:81)]. Defendants made this same argument to the jury [App.VI:73-74, 103-04], and the jury rationally rejected it.

39

Kesten was candid in admitting that Lynch did not make her request explicit. [App.V:81]. But he was also clear that the request made him "incredibly uncomfortable"—"even more uncomfortable" than testifying against Pullman, who "worked tirelessly for the union," and so much so that he expressed concerns to other members of SPAM after the conversation took place. [App.V:82-83; *see also* App.V:78 ("If people had come to me and said, 'We didn't submit the receipts to Andy Daly, but we have receipts,' I would have been the happiest, I would have been so happy. And I certainly would have told them or we would have produced them to the U.S. Attorney and said, 'They weren't there, but they've now located them.' Absolutely. I would have been so happy if that happened with Dana Pullman.")]. The jury was entitled to credit Kesten's testimony and to "conclude, from the circumstances of the conversation, that the defendant had sought, however cleverly and with whatever cloaking of purpose, to influence improperly [the grand jury proceeding]." *United States v. Tedesco*, 635 F.2d 902, 907 (1st Cir. 1980); *see also United States v. Soto-Beniquez*, 356 F.3d 1, 52 (1st Cir. 2003) ("plausible credibility determinations cannot be disturbed on appeal"). "[T]he fact that the effort to influence was subtle or circuitous ma[kes] no difference." *Id.* (citation omitted).

Surrounding circumstances lent further support to the jury's conclusion about defendants' intention. Both before Lynch's conversation with Kesten and after, Pullman asked Daly whether SPAM could report to the grand jury that it had a policy

of destroying expense receipts after one year. This evidence—absent from defendants' discussion despite their recognition that Count VIII was based on both the Kesten *and* the Daly conversations [P.Br.16 n.11, 46-47][20]—undermined defendants' suggestion that Lynch was merely requesting additional time to gather receipts. So, too, did Lynch's later denial of her involvement. If defendants were not concerned with creating the appearance that the receipts had been properly submitted to SPAM, there would have been no reason for Pullman to suggest a false explanation for why they were absent from SPAM's records and resign as President of SPAM on the heels of being told that neither his suggestion to Daly nor Lynch's suggestion to Kesten was a viable option [App.II:345-46; App.V:57-58]. Nor would there have been reason for Lynch to deny that she had spoken to Pullman about the investigation and claim she had "absolutely nothing to do with" expense reimbursements [App.IV:248, 371; App.VIII:156-57, 170-71]. The jury could thus supportably find that Lynch's request of Kesten was not the innocent one defendants claimed, and their challenge to the sufficiency of the evidence to prove intent to obstruct justice fails. *See United States v. Acevedo*, 882 F.3d 251, 259 (1st Cir. 2018)

---

[20] Defendants note that the first of Pullman's discussions with Daly about a fake destruction policy occurred in August 2018 and was thus outside the time frame set out in the indictment. [P.Br.47 n.18]. That discussion was nonetheless relevant evidence of Pullman's intent in asking Kesten to speak with Lynch and in making the same suggestion to Daly a second time.

41

("[I]f the evidence can be construed in various reasonable alternatives, the jury is entitled to freely choose from among them." (quotation omitted)).

### D.    Defendants' Actions Constituted an "Endeavor"

Defendants next challenge the sufficiency of the evidence to prove an "endeavor." That claim fares no better.

It is well-established that the term "endeavor" avoids "the technicalities which might be urged as besetting the word 'attempt'" and includes "*any* effort or essay to accomplish the evil purpose that the section was enacted to prevent." *United States v. Russell*, 255 U.S. 138, 143 (1921) (emphasis added) (interpreting substantially identical predecessor statute); *accord United States v. Lazzerini*, 611 F.2d 940, 941-42 (1st Cir. 1979) ("endeavor" in 18 U.S.C. §1503 likewise "connotes a somewhat lower threshold of purposeful activity than 'attempt'"); *see also United States v. Brady*, 168 F.3d 574, 578 (1st Cir. 1999) (actus reus requires only "some step in th[e] direction" of obstruction). As discussed above, defendants' conduct could reasonably be found to constitute an effort to manipulate SPAM's grand jury response. *See supra* Part III.C. To prove an "endeavor," no more was required.

Defendants' contrary argument does not withstand scrutiny. Citing *Aguilar* and *Tedesco*, they claim their actions do not amount to an endeavor because they involved "no follow-up or pressure" and so "were not undertaken in a manner likely to obstruct justice." [P.Br.48-50]. This contention misreads *Aguilar*. *Aguilar*

42

referred to acting "in a manner that is likely to obstruct justice" as shorthand for a requirement of a "nexus" between the obstructive acts and a particular proceeding. *See* 515 U.S. at 599-602. It did not impose a requirement that the acts be likely to succeed, as defendants' argument implies. To the contrary, *Aguilar* reaffirmed that "[g]uilt is incurred by the trial—success may aggravate; it is not a condition of it." *Russell*, 255 U.S. at 143 (cited for this proposition in *Aguilar*, 515 U.S. at 599); *see also United States v. Callipari*, 368 F.3d 22, 43 (1st Cir. 2004) (finding jury was adequately informed of nexus requirement where court instructed that "[s]uccess of the endeavor is not an element of the crime. The term 'endeavor' includes conduct which is *aimed* at influencing, intimidating or impeding the proceedings.").

Defendants' reliance on *Tedesco* is similarly misplaced. [P.Br.49]. The defendant in *Tedesco* told a witness who had testified before a grand jury that had indicted the defendant's friend that the friend "could do a lot" for the witness, and the defendant was charged with obstruction after he reiterated the suggestion in subsequent conversations. 635 F.2d at 904. During the first such conversation, the defendant said the witness should meet with the friend, but no specific arrangements were made. *Id.* During the second, the defendant spelled out what the friend could do for the witness and added that the witness should meet with the friend's attorney to review his testimony. *Id.* When the witness replied that he would not change his testimony, the defendant said the witness should not "add any more wood to the

43

fire." *Id.* A third conversation, instigated and recorded by authorities, included similar themes. *See id.* This Court affirmed the conviction. *Id.* at 907.

Defendants argue *Tedesco* counsels in favor of reversal because here "there was no follow-up or pressure." [P.Br.50]. But the cases are not as far apart as defendants suggest: in both instances the defendants were charged with obstruction only when they persisted in their efforts after their first approach failed to yield results. And, in any event, *Tedesco* did not address the argument defendants make here, much less purport to establish the atextual floor for "endeavor" that they propose. *See id.* at 906-07 (explaining that "[t]he key point of Tedesco's challenge" was that "he did not endeavor to influence a witness because he made no explicit offer of a bribe or request for specific testimony"). Indeed, defendants in this circuit and elsewhere have been convicted of obstruction of justice based on actions less dogged. *See, e.g.*, *Acevedo*, 882 F.3d at 260 (where attorney-defendant paid a single visit to his client's co-conspirator requesting that he retract statements made to law enforcement); *United States v. Roe*, 529 F.2d 629, 631 (4th Cir. 1975) (where defendant made a single phone call to the home of a jury member and told the juror's husband that the defendant in the trial was not guilty and calls were being made to "try to help" him). *Cf. Russell*, 255 U.S. 143 (where defendant once requested that wife of juror question her husband about his disposition towards defendants and

44

report his response because defendants did not wish to pay money to any juror not known to favor acquittal).

## IV. THE EVIDENCE WAS SUFFICIENT TO PROVE A RICO CONSPIRACY, AND THERE WAS NO CONSTRUCTIVE AMENDMENT

Count I, as submitted to the jury, charged that Pullman and Lynch conspired to conduct the affairs of SPAM through a pattern of racketeering activity consisting of the honest-services wire fraud offense alleged in Count II, the wire fraud offenses alleged in Counts III-V, and the obstruction of justice offenses alleged in Counts VIII and IX. [*See* App.I:225-30]. Pullman, joined by Lynch, argues that Count I fails because there are no predicate acts which he agreed would be committed. [P.Br.50-51; L.Br.14 n.2]. Lynch further argues that Count I was constructively amended. [L.Br.32-36]. Both claims fail.

### A. Procedural History

As noted *supra* at Part II.A, defendants moved for judgments of acquittal at the close of the government's case, at the close of evidence, and in a post-verdict motion for judgment of acquittal or alternatively for a new trial. In her post-verdict motion, Lynch argued that Count I was constructively amended. [D.267 at 14-18].

45

**B.     Standard of Review**

As set forth *supra* at Part II.B, preserved sufficiency challenges are reviewed de novo.  So, too, are preserved constructive amendment claims.  *United States v. Katana*, 93 F.4th 521, 530 (1st Cir. 2024).

**C.     A Rational Jury Could Find a Pattern of Racketeering Activity**

Defendants' challenge to their RICO convictions is derivative of their sufficiency claims.  They contend that because the evidence was insufficient to establish that their conduct constituted honest-services wire fraud, wire fraud, or obstruction of justice, there was no predicate act which either agreed should be committed and hence no "pattern of racketeering activity."  [P.Br.51].  That claim fails because the evidence was sufficient to prove both honest-services wire fraud (Predicate Act C as to both defendants) and obstruction of justice (Predicate Act D as to both defendants and Predicate Act E as to Lynch), *see supra* Parts II-III; [App.I:225-30], and the evidence was sufficient for a jury to find those acts were part of a pattern of racketeering activity.

A "pattern of racketeering activity" requires "at least two acts of racketeering activity" that are "related" and "amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 238 (1989) (construing 18 U.S.C. § 1961(5)).  Relatedness between or among criminal acts is shown where they "have the same or similar purposes, results, participants, victims,

or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240.  The "threat of continued criminal activity is a fact specific concept" and may be established by showing either "that the related predicates themselves involve a distinct threat of long term racketeering activity, either implicit or explicit," or "that the predicate acts or offenses are a part of an ongoing entity's regular way of doing business." *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991) (citing *H.J. Inc.*, 492 U.S. at 242-43).  "[T]he threat of continuity need not be established solely by reference to predicate acts alone; facts external to the predicate acts may, and indeed should, be considered." *Id.*; *accord United States v. Connolly*, 341 F.3d 16, 26 (1st Cir. 2003); *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 410 (6th Cir. 2012); *United States v. Kaplan*, 886 F.2d 536, 542 (2d Cir. 1989).

A jury could rationally find both relationship and continuity notwithstanding insufficient evidence of wire fraud related to Mark43 and Taser.  Honest-services wire fraud and obstruction of justice are acts of "racketeering activity," 18 U.S.C. § 1961(1), and both acts (or, in Lynch's case, all three) related to a scheme to defraud SPAM through abuse of Pullman's position as its president.  Pullman and Lynch defrauded SPAM of its right to Pullman's honest-services and then endeavored to obstruct justice by manipulating SPAM's grand jury subpoena response to conceal Pullman's further defrauding of SPAM through his personal use of SPAM funds.

Lynch also denied making payments to Pullman or his wife or talking to Pullman about the grand jury investigation.  The predicates were plainly "related."

The evidence was also sufficient to find a threat of continued criminal activity.  Though Lynch Associates was hired by SPAM before Pullman's tenure as president, it was under his tutelage that Lynch Associates' compensation for its lobbying services increased, $2,500 were added per month for public relations, and $200,000 were added for DOL-related services some thought more appropriate for an accounting or auditing firm.  When $200,000 for the DOL work turned into $350,000, it was through sheer force of Pullman's demand.  And when Mark43, Taser, and Rafferty hired the firm, it was based on his influence.  The evidence thus demonstrated that Pullman used his position to direct business to Lynch Associates at every possible turn and he and Lynch were willing to go beyond unsavory to illegal to ensure Pullman receive money in return.  Both defendants, moreover, were willing to obstruct justice to prevent their "way of doing business" from being uncovered.  Their illegal conduct was "capable of repetition" so long as Pullman remained in his position at SPAM's helm.  *See Busacca*, 936 F.2d at 237-38 (holding that predicate acts of embezzlement from an employee benefit plan were sufficient to prove continuity where defendant showed "willingness to disregard established Board procedures for the disbursement of checks," had a "position of control over

the Union and the Funds," and engaged in "secretive concealment and affirmative misrepresentations to the Board regarding the [embezzled funds]").

### D.    There Was No Constructive Amendment

Lynch argues that Count I was constructively amended because the indictment alleged that the purposes of the RICO conspiracy included obtaining money and property from Mark43 and Taser "by concealing the payment of bribes and kickbacks from Lynch and Lynch Associates to Pullman" [App.I:58 (purposes of the conspiracy); *accord* App.I:58-59 (manner and means)] and the evidence failed to prove those payments were "bribes" or "kickbacks." [L.Br.33-34]. That "mismatch" is not a constructive amendment. "[T]he rule against constructive amendments is focused not on particular theories of liability but on the *offenses* charged in an indictment." *Katana*, 93 F.4th at 531 (quoting *United States v. Simon*, 12 F.4th 1, 35 (1st Cir. 2021)). "The offense charged" here, RICO conspiracy, "was the same offense on which the government presented evidence and on which the district court instructed the jury." *Id.* at 532 (cleaned up). The predicate offenses themselves "are not elements required to be proved," *Simon*, 12 F.4th at 35—though notably, the wire fraud predicates were not altered either. Lynch was charged with conspiring to conduct the affairs of SPAM through a pattern of racketeering activity that included wire fraud in the form of defrauding Mark43 and Taser of money or property. [App.I:63-64]. That is the same predicate that went to the jury.

49

To the extent Lynch means to argue there was a prejudicial variance (she uses constructive amendment and prejudicial variance interchangeably), that claim also fails.  A mislabeling of the payments supporting the wire fraud predicates is a dubious basis for a variance claim where the underlying facts alleged and the facts proved were one and the same.  *See Katana*, 93 F.4th at 530 ("[A] variance occurs when the government relies at trial on different facts than those alleged in the indictment to prove the same offense.").  And in any event, Lynch cannot demonstrate prejudice where the government has conceded that judgment of acquittal should enter on Counts III-V and the jury supportably found her guilty of three other predicate acts.

## V.    THE EVIDENCE WAS SUFFICIENT TO PROVE A CONSPIRACY TO DEFRAUD THE UNITED STATES

Defendants claim the trial evidence was insufficient to prove the tax conspiracy charged in Count X.  [P.Br.52–53; L.Br.14 n.2].  That claim fails.

### A.    Procedural History

The relevant procedural history is set forth *supra* at Part. II.A.

### B.    Standard of Review

The standard of review is set forth *supra* at Part II.B.

**C.     A Rational Jury Could Find an Agreement and Defendants' Willful Participation In It**

Defendants challenge the sufficiency of the evidence to establish an agreement to defraud the United States and their knowing and voluntary participation in that agreement, as required to prove they conspired to commit tax fraud. *See United States v. Mubayyid*, 658 F.3d 35, 57 (1st Cir. 2011); *United States v. Frankhauser*, 80 F.3d 641, 653 (1st Cir. 1996). In defendants' telling, there was no evidence—"direct or circumstantial"—of an agreement between them. [P.Br.53]. The fact that there was no *direct* evidence of an agreement to commit tax fraud is "unsurprising," however, *Mubayyid*, 658 F.3d at 57, and defendants' contention that there was no *circumstantial* evidence is simply wrong. "[I]t is a well-established legal principle that a conspiracy may be based on a tacit agreement shown from an implicit working relationship," and "there was sufficient evidence here of a deliberate, coordinated effort among the defendants reflecting just such a tacit agreement." *Id.* (cleaned up).

Each of the payments Lynch made to Pullman came on the heels of Lynch Associates' receipt of money or other benefits Pullman played a role in obtaining and was recorded in the Lynch Associates' books as a commission or consulting fee. They included a $5,000 payment made two days after Lynch Associates sent Mark43 an invoice for its engagement; a $20,000 payment made one day after SPAM paid Lynch Associates the balance of $350,000 from the DOL reimbursement; a $5,000

payment made four days after Pullman secured a DOC meeting for Taser; and payments of $2,250 and $9,000 made the day of the Rafferty engagement kickoff meeting at Lynch Associates and upon Rafferty's payment to the firm, respectively.[21]  The first of these payments was made by way of a Lynch Associates check to Pullman and recorded as a commission payment to him.  For each of the remaining payments, however, defendants took efforts to disguise the source of the payments and/or their true recipient.  The Taser payment, though made out to Pullman, came in the form of a check from Lynch rather than Lynch Associates and was recorded as a consulting fee paid to BCG.  The DOL and Rafferty payments were each made by check written to Pullman's wife and recorded (after Lynch thought better of calling the DOL withdrawal an "owner's draw") as consulting fees paid to her.  Lynch Associates meanwhile did not issue an IRS Form 1099 or W-2 for any of these or the Mark43 payments, despite having issued other Form 1099s during the same timeframe.  [App.V:236-37, 440-41].  And Pullman declared none of the payments on his tax returns, despite four years' experience tracking income

---

[21] Pullman notes that the Rafferty transactions were not charged as substantive offenses.  [P.Br.16 (citing App.VI:22)].  Lynch's misclassification of the payments and Pullman's failure to report them on his tax return were, however, alleged as overt acts in furtherance of the conspiracy to defraud the United States.  [App.I:81-83 (Count 12, renumbered as Count X)].

and expenses and assisting in the preparation of tax returns as treasurer of SPAM. [App.III:286, 346, 351-53].

A jury could rationally infer from the timing and circumstances of the payments that they were not gifts to Pullman, and that defendants knowingly agreed to effectuate the commission of tax fraud by concealing the income that they in fact were. The upshot of their efforts was that none of the payments Lynch made to Pullman was reflected in a Form 1099 and not one of the DOL, Taser, or Rafferty payments was even reflected in the Lynch Associates' books as a payment to him. The jury was entitled to conclude from this persistent pattern of structuring and recording payments to appear to be something other than income to Pullman that defendants acted at least in part for the purpose avoiding taxes owed. *See United States v. Goldberg*, 105 F.3d 770, 774 (1st Cir. 1997) (tax fraud need only be *a* purpose of the conspiracy).

To the extent defendants mean to suggest the government was required to prove in addition that Pullman was aware that Lynch would falsify her taxes, or that Pullman and Lynch's agreement included, or Lynch was aware of, the details of how *precisely* Pullman would file his [*see* P.Br.53], they are mistaken. Pullman and Lynch's agreement to conceal Pullman's income to avoid taxation was alone sufficient to support their conviction, without regard to whether they agreed that Lynch would file false tax returns as well. Moreover, the government was required

53

to show only that Lynch knew of the essential nature of the scheme, *see, e.g.*, *United States v. Stubbert*, 655 F.2d 453, 456 (1st Cir. 1981) (citing *United States v. Blumenthal*, 332 U.S. 539, 557-58 (1947)), and as demonstrated by the discussion above, the jury supportably found that she did.

## VI.    DEFENDANTS' CLAIMS OF INSTRUCTIONAL ERROR DO NOT WARRANT A NEW TRIAL

Defendants contend that the district court erred in rejecting their request for a duty-to-disclose instruction in connection with the Mark43 and Taser wire fraud charges.  [P.Br.61-63; L.Br.14 n.2].  The government's concession moots this claim.

Defendants also contend that the district court's fiduciary duty instruction was erroneous and requires reversal of their honest-services wire fraud and RICO convictions.  Their challenge is twofold.  First, they argue that by instructing the jury that Pullman owed a fiduciary duty to the Commonwealth, the court's instructions allowed the jury to return a verdict on what they contend was a "legally invalid theory."  [P.Br.59-60; L.Br.14 n.2].  Alternatively, they argue the instructions impermissibly removed the determination of the existence of such a fiduciary duty from the jury.  [P.Br.60-61; L.Br.14 n.2].  Neither claim entitles defendants to a new trial.

### A.   Procedural Background

The district court initially instructed the jury on Friday, October 28, 2022, the day after closing arguments, informing the jurors that it would instruct on the

elements of the offense orally and written instructions would follow.  [App.VI:152].

In discussing honest-services fraud, the court told the jury that a "labor union representative" and "an employee of the Commonwealth as a state cop" "[b]oth … owe fiduciary duties under these circumstances." [App.VI:164].  In seeming tension with the first part of this statement, the court also told the jury that "[a] union official typically owes a fiduciary duty to the union—but it's for you to decide in this case— and its members, and an employee owes a fiduciary duty to his or her employer[,] [h]ere, the Commonwealth of Massachusetts." [App.VI:166].  The court then went on to state, however, that "[w]hen a union official or employee devises or participated in a bribery or kickback scheme, that person violates his union members' and employer's right to his honest services." [App.VI:166].

During a break the district court asked counsel whether there was anything to be remedied before the jury received the written instructions.  [App.VI:187].  As relevant here, counsel for Pullman noted the discrepancy in the oral instruction, stating, "We believe the Court circled around perhaps and said ultimately it's an issue for the jury to decide whether he owed a fiduciary duty, but we are somewhat concerned that the Court said … that he had the fiduciary duty to the Commonwealth," as the defense position was that "in these circumstances" he did not.  [App.VI:187-88].  The court responded that it "did mean to convey that, as a matter of law, Mr. Pullman is a fiduciary wearing two hats.  And one of them is as a

union official.  The other is as an employee of the Commonwealth in a particular setting."  [App.VI:188].  The court then finished its oral instructions and told the jury it would likely receive the written instructions on Monday.  [App.VI:208-09].  The jury was briefly permitted to discuss the evidence but was not formally deliberating.  [App.VI:209, 212, 220, 239-41].

On Monday, October 31, 2022, the jury was sent home as the parties discussed the written instructions with the court.  [App.VI:243].  Pullman renewed his request that the court not instruct that he owed a fiduciary duty to the Commonwealth, citing a proposed instruction that would identify for the jury factors to consider in determining whether a fiduciary duty exists.  [App.VI:263 (referencing Defendant's Proposed Jury Instruction No. 29, found at App.I:154-55)].  The court denied the request.  [App.VI:263-64].

The district court finally instructed the jury on Tuesday, November 1, 2022. [App.VI:321-22].  After telling the jury that Pullman was both a "union employee" and "public employee" [App.VI:346], the court instructed:

> [A] fiduciary duty … encompasses any trusting relationship in which one party acts for the benefit of another party and induces the trusting party to relax the care and vigilance which such a trusting party would ordinarily exercise. A union official typically owes a fiduciary duty to the union and its members, and a public employee owes a fiduciary duty to his public employer. This fiduciary duty is to act only for the benefit of the union's members and/or the public employer and not for

> the union official's or the public employee's own
> enrichment or benefit.
>
> When a union official or public employee devises or
> participates in a bribery or kickback scheme, that person
> violates his union members' or employers' right to his
> honest services.

[App.VI:346-47].

Objecting to a different component of the honest-services instruction,

Pullman's counsel, joined by counsel for Lynch, [App.VI:386], requested that the

court "further clarify" that

> [t]he object of the scheme must have been to deprive
> SPAM and the membership of their intangible right to
> honest services.  That SPAM and the membership had to
> have been deprived of their rights and honest services is
> not sufficient.  The result must have been the object of the
> scheme.

[App.VI:386 (citing Defendant's Proposed Jury Instruction No. 28)].  Counsel then

stated:

> I will stop there and I will note that I omitted "The
> Commonwealth" again and continue along with our Rule
> 29 motion, in our view the Commonwealth did not—there
> was no honest services fraud as to the Commonwealth
> here, and that is why I am omitting it again or asking the
> court to omit that in the jury instructions.

[App.VI:386].  He reiterated this view when thereafter discussing the redacted

indictment to be sent back with the jury: "And again as Rule 29 and the instructions,

the indictment, we would object to the fact that the Commonwealth is named as a

fiduciary obligation of Mr. Pullman." [App.VI:388-89]. The referenced Rule 29 motion argued that the evidence was insufficient to prove a fiduciary duty. [Sealed.S.App.13-14].

The verdict form did not indicate whether the jury found that Pullman violated a fiduciary duty to SPAM, to the Commonwealth, or to both. [App.I:225-43].

### B. Standard of Review

In reviewing preserved challenges to jury instructions, this Court "consider[s] de novo whether an instruction embodied an error of law, but [] review[s] for abuse of discretion whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues." *United States v. Ackell*, 907 F.3d 67, 78 (1st Cir. 2018). An instruction that relieves the government of its burden of proving an element of the offense is harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. Wright*, 937 F.3d 8, 30 (1st Cir. 2019) (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)).

Unpreserved challenges to jury instructions, "regardless of whether they go to the wording, form, or substance," are reviewed for plain error. *United States v. Correia*, 55 F.4th 12, 41 (1st Cir. 2022). Reversal is warranted under this standard only "if the defendant shoulders the heavy burden of proving '(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the

defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir. 2001)).

### C. Defendants' Unpreserved "Legal Invalidity" Claim Fails

Defendants first argue that the district court's instructions allowed the jury to return a verdict on the "legally invalid theory" that Pullman owed a fiduciary duty to the Commonwealth. With this argument, defendants endeavor to bring this case within the rule of *Yates v. United States*, 354 U.S. 298 (1957), and its progeny, which requires vacatur of a verdict that may rest exclusively on a legally invalid theory.

The initial problem for defendants is that legal invalidity was not the basis of their objection below. The concern they raised in response to the district court's initial oral instructions was that Pullman did not owe a fiduciary duty to the Commonwealth "in these circumstances," and the proposed jury instruction they referenced when debating the written instructions would have submitted the question to the jury. Their objection to the final instructions requested that the court remove the question from the jury's consideration—but because of *evidentiary insufficiency*, not legal invalidity. Counsel specifically referenced a Rule 29 motion that argued the evidence was insufficient to prove Pullman owed a fiduciary to the Commonwealth and stated, "that is why I am … asking the court to omit [the Commonwealth] in the jury instructions." [App.VI:386]. The request, in other

words, was that the district court exercise its discretion to "eliminat[e] from the jury's consideration an alternative basis of liability that d[id] not have adequate evidentiary support." *Griffin v. United States*, 502 U.S. 46, 60 (1991). Their legal invalidity challenge is unpreserved, if not waived.

Waiver aside, defendants cannot satisfy the resulting plain-error burden. They do not cite a single authority for the proposition that a public employee on full-time release to a union does not, as a matter of law, owe a fiduciary duty to his public employer, whether in the context of negotiating on behalf of the union against the public employer or otherwise. That alone defeats their claim on plain-error review. *United States v. Romero*, 906 F.3d 196, 206 (1st Cir. 2018) (absence of binding, on-point authority precludes finding a clear or obvious error).

In any event, defendants' argument would fail on its own terms even if preserved. Because the Massachusetts state law they rely on to determine the existence of a fiduciary duty looks to indicia of "trust and confidence," defendants are forced to acknowledge the fact-bound nature of the inquiry by writing that "*the evidence failed to establish* that Pullman possessed the qualities that would make him a fiduciary of the Commonwealth."[22]  [P.Br.55 (emphasis added); *see also*

---

[22] Despite having acknowledged below a split in authority regarding the source of fiduciary duties for purposes of honest-services fraud and arguing that state law should apply [D.265 at 13 & n.5], on appeal defendants assume without argument that it does [P.Br.29, 54-55]. This Court need not decide the question

P.Br.56 (arguing that Pullman did not owe a fiduciary duty "under these atypical circumstances"), 59 ("under the circumstances of this case")]. That is not the stuff of legal invalidity, and it reveals their argument for what it really is: an evidentiary sufficiency challenge parading as a *Yates* claim.

The Supreme Court has already declined this gambit. The Court clarified in *Griffin* that the *Yates* rule "'applies where a particular theory of conviction submitted to [the jury] is contrary to law,' and not where one of several alternative bases for conviction is legally sound but supported by insufficient evidence." *United States v. Abdelaziz*, 68 F.4th 1, 65 (1st Cir. 2023) (quoting *Griffin*, 502 U.S. at 59). In doing so, the Court rejected the petitioner's contention that because "judgments that are not supported by the requisite minimum of proof are invalid *as a matter of law*," "[i]nsuffiency of proof … *is* legal error." *Griffin*, 502 U.S. at 58-59. Defendants' contention here is no different and fails just the same.

### D.   Any Error in Failing to Submit the Fiduciary Duty Question to the Jury Was Harmless Beyond a Reasonable Doubt

Defendants argue in the alternative that the instructions erroneously removed the question of whether Pullman owed a fiduciary duty to the Commonwealth from the jury's consideration. [P.Br.60-61; L.Br. at 14 n.2]. This Court has held in the

---

because even if defendants' assumption is correct, their instructional challenges fail for the reasons set forth herein.

civil context that the existence of a fiduciary duty under Massachusetts law is a question of fact. *Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 44 (1st Cir. 1995). Assuming the same is true here, *see United States v. Milovanovic*, 678 F.3d 713, 723 & n.9 (9th Cir. 2012) (en banc), and that the district court therefore erred, a new trial is unwarranted because the evidence of the alternative theory of guilt—that Pullman owed a fiduciary duty *to SPAM*—was overwhelming and uncontested. *See Wright*, 937 F.3d at 30 ("[W]e are required to affirm the conviction if the evidence for either theory of guilt … was so 'overwhelming that the jury verdict would have been the same absent the error.'" (quoting *Neder*, 527 U.S. at 17)).

The government charged and the trial evidence proved a single kickback scheme alleged to have defrauded two entities of their right to Pullman's honest services. [App.I:71]. Defendants make no argument in connection with either their instructional claim or their sufficiency challenge that the identity of the entity allegedly defrauded by the scheme was relevant to the jury's findings that they participated in the scheme knowingly and with the intent to defraud, that the scheme involved a material misrepresentation or omission, and that an interstate wire was used in furtherance. [App.VI:344 (setting forth elements of offense)]. The only question implicated by defendants' instructional challenge is whether Pullman owed a fiduciary duty to SPAM, to the Commonwealth, or to both.

On appeal, defendants do not assign error to the district court's instruction regarding whether Pullman owed a fiduciary duty to SPAM.  *United States v. Mayendia-Blanco*, 905 F.3d 26, 32 (1st Cir. 2018) (arguments not raised in opening brief are waived).  And below, they never once suggested that the answer to that inquiry could be "no."  To the contrary, the fact that Pullman owed a fiduciary duty to SPAM was uncontested at trial and conceded in post-trial filings.  [D.265 at 12 n.3 ("Pullman concedes that as the President of SPAM, he owed a fiduciary duty to SPAM and to its members."), 14 (similar); D.282 at 7 (similar)].  As defendants' treatment of the issue makes plain, there was no room for dispute that Pullman owed SPAM a fiduciary duty.  "[E]mployees … occupying positions of trust and confidence, including officers, directors, executives and partners" owe fiduciary duties to their employers, [P.Br.29], and the undisputed evidence at trial overwhelmingly proved that Pullman's position as President of SPAM fit that bill, [*see, e.g.*, P.Br.5 (describing Pullman as the "face of the union for the public, members and management")].  There is accordingly no doubt that "the jury verdict would have been the same absent the error."  *Neder*, 527 U.S. at 17.

## VII. DEFENDANTS ARE NOT OTHERWISE ENTITLED TO A NEW TRIAL

In an argument Pullman does not join, Lynch contends that errors related to the honest-services wire fraud, wire fraud, and racketeering conspiracy counts entitle her to a new trial on the tax and obstruction counts.  [L.Br.37].  The government's

concession that judgment of acquittal should enter on Count D moots Lynch's request for a new trial on this count, and her claim that she is entitled to a new trial on the remaining tax count and the obstruction counts is unpreserved, undeveloped, and in any event unavailing.

### A.  Procedural Background

Though she moved in the alternative below for a new trial, Lynch did not do so on the basis advanced here—that "the jury likely relied on unsound fraud theories" to reach a verdict on the tax and obstruction counts [L.Br.17].  [*See* D.267 at 18-20; D.284].

### B.  Standard of Review

Because Lynch failed to advance before the district court the basis for a new trial she presses on appeal, her claim is subject to review only for plain error.  *United States v. Ackerly*, 981 F.3d 70, 76 (1st Cir. 2020).

### C.  Lynch's Argument for a New Trial on the Remaining Tax Count and the Obstruction Counts Is Doubly Waived and Meritless

Lynch's bid for a new trial posits that "the jury likely relied on unsound fraud theories" undergirding the honest-services wire fraud, wire fraud, and racketeering conspiracy convictions to reach a verdict on the tax count and obstruction counts. [L.Br.37].  Her explanation for why this would be so is that "a jury that finds her guilty of honest-services wire fraud, wire fraud and a racketeering conspiracy would be more likely to conclude that she was also guilty of the obstruction and tax crimes."

[L.Br.37].  She elaborates only by stating that "a jury that was properly instructed on honest services fraud and wire fraud would be less likely to find the corrupt intent necessary for obstruction or the specific intent to violate the tax laws."[23]  [L.Br.37].

In making this claim, Lynch does not address the plain-error standard of review that applies to it.  Moreover, her two-sentence *ipse dixit* falls far short of developed argumentation.  Her argument for a new trial on this ground is therefore doubly waived.  *See United States v. Rathbun*, 98 F.4th 40, 58 (1st Cir. 2024) (Where a defendant "does not acknowledge his failure to preserve his objection below or provide … a plain error analysis of [the] argument in his opening brief, the argument is waived." (citing *United States v. Pabon*, 819 F.3d 26, 33 (1st Cir. 2016), among other cases)); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

In any event, it lacks merit.  Count D was predicated on proof of the illegality of Lynch's $5,000 payment to Pullman in connection with the Taser engagement. [App.V:184-85; App.VI:39; App.VIII:134].  Count C, by contrast, was based on

---

[23] Lynch rightly does not dispute that the evidence of the Mark43 and Taser payments was admissible irrespective of the payments' legality.  The evidence was independently admissible to prove both the Counts A and B tax charges against Pullman and the Count X tax conspiracy against charge against Pullman and Lynch. It was also admissible to show that none of Lynch's repeated payments to Pullman were gifts.

Lynch's "business expense" deduction of $50,000 spent on personal expenses ($30,000) and an illegal kickback to Pullman ($20,000) and of an additional $7,248 in "IT expenses" that were never incurred.  [App.V:183-84, 238; App.VI:39-40; App.VIII:134].  It had nothing to do with the legality of either the Taser payment or the Mark43 payment, neither of which even took place in the relevant tax year.  [S.App.235-36].

The legality of the Taser and Mark43 payments was likewise irrelevant to the Count VIII and Count IX obstruction counts.  Pullman and Lynch's effort to manipulate the SPAM subpoena response was about covering up Pullman's personal use of SPAM funds, and Lynch's interview statements that she never discussed the subpoena response with Pullman or made payments to Pullman or his wife were false whether the underlying payments were the product of fraud or not.

Moreover, despite Lynch's assertion that a jury properly instructed on the fraud counts would be less likely to find the mens rea required for tax fraud or obstruction, she does not argue that the jury instructions on the tax count or the obstruction counts were improper.  *See Abdelaziz*, 68 F.4th at 65 (rejecting a *Yates* argument of a similar ilk).  Nor does she cite anything in the indictment provided to the jury or in the jury instructions "that would lead a juror to conclude that a guilty verdict on other charges would necessarily affect the outcome of" the obstruction or

66

tax counts.  *Id.*  To the contrary, the district court instructed the jury that each count must be considered on an individual basis.  [App.VI:322, 324].

Lynch has offered only conjecture in support of her new-trial claim.  That unsubstantiated claim fails under any standard of review.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court reverse the judgments on Counts III-V and Count D, affirm the judgments on all remaining counts, and remand for resentencing.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:    /s/ *Alexia R. De Vincentis*
        Alexia R. De Vincentis
        Assistant U.S. Attorney

**CERTIFICATE OF COMPLIANCE WITH**
**Rule 32(a)**

**Certificate of Compliance with Type-Volume Limit,**
**Typeface Requirements, and Type-Style Requirements**

1.    This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 15,645 words (on July 11, 2024, the Court granted the government's motion to file an oversized responsive brief not to exceed 16,000 words), excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Microsoft Word version 2019.

 /s/ *Alexia R. De Vincentis*
ALEXIA R. DE VINCENTIS
Assistant U.S. Attorney

Dated:  July 16, 2024

68

## **CERTIFICATE OF SERVICE**

I, Alexia R. De Vincentis, Assistant U.S. Attorney, hereby certify that on July 16, 2024, I electronically served a copy of the foregoing document, on the following registered participant of the CM/ECF system:

Judith Mizner
Federal Defender Office
District of Massachusetts
51 Sleeper Street 5th Floor
Boston, MA 02210

Scott P. Lopez
Lawson & Weitzen, LLP
88 Black Falcon Ave, Suite 345
Boston, MA 02210

/s/ *Alexia R. De Vincentis*
ALEXIA R. DE VINCENTIS
Assistant U.S. Attorney