UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 23-1508
_____

_____

UNITED STATES,
Appellee,

v.

DANA A. PULLMAN,
Defendant-Appellant.
_____

ON APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

REPLY BRIEF OF DEFENDANT-APPELLANT
DANA A. PULLMAN
_____

Judith Mizner
Assistant Federal Public Defender
Federal Defender Office
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No.:  11056

# TABLE OF CONTENTS

<u>Page</u>

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iii

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

I.  The Evidence Was Insufficient to Establish Honest Services
    Wire Fraud (Reply to G.B.pp.29-36). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

    A.  The Evidence Fails to Support a Finding, Beyond a Reasonable
        Doubt, of a *Quid Pro Quo* Kickback. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.  The Evidence Was Insufficient to Support a Finding
        of a Scheme to Defraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

II.  The Evidence Was Insufficient to Establish Obstruction of Justice
     (Reply to G.B.pp.37-45) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

III.  The Evidence Was Insufficient to Establish the RICO
      Conspiracy Charged in Count I (Reply to G.B.pp.45-49). . . . . . . . . . . . . . . . 12

IV.  The Evidence Was Insufficient to Establish That Pullman
     Conspired With Lynch to Defraud the United States
     for the Purpose of Impeding the IRS in the Collection
     of Federal Income Taxes (Reply to G.B.pp.50-54). . . . . . . . . . . . . . . . . . . . . .13

V.  The District Court's Instructions on Fiduciary Duty
    in an Honest Services Wire Fraud Prosecution
    Require a New Trial (Reply to G.B.pp.54-61) . . . . . . . . . . . . . . . . . . . . . . . . . 14

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Page

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

# TABLE OF AUTHORITIES

<u>Case</u>                                                                                                              <u>Page</u>

*Black v. United States,*
    561 U.S. 465 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 18

*Griffin v. United States,*
    502 U.S. 46 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 18

*United States v. Aguilar,*
    515 U.S. 593 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*United States v. Guzman-Ortiz,*
    975 F.3d 43 (1st Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

*United States v. Hernandez-Bermudez,*
    857 F.2d 50 (1st Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Russell,*
    255 U.S. 138 (1921). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Sawyer,*
    85 F.3d 713 (1st Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*United States v. Tedesco,*
    635 F.2d 902 (1st Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Yates v. United States,*
    354 U.S. 298 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

<u>Statutes</u>

18 U.S.C.
    § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    § 1346. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

# REPLY BRIEF

# ARGUMENT

The government concedes that judgments of acquittal should enter on Counts III-V of the indictment charging Pullman with wire fraud as to Mark43 and Taser. G.B.p.28-29.[1] This reply will address the honest services wire fraud, obstruction, RICO conspiracy, and tax conspiracy convictions and the honest services fraud fiduciary duty jury instructions.

## I. The Evidence Was Insufficient to Establish Honest Services Wire Fraud (Reply to G.B.pp.29-36)

To support a conviction for honest services wire fraud, the government must present evidence sufficient to prove, beyond a reasonable doubt, a "scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. §§ 1343 and 1346. In *Skilling v. United States*, 561 U.S. 358 (2010) the Court limited the statutory scope to "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who ha[s] not been deceived." 561 U.S. at 404. *See also Id.* at 409. This requires proof that an individual "in violation of a fiduciary duty,

---

[1] "G.B." refers to the brief of the United States. "A.B." will refer to Mr. Pullman's opening brief. "App.v.#:#" will refer to the volume and page numbers of the Appendix. "G.Supp.App." will refer to the government's Supplemental Appendix. "G.S.Supp.App." will refer to the government's Supplemental Appendix Under Seal. "D.E.#:#" will refer to the  number and page number of district court docket entries.

participated in bribery or kickback schemes." *Id.* at 407. It also requires proof of a *quid pro quo* – here, an agreement that in exchange for increasing the payment to Lynch Associates for their work on the DOL settlement Pullman would receive money from Lynch. It does not include undisclosed self-dealing. *See* A.B.p.37.

## A. The Evidence Fails to Support a Finding, Beyond a Reasonable Doubt, of a *Quid Pro Quo* Kickback

The government does not argue that the check from Lynch to Ms. Pullman following SPAM's final payment to Lynch Associates for their work on the settlement of the DOL grievance was a bribe. As it did in closing argument (App.v.VI:15), the government agrees that a *quid pro quo* is required for a kickback and argues that the honest services fraud charge based on the days-off-lost (DOL) grievance was a classic kickback scheme (G.B.p.30 and n.15). It maintains that Pullman's demanding in an uncharacteristically angry manner[2] that Daly give him a $250,000.00 check for the final DOL payment to Lynch Associates after the settlement check from the Commonwealth had been deposited, and Ann Lynch's sending a check for $20,000.00 to Melissa Pullman the following day, were sufficient to support a finding that Lynch had agreed to pay Pullman in exchange for increased compensation. G.B.pp.30-31. It

---

[2] Daly questioned the payment to Lynch Associates both at the time of the initial contract and when Pullman told him to write the final payment check. App.v.II:252, 275. Daly's testimony about Pullman's anger was not corroborated. While he testified Hunter was outside his office at the time, Hunter was not in the office that day. App.v.III:171-174.

argues that such a conclusion was "buttressed" by Lynch's efforts to "cover it [payment to Pullman] up" (G.B.p.31)[3] and that Pullman, too, attempted to keep the arrangement secret (G.B.pp.32-33).

Pullman maintains that the totality of the facts and reasonable inferences, placed in context, are insufficient to establish an illegal kickback beyond a reasonable doubt. While facts and reasonable inferences are viewed in their totality in the light most favorable to the verdict, "neither may a judge 'stack inference upon inference in order to uphold the jury's verdict'" and "'[w]hen a jury is confronted, as here, with equally persuasive theories of guilt and innocence it cannot rationally find guilt beyond a reasonable doubt.'" *United States v. Guzman-Ortiz*, 975 F.3d 43, 55-56 (1st Cir. 2020). Here, the facts and reasonable inferences give rise to such equally persuasive theories.

The government contends that Lynch Associates could have been held to the original terms of its contract for DOL work and, therefore, the increase in payment to Lynch Associates for its DOL work from $200,000.00 to $350,000.00 cannot be characterized as a renegotiation but was simply evidence of an agreement for a

---

[3] The government also asserts that Lynch's later denial of payments to the Pullmans "evince[ed] consciousness of guilt." G.B.31. However, consciousness of guilt must be consciousness of guilt of the offense charged. *United States v. Guzman-Ortiz*, 975 F.3d 43, 53 (1st Cir. 2020); *United States v. Hernandez-Bermudez*, 857 F.2d 50, 52 (1st Cir. 1988) (both discussing consciousness of guilt in context of evidence of flight). The record here, does not support an inference that any denials evidenced consciousness of guilt of honest services fraud.

kickback from Lynch to Pullman (G.B.pp.32-33). This conclusion fails to recognize the import of the changing circumstances and scope of work involved in pursuing the grievance, and the process resulting in the agreement to increase the payment to Lynch Associates. D'Agostino testified that the scope of the work and the estimated value of the settlement was greater than anticipated at the time the fixed fee contract was entered into in April 2013[4], and he and Lynch discussed requesting additional payment for their work. App.v.IV:294, 392-93. In December 2013, they provided Pullman an invoice to support the request for additional funds, with an estimation of the hours worked through December 19, 2013. The invoice total was $495,000.00. App.v.VII:29; App.v.IV:390-391. When Lynch and D'Agostino met with Pullman he rejected that proposal. App.v.IV:393-396. D'Agostino had no further conversations about compensation with Pullman but was subsequently told by Lynch that SPAM

---

[4] After organizing the voluminous records it became clear that many remained missing. D'Agostino developed a formula for addressing missing records, accepted by the Commonwealth, used to estimate the settlement amount. App.v.IV:146-147, 386-387, 452-454. While the settlement was estimated to be around $5,000,000.00 at the time the contract was signed, after additional review, D'Agostino estimated it to be $15,000,000.00 plus. App.v.IV:383-84. After Lynch Associates' work in organizing, compiling, and analyzing data from the voluminous paper calendars and developing the mathematical formula used to estimate the settlement value, the settlement ended up at approximately $21,000,000.00 paid directly to troopers (App.v.IV:107) and millions more in other benefits, for a total settlement worth approximately $30,000,000.00 to troopers (App.v.III:14; App.v.IV:446, 147). $350,000.00 is less than 2% of the settlement value. The government has provided no support for a finding that $350,000.00 was unwarranted compensation for the instrumental work provided by Lynch Associates on the DOL project.
.

4

would pay $350,000.00. App.v.IV:397-398. $350,000.00 is approximately the midpoint between the initial contract price and the invoice request. Pullman submits the totality of these facts and circumstances are at least as supportive of finding a reasonable renegotiation as they are of an agreement for a kickback.

The government's secrecy arguments (G.B.pp.31, 33) similarly fail to address the totality of the facts, circumstances, and reasonable inferences. Pullman suggests that D'Agostino's lack of awareness at the time of Lynch's payment to Melissa Pullman does not evidence a coverup. Lynch was the owner of Lynch Associates and could take an owner's draw without discussing it with D'Agostino. Nor need she inform him of how she chose to spend her money. There was no evidence that she ordinarily did so. That Lynch later reclassified her draw as a consulting fee can as readily be seen as related to taxes as to a coverup of the payment.

While Pullman alone renegotiated Lynch Associates' compensation for its work on the DOL grievance and did not memorialize the renegotiated compensation or present it to the E-Board, neither Lynch Associates' work on the DOL settlement nor compensation above that called for in the original contract was a secret. Lynch and D'Agostino came to E-Board meetings and updated the Board on the DOL issue. A.v.II:158-159. D'Agostino presented his initial review to the E-Board. App.v.IV:384. The minutes of the July 30, 2024 E-Board meeting reflect that SPAM would be receiving $350,000.00 for expenses in the DOL settlement and Hunter, SPAM's secretary, thought that it was for "our expenses for the DOL work that Ann

did." App.v.II:139,141,146. Hunter also sent Pullman an e-mail in September, 2014 stating his objection to additional funds above the contract price, an objection again indicating that he was aware of a proposed payment (G.Supp.App.:29; App.v.II:161,179).[5] The government argues that the January 2014 financial statement concealed the additional compensation to Lynch Associates (G.B.33). However, that statement noted that part of the DOL settlement, capped at $350,000.00, would reimburse SPAM for "office and staff expenses" incurred in SPAM's "data collection and verification ('DOL Project')." G.Supp.App.:107.[6] Lynch Associates were staff at the heart of the project.

There was no evidence of an agreement for compensation to Pullman in or around December 2013 when Lynch Associates' compensation was renegotiated. The government's suggestion that such an agreement had been reached because Pullman knew that increasing Lynch Associates' payment would be "met with resistance" and

---

[5] Hunter thought the work should have been done by an auditing or accounting firm and that Lynch Associates should not receive extra money (App.v.II:141,143,179,180). However, there was no evidence an auditing or accounting firm would have done a better job or charged less than the $350,000.00 ultimately paid.to Lynch Associates. App.v.II:180-181. Both Langan and Cohen, negotiating for the Commonwealth, described D'Agostino and Lynch representation of SPAM's interests in the negotiations in positive terms, with Langan testifying that D'Agostino came up with the mathematical calculation the Commonwealth accepted to estimate the settlement. App.v.IV:146-147,157,165,168.

[6] Pullman had requested $705,000.00 in expense reimbursement. App.v.IV:109; G.Supp.App.131. He had provided the Commonwealth a summary of the expenses without bills or invoices. App.v.IV:109,111-112,136-137; G.Supp.App.132. The $350,000.00 was a negotiated 50-50 split with the Commonwealth.App.v.IV:142.

he would agree to what would "be a difficult sell" only if he were to be paid (G.B.p.33-34 n.16) is sheer speculation, not a reasonably supported conclusion.

The only evidence of a request by Pullman for money from Lynch came from D'Agostino, who stated that the "connotation" of a call with his mother was an indication that Pullman "had hit her up for a check.." App.v.IV:301. He repeated that was "the connotation of the call", "not a quote." He did not remember the exact words. *Id. See also* App.v.IV:426. He did not know what Pullman had said to Lynch as he was not part of the conversation. App.v.IV:428. His memory was that the call occurred sometime in October 2014. App.v.IV:432-435. This connotation is insufficient to support a reasonable conclusion that the check to Ms. Pullman in November 2014 was in exchange for the December 2013 renegotiation of Lynch Associates' compensation.

In sum, the totality of the facts and reasonable inferences, placed in context, are insufficient to establish the *quid pro quo* required for an illegal kickback beyond a reasonable doubt. They can equally support the conclusion that the check to Ms. Pullman was made to continue the cultivation of a business relationship, express gratitude, or curry favor, none of which establish the quid pro quo for an illegal kickback. *See* A.B.pp.43-44.

## B. The Evidence Was Insufficient to Support a Finding of a Scheme to Defraud

The government maintains that because the evidence was sufficient to conclude the check to Ms. Pullman was a kickback, it was sufficient to support a finding of a scheme to defraud. Pullman maintains that the evidence was insufficient to support a finding, beyond a reasonable doubt, of a kickback and, therefore, there it was insufficient to support a finding of a scheme to defraud. *See* A.B.pp.45-46.[7]

## II.  The Evidence Was Insufficient to Establish Obstruction of Justice (Reply to G.B.pp.37-45)

The government asserts that Pullman does not dispute that the version of events it sets out at G.B.p.39, if credited, was sufficient to establish an intent to obstruct justice. G.B.p.39. Pullman does, however, dispute crediting the government's statement that Lynch asked Kesten to delay the response to the subpoena "so that the receipts she said she and Pullman were looking for could be included in the production as if they had always been contained in SPAM's files." G.B.p.39.

Asked by the government what happened during a phone call from Lynch, Kesten replied: "She asked me if I would delay the production of the documents

---

[7] The government asserts that because Pullman did not dispute a fiduciary duty to SPAM this Court "can affirm on that basis alone." G.B.p.37 n.18. Pullman maintains that he did not breach a fiduciary duty to SPAM by failing to disclose Ms. Pullman's receipt of the check from Lynch (*see* A.B.pp.45-46) and, again, maintains that the evidence was not sufficient to support a finding of a kickback. That Pullman did not dispute a fiduciary duty to SPAM does not, alone, provide grounds to affirm his honest services wire fraud conviction.

contained in the subpoena because she was looking, or she, they, were still looking for receipts." App.v.V:57. Then asked what he took the request to mean to him, he said: "What I took it to mean, that I should hold off so that receipts or something, documentation of expenses could be put into the documents before I sent them to the U.S. Attorney." *Id.* On cross-examination he responded that Lynch did not specifically ask "to gather receipts to put them into these records" and did not say "can you delay this so we can get receipts and slip these in as though they've always been there?" App.v.V:65. He said he could not tell  counsel Lynch's exact words. App.v.V:73. He reiterated his impression: "My impression was that receipts were going to be put into the documents and then produced as if they had existed when the subpoena came in. That was my concern." App.v.V:76. *See also* App.v.V:81 for reiteration of his understanding. He never asked Lynch what she was asking him to do. App.v.V:84.

He was aware that at that time others at SPAM were gathering receipts for production to the U.S. Attorney and agreed that they could have been produced to the U.S. Attorney's Office with a clarification of as to where they came from. App.v.V:66. He would have been happy if people came to him and said they had receipts they had not submitted to Daly; he would have produced with the explanation they were not here [in Spam's files]  but have been located. App.v.V:78.

While the jury was entitled to credit Kesten's testimony, it was not entitled to conclude from that testimony that Lynch had been seeking to "corruptly…endeavor

to influence, obstruct and impede the due administration of justice in the grand jury investigation of SPAM and others by…attempting to manipulate records required to be produced pursuant to a grand jury subpoena." Kesten was clear that it was only his impression that she was asking him to delay production for an improper purpose – to include new documents as if they had been in files all along. Although he could not remember her exact words, his first response to the question about her phone call was that she asked for delay in production "because she was looking, or she, they, were still looking for receipts." App.v.V:57. Given his testimony that others in SPAM were also looking for receipts to be produced to the US. Attorney's Office and that he would have been happy to produce them with the explanation that they had not been in SPAM's files but had been located, his general recollection of Lynch's words do not reasonably support an inference of intent to obstruct. His impression that Lynch's request for delay to look for receipts, not pressed or repeated, was asking him to do something improper is too slender a reed to support a finding, beyond a reasonable doubt, of intent to obstruct. It is certainly too slender a reed to support an inference of Pullman's intent, given the complete absence of evidence as to the content of his conversation with Lynch.

The circumstances of the conversations in *United States v. Tedesco*, 635 F.2d 902 (1st Cir. 1980) are quite different. There the jury was presented with testimony of the defendant's own words, not someone else's impression of what those words meant. 635 F.2d at 903-904. Indeed, the defendant admitted to the postal inspector who

arrested him that he did attempt to have a witness, a friend of his, alter his testimony or withhold damaging information at the trial of another friend of his. *Id.* at 904.

If, however, this Court concludes that Pullman's question to Daly asking if they could tell the government that SPAM had an internal policy to destroy expense reimbursement records after one year (App.v.II:338-339, 345) is sufficient to support a finding of intent, he maintains that the evidence was insufficient to support a finding that he endeavored to obstruct justice.

While an endeavor does not require success or actions rising to the level of attempt (*Tedesco*, 635 F.2d at 907), it must, as the Court stated in in *United States v. Aguilar*, 515 U.S. 593, 599 (1995) "have the 'rational and probable effect' of interfering with the due administration of justice." The majority rejected as unwarranted Justice Scalia's criticism that it was reading the word "endeavor" out of the statute, stating that: "our reading of the statute gives the term 'endeavor' a useful function to fulfill: It makes conduct punishable where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but is foiled in some way." *Id.* at 601-602.[8] The conduct there, lying to federal agents not shown to be acting as an arm of a grand jury or to have been summonsed as grand jury witnesses was held not to violate the statute.

---

[8] The Court cited *United States v. Russell*, 255 U.S. 138 (1921) for the proposition that requiring that an endeavor have the "natural and probable effect" of interfering with the administration of justice "is not to say that the defendant's actions need be successful; an 'endeavor' suffices." *Aguilar*, 515 U.S. at 599.

Contrary to the government's suggestion (G.B.p.43) Pullman is not suggesting that an endeavor requires that the acts are likely to succeed. He does contend that "likely to obstruct justice" requires more than simply any act related to a grand jury proceeding and that his acts  -- twice simply accepting a negative answer to the question of whether the U.S. Attorney's office could be told in response to a subpoena that the documents had been routinely destroyed after a year--  do not, for the reasons set out at A.B.48-50, rise to the level of acts likely to obstruct justice.

## III. The Evidence Was Insufficient to Establish the RICO Conspiracy Charged in Count I (Reply to G.B.pp.45-49)

Pullman argued that a judgment of acquittal should be ordered as to the RICO conspiracy charge because the evidence was insufficient to establish the requisite predicate acts of racketeering activity. He argued that the evidence was insufficient as to the four wire fraud offenses and the obstruction of justice offense charged in the indictment. *See* A.B.pp.50-51. The government now agrees that judgments of acquittal should enter on three of the four wire fraud charges.G.B.pp.28-29. It maintains that the evidence was sufficient to prove the honest services wire fraud and obstruction charges and that they establish a pattern of racketeering activity. G.B.pp.45-49.

For the reasons set out above in Arguments I and II and in Pullman's opening brief, he maintains that the evidence was insufficient to establish either honest services wire fraud or obstruction of justice. As these are the only two potential predicate acts of racketeering, and a pattern of racketeering activity requires at least

12

two acts of racketeering, a judgment of acquittal should be ordered on Count I if this Court finds that the evidence is insufficient to establish either honest services wire fraud, or obstruction of justice, or both.

## IV.  The Evidence Was Insufficient to Establish That Pullman Conspired With Lynch to Defraud the United States for the Purpose of Impeding the IRS in the Collection of Federal Income Taxes (Reply to G.B.pp.50-54)

The government argues that circumstantial evidence was sufficient to prove the conspiracy to defraud the United States for the purpose of impeding the IRS in the collection of federal income taxes. It describes payments from Lynch to Pullman following Lynch Associates' receipt of money Pullman played a role in obtaining. G.B.pp.50-51. It asserts that, with one exception, "defendants took efforts to disguise the source of the payments and/or their true recipient," describing a payment to Pullman from Lynch's personal account rather than Lynch Associates which was recorded as a consulting fee to another entity, and checks written to Pullman's wife and recorded as consulting fees. Lynch Associates did not issue IRS forms 1099 or W-2 for these payments and Pullman did not declare them on his tax returns. G.B.p.52

If those payments constituted income, Pullman's failure to declare them may have constituted substantive offenses. However, that would not establish the agreement between Pullman and Lynch to impede the functions of the IRS in connection with its responsibilities to ascertain and collect taxes the government was required to establish here. Pullman and his wife filed joint tax returns. App.v.VII:237.

Making a check payable to her rather than him would not appear to be concealing income to avoid taxation. Nor was there any evidence that Pullman knew how Lynch was recording payments in her company or personal accounts, much less agreed that they should be recorded in any particular way.

## V.  The District Court's Instructions on Fiduciary Duty in an Honest Services Wire Fraud Prosecution Require a New Trial (Reply to G.B.pp.54-61)

The government argues that Pullman did not preserve his challenge to the district court's instructions that he owed a fiduciary duty to the Commonwealth in connection with the honest services wire fraud charge which allowed the jury to return a verdict on a legally erroneous theory. The government is wrong.

The sequence of the court's instructions to the jury, both oral and written, and Pullman's objections to those instructions, are set out at A.B.pp.56-59. In instructing the jury on the elements of honest services fraud, the court initially stated and repeated that Pullman had fiduciary duties to SPAM and to the Commonwealth. App.v.VI:162, 163, 164. Explaining fiduciary duty, the court stated: "A union official typically owes a fiduciary duty to the union – but it's for you to decide in this case – and its members, and an employee owes a fiduciary duty to his or her employer. Here, the Commonwealth of Massachusetts." App.v.VI:166.

Pullman objected to the instruction that he owed a fiduciary duty to the Commonwealth, arguing that no fiduciary duty was owed to the Commonwealth "in these transactions" and "in these circumstances" (App.v.VI:187-188). The court

14

responded that it "did mean to convey that, as a matter of law, Mr. Pullman is a fiduciary wearing two hats. And one of them is as a union official. The other is as an employee of the Commonwealth in a particular setting." App.v.VI:188. In further discussion of the content of the written instructions that were to go to the jury Pullman requested that "just to be consistent with Rule 29, we would ask the court not to instruct that the Commonwealth was deprived of its intangible services…" App.v.VI:262-263. In reviewing the instruction concerning the purposes of the RICO conspiracy Pullman requested that "consistent with our Rule 29, we would strike 'The Commonwealth of Massachusetts' where [the instruction stated that the purposes were to deprive the Commonwealth of its right to honest services and property and money]". App.v.VI:315.

In orally instructing the jury for the final time the court repeated that Pullman owed fiduciary duties to SPAM and the Commonwealth., including instructing "A union official typically owes a fiduciary duty to the union and its members, and an employee owes a fiduciary duty to his public employer." App.v.VI:344, 345, 346, 347, 347.

Following the final oral instructions to the jury Pullman objected to the court's instruction that Pullman owed a fiduciary duty to the Commonwealth of Massachusetts in connection with the DOL litigation. App.v.VI:386.

While in objecting to the court's instructions that Pullman owed a fiduciary duty to the Commonwealth counsel stated "to be consistent with Rule 29"

(App.v.VI:315) and "to continue along with our Rule 29" (App.v.VI:386), those references do not, as the government maintains, limit the objections to evidentiary insufficiency. The court viewed Pullman as owing the Commonwealth a fiduciary duty here as a matter of law and so instructed the jury. Pullman had argued in his Rule 29 motion that no fiduciary duty was owed to the Commonwealth in connection with the DOL grievance – the basis for the honest services fraud charge -- because in connection with the DOL grievance Pullman, as SPAM president, was acting in an adversarial position to the Commonwealth, negotiating against the Commonwealth, and could not, therefore, have a fiduciary duty to the Commonwealth. G.S.Supp.App.:14. Because, *inter alia*, Pullman's adversarial position to the Commonwealth precluded a fiduciary duty to the Commonwealth in these circumstances as a matter of law, the references to Rule 29 then, were not inconsistent with, but rather encompassed, objection as a matter of law.

That a court must evaluate some facts in determining whether a fiduciary duty exists does not mean that the determination is not a matter of law. *Yates v. United States*, 354 U.S. 298 (1957) illustrates this point. The conspiracy charged in *Yates* had two objectives – advocating and teaching the overthrow of the government and organizing as the Communist party with the intent to overthrow the government. The Court concluded that the term "organize" was limited to the initial organization. 354 U.S. at 310. Because the Communist Party had been organized in 1945 and the indictment was returned in 1951, the statute of limitations had run on the organizing

charge, the organizing ground was legally inadequate "and required the withdrawal of that part of the indictment from the jury's consideration." *Id.* at 312. The conviction was vacated. In determining that the organizing ground was legally inadequate, the Court looked at a fact - the date of the return of the indictment *See also Black v. United States*, 561 U.S. 465 (2010) (vacating conviction where government presented alternative theories of money or property fraud and honest services fraud and honest services fraud instructions were erroneous); *United States v. Sawyer*, 85 F.3d 713, 730-31 (1st Cir. 1996) (vacating honest services fraud conviction where scheme to defraud was based on alleged violations of Massachusetts gift and Massachusetts gratuities statute but gift statute, as charged, was legally insufficient basis to find scheme to defraud).

In *Griffin v. United States*, 502 U.S. 46 (1991) defendant was charged with a conspiracy to defraud the United States alleged to have two objects – impairing the IRS efforts to ascertain taxes and impairing DEA efforts to ascertain forfeitable assets. The evidence at trial did not connect defendant to the DEA objective. The jury returned a general verdict of guilty. The Court upheld the conviction, distinguishing between arguments based on evidentiary insufficiency and legal inadequacy. 502 U.S. at 58-60. It stated that "[o]ur continued adherence to the holding of *Yates* is not at issue in this case." *Id.* at 56.

Here, the rule of *Yates* applies. While the factors that go into determining whether, as a matter of law, an individual owes a fiduciary duty to another entity or

person may entail looking at facts, the existence of that duty is a matter of law. And here, the court erroneously instructed the jury that, as a matter of law, Pullman owed a fiduciary duty to the Commonwealth of Massachusetts. Whether he breached a fiduciary duty would be a factual question for the jury. Whether that duty existed was not. The instruction was legal error; evaluating the factors relevant to determining the existence of a fiduciary duty, Pullman could not owe a fiduciary duty to the Commonwealth of Massachusetts when he was representing the union in a grievance proceeding against the Commonwealth and seeking money from it –ultimately more than $21,000,000.00 directly to troopers and millions more in days credited to troopers. Since the jury may have based its verdict based on the legally erroneously theory that Pullman owed a fiduciary duty to the Commonwealth *Yates* and not *Griffin*, applies and the honest services fraud conviction must be vacated.

18

## CONCLUSION

For the reasons set forth above and in Appellants Opening Brief this Court should order the entry of judgments of acquittal on counts I-V, VIII, and X. At minimum it should order a new trial on counts I and II.

Dated: August 24, 2024

Respectfully submitted,
by his attorney,
*/s/ Judith H. Mizner*
Judith H. Mizner, AFPD
Federal Defender Office
District of Massachusetts
51 Sleeper Street 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No. 11056

## CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)

I, Judith Mizner, hereby certify that the foregoing brief of appellant Dana Pullman complies with the type-volume limitation of FRAP 32(a)(7).

1. The brief contains 4,735 words excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).

2. The brief has been prepared in a proportionally spaced typeface using word in 14 point Garamond.

*/s/Judith H. Mizner*

Judith H. Mizner

## CERTIFICATE OF SERVICE

I, Judith H. Mizner, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, including all counsel of record for the respondent, Alexia DeVincentis, Donald C. Lockhart, Kristina E. Barclay, and Neil J. Gallagher, Jr., as identified on the Notice of Electronic Filing on. August 24, 2024.

*/s/Judith H. Mizner*

Judith H. Mizner